Robert P. Goe - State Bar No. 137019
Elizabeth A. LaRocque – State Bar No. 219977
Donald W. Reid – State Bar No. 281743
**GOE & FORSYTHE, LLP**
18101 Von Karman Avenue, Suite 510
Irvine, CA 92612
rgoe@goeforlaw.com
elarocque@goeforlaw.com
dreid@goeforlaw.com

Telephone:  (949) 798-2460
Facsimile:   (949) 955-9437

Attorneys for Mega RV Corp.,
Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>MEGA RV CORP., a California Corporation; d/b/a McMahon's RV; d/b/a McMahon's RV Irvine; d/b/a McMahon's RV Colton; d/b/a McMahon's RV Palm Desert,<br><br>Debtor and Debtor-in-Possession. | Case No. 8:14-bk-13770-MW<br><br>Chapter 11 Proceeding<br><br>**NOTICE OF MOTION AND MOTION FOR ORDER EXTENDING DEBTOR'S EXCLUSIVITY PERIOD FOR FILING A PLAN OF REORGANIZATION AND OBTAINING ACCEPTANCE OF A PLAN OF REORGANIZATION PURSUANT TO 11 U.S.C. § 1121(d); DECLARATION OF ROBERT P. GOE IN SUPPORT THEREOF**<br><br>Hearing Date: November 24, 2014<br>Time:              2:00 p.m.<br>Courtroom:    6C<br>                     411 West Fourth Street<br>                     Santa Ana, CA 92701 |

**TO THE HONORABLE MARK S. WALLACE, UNITED STATES BANKRUPTCY JUDGE, THE UNITED STATES TRUSTEE, AND TO ALL CREDITORS AND PARTIES IN INTEREST:**

1

MEGA RV CORP., a California corporation, dba McMahon's RV; dba McMahon's RV Irvine; dba McMahon's RV Colton; and dba McMahon's RV Palm Desert ("Debtor"), a California corporation, hereby submits this Motion for Order Extending Debtor's Exclusivity Period for Filing a Plan of Reorganization and Obtaining Acceptance of a Plan of Reorganization pursuant to 11 U.S.C. § 1121(d) ("Motion").

**PLEASE TAKE NOTICE THAT, ACCORDING TO LOCAL BANKRUPTCY RULE 9013-1(a), ANY OPPOSITION TO THIS MOTION SHALL BE FILED WITH THE COURT AND SERVED ON THE DEBTOR'S COUNSEL NOT LATER THAN FOURTEEN (14) CALENDAR DAYS (NOT EXCLUDING SATURDAYS, SUNDAYS AND LEGAL HOLIDAYS) PRIOR TO THE HEARING ON THE MOTION.**

DATED: October 10, 2014                    **GOE & FORSYTHE, LLP**

By: /s/Robert P. Goe
    Robert P. Goe, Proposed Counsel for
    Debtor and Debtor-in-Possession

# I.

# INTRODUCTION

On June 15, 2014 ("Petition Date"), the Debtor and Debtor-in-Possession Mega RV Corp. ("Debtor") filed a voluntary petition under chapter 11 of the Bankruptcy Code. Pursuant to 11 U.S.C. § 1121(b) and (c), Debtor's exclusivity periods for filing a plan of reorganization and obtaining acceptance of a plan of reorganization will expire on October 13, 2014 and December 12, 2014, respectively.

The Debtor hereby files this Motion for an Order Authorizing Extending the Exclusive Period for the Filing of a Plan and Acceptance of a Plan Pursuant to 11 U.S.C. § 1121(d) (the "Motion"). Debtor requests that such exclusivity periods be extended for "cause" under 11 U.S.C. § 1121(d)(1) for ninety (90) days, or from October 13, 2014 to January 11, 2015, and from December 12, 2014 to March 12, 2015, respectively.

As discussed below, this bankruptcy case is particularly large and complex. The Debtor is currently marketing its assets for sale, while simultaneously conducting settlement negotiations with its secured lender, GE Distribution Finance Corporation ("GE"). The Debtor and GE will attend formal mediation on October 13-14, 2014 before Judge Goldberg (ret.). The Debtor is hopeful the mediation will result in a settlement. However, if the mediation is not successful, the Debtor is preparing to litigate its claims against GE in an adversary proceeding before this Court or other forum. Until such contingencies are resolved, the Debtor is unable to propose a plan of liquidation at this time. Accordingly, the Debtor respectfully requests that the Court extend the Debtor's exclusivity periods by ninety (90) days.

# II.

# BACKGROUND

### A.    History of the Debtor[1]

The Debtor was formed on December 12, 2000, and has operated as McMahon's RV until April 2014. Brent McMahon ("McMahon") is the Debtor's CEO and 100% shareholder. From 2000

---

[1] The facts are set forth in previously filed declarations of Brent McMahon.

3

until 2014, the Debtor sold and serviced new and used RVs throughout Southern California, with locations in Westminster, Colton and Palm Desert. The Debtor was the number one dealer of RVs in California in 2011 and 2012 and number two in 2013 based on the data compiled by Statistical Surveys Inc. Winnebago awarded the Debtor the largest dealer west of the Mississippi designation in 2011, 2012 and 2013. Debtor has sold annually $180 million of RVs, new and used, and parts and service. Despite its strong sale efforts, the Debtor had incurred operating losses for several years leading up to the Petition Date.

### B. The Inventory Financing Agreement with GE

From 2006 until 2011, Debtor's revolving credit line with GE Distribution Finance Corporation ("GE") was managed by GE's office in Phoenix, Arizona (the "Phoenix Office"). At the time, the Phoenix Office housed the entire RV division of GE. The Phoenix Office was very knowledgeable regarding the RV industry, including its business cycles and industry norms.

On or about May 8, 2006, the Debtor entered into an Inventory Financing Agreement (the "IFA") with GE pursuant to which GE extended credit to the Debtor to obtain and sell RVs. In return, Debtor granted GE a security interest in certain collateral, including inventory, equipment, fixtures and accounts. Cash proceeds, however, were not included as part of GE's collateral under the IFA. In connection with the IFA in 2006, GE extended to Debtor a line of credit up to $10,000,000.

Within the dealership industry, the IFA is known as "floor plan financing." The IFA is self-limited to general terms because the specific terms for any advance depended on various factors, including the availability of vendor discounts, payment terms or other incentives, GE's floor planning volume with Debtor, and other economic factors. Upon agreeing to finance an item of inventory for Debtor, GE would transmit a Transaction Statement to Debtor that identifies the collateral financed and the terms of the certain advance made. Then, after Debtor sold the financed inventory to a customer, Debtor would remit payment of the financed amount with interest to GE (i.e., a "floor payment").

During Debtor's course of dealing with the Phoenix Office, the standard operating procedure, for years, was that GE allowed Debtor to sell RVs "out of trust," i.e., to receive

1  payment for RVs from customers without immediately remitting the sale proceeds to GE to pay

2  off GE's lien. The reason for this practice was that Debtor would often address operational costs

3  prior to immediately remitting payment to GE. While such practice was technically a default

4  under the IFA, the Phoenix Office treated such defaults as immaterial because it was (and is)

5  common practice within the industry. Indeed, GE measured Debtor's performance under the IFA

6  by how quickly Debtor made the floor payments to GE after RVs were sold out of trust.

7  Generally, the parties considered 3 to 5 days after funding to be outstanding, 7 to 10 days after

8  funding to be acceptable, and 11 to 12 days after funding as less than desirable but still permitted.

9  GE itself has admitted this practice with Debtor through a representative's deposition testimony

10  from a related case: "Q. And what number, what average number of days outstanding would be

11  high? Anything over how many days? A. Anything over 10."

12  Under this course of dealing, Debtor maintained a good relationship with GE. While

13  Debtor occasionally had a rare lull in sales that would cause a temporary increase in days after

14  funding, Debtor was always able to cure such issues within a very short period of time due to its

15  consistently high sales volume.

16  **C.    GE Increases Debtor's Credit Line and Consolidates Debtor's Credit Facility**

17  In August 2010, GE approved Debtor's increase in the maximum extension of credit available

18  to Debtor, increasing its line from $10,000,000 to $13,000,000. In that same letter, GE notified Debtor

19  of its multiple defaults, which GE was willing to waive. On June 9, 2011, GE again approved

20  Debtor's increase in the maximum extension of credit available to Debtor, increasing its line from

21  $13,000,000 to $18,000,000.  Only 6 months later, on December 20, 2011, GE again approved

22  Debtor's increase in the maximum extension of credit available to Debtor, increasing its line from

23  $18,000,000 to $38,000,000. In between June 9, 2011, and December 20, 2011, GE purchased (at a

24  likely substantial discount) Debtor's credit line with Bank of America ("BOA") and thereby

25  consolidated Debtor's credit line. On the same day that it more than doubled (and consolidated)

26  Debtor's credit line, GE issued a notice of default to Debtor, which, again, GE simultaneously waived.

27  / / /

28

### D. GE Utilizes Debtor to Sell Auction Units GE Repossessed From Other Dealerships

Starting in 2009, GE began imposing on Debtor to take repossessed units off of GE's books by providing Debtor with lists of units Debtor was to purchase at auction and then to sell from Debtor's lots ("Auction Units"). Debtor was required to use portions of the credit facility to buy the Auction Units, which restricted Debtor's ability to acquire new inventory. This procedure lasted into 2011, with Auction Units still being sold after sitting on Debtor's lots for years into 2012.

### E. GE Exerts Control Over the Debtor in 2012

Shortly after GE consolidated Debtor's credit lines in December 2011, Debtor and GE began to disagree on how they measured flooring payments. GE desired to unilaterally change the parties' course of dealing on when Debtor sold RVs out of trust and how many days were acceptable thereafter to pay GE. Previously, GE would accept payment at least 12 days after Debtor received payment on GE's inventory. Debtor had little, if any, leverage to oppose these changes because, after the consolidation, GE was Debtor's only remaining credit facility for financing inventory purchases and GE could force the closure of Debtor's business if Debtor did not acquiesce to all of its demands.

Debtor had a difficult time meeting the new requirements imposed by GE as its performance varied due to fluctuating sales, trade-ins, and seasonal trends within the industry. As a result, Debtor attempted to improve its financial performance by cutting costs across the board. Debtor renegotiated the leases with its landlords to more favorable terms and made significant cuts to its payroll.

These changes alone, however, were not enough because Debtor continued to pay an exorbitant interest rate on the advances made by GE. Most dealerships pay LIBOR plus 2 to 3 percent to their lenders; GE, however, continually required Debtor to pay LIBOR plus 6 to 7 percent. In fact, during the past few years, Debtor paid GE more than $10,000,000 in interest expense charges. Debtor made numerous requests to GE to reduce the interest rate, but GE refused. What is perhaps most significant about GE's unwillingness to change the interest rate is that, in the industry, the interest rate is related to the number of days the lender permits the RV borrower to be out of trust. As evidence of how one-sided negotiations became after GE consolidated Debtor's line of credit, GE refused to reduce the interest rate of LIBOR plus 6 to 7 percent while it simultaneously required Debtor to reduce

the number of days it paid GE for out of trust payments.

Despite Debtor's performance issues in 2012, GE extended Debtor's line of credit, increasing it to $50,000,000 in August 2012, assuring Debtor that the Phoenix Office would continue to manage the Debtor's account. Less than a month later, GE reassigned Debtor's account to GE's Chicago office (the "Chicago Office"). Unlike the Phoenix Office, the Chicago Office had virtually no experience in the RV industry.

### F.    GE Exerts Control Over the Debtor in 2013

On March 28, 2013, GE sent Debtor a notice of performance issues, covenant default and waiver, reservation of rights and performance conditions agreement (the "March 2013 Letter Agreement"). According to the March 2013 Letter Agreement, Debtor had approximately $2,593,999.87 of past due payments owed to GE. GE demanded that Debtor pay $1,500,000 of that amount in less than a week. The March 2013 Letter Agreement also required Debtor to agree to several new covenants involving EBITDA requirements which would be very difficult, if not impossible, to obtain after GE depleted the Debtor of $1,500,000 through the same agreement. GE, also through that same March 2013 Letter Agreement, reduced Debtor's credit facility to $47,000,000, effective as of May 1, 2013.

After the Debtor was forced to sign the March 2013 Letter Agreement, the Notices of Default followed because of Debtor's predictable failure to maintain the nearly insurmountable EBITDA covenants as well as payment covenants arising from that agreement. GE issued notices of default related to those EBITDA and payment covenants on, among other dates, May 21, 2013, June 26, 2013, and July 26, 2013. After GE issued these default notices, it moved the Debtor to GE's "workout group."

With these numerous default letters, GE required Debtor to sign several new agreements and documents, all with the threat that if Debtor did not sign such documents, GE would terminate financing and the Debtor would be out of business. Specifically, GE required Debtor to sign the 2013 IFA Amendment, dated December 10, 2013, which was not the result of arms-length negotiations. Under the 2013 IFA Amendment, GE required that Debtor establish a deposit account with Wells Fargo, which would be subject to a deposit account control agreement. The 2013 IFA Amendment

also required, among other things, that (1) Debtor pay BOE at least $900,000 in less than two weeks from the date of signing the 2013 IFA Amendment, (2) McMahon contribute cash not less than $500,000 to the Debtor, and (3) an RV manufacturer loan Debtor $2,000,000. Id. at pp. 9-10. Debtor obtained that $2,000,000 loan from Forest River, one of its manufacturers. GE demanded that some of that loan be paid to BOE with the remainder directed to GE, thus leaving Debtor with very little operating capital.

### G. The Control Agreement

On or about January 23, 2014, GE forced the Debtor to sign the Control Agreement under threat of accelerating all of Debtor's debt. The Control Agreement requires Debtor to acknowledge that GE now had a security interest "in all of [Debtor's] right, title and interest in and to the Collateral Accounts and all sums now or hereafter on deposit in or payable or withdraw able from the Collateral Accounts." Under the Control Agreement, the Debtor was forced to agree that Wells Fargo, the bank maintaining the account, would comply with instructions given to it by GE "directing disposition of funds in the Collateral Accounts without further consent by [the Debtor]." GE had the right to deny Debtor access to any Collateral Accounts or Collateral Account Funds, each as defined in the Control Agreement, after Debtor received an Access Termination Notice, also as defined in the Control Agreement, even if the Debtor had objections. In other words, based on this agreement, GE could accelerate and sweep Debtor's debt at any time and without any reasonable notice to Debtor or its other creditors. At the time that Debtor executed the Control Agreement, the Debtor was insolvent and GE was undersecured.

### H. GE Exerts Control Over the Debtor in 2014

GE's next action was to "strongly suggest[]" that Debtor stop attending large tent sale events. Debtor had become a prominent dealer in the Southern California market, in part, due to its strategy of doing such large tent sale events. These events typically last 10-14 days and were responsible for 40% of Debtor's business. Pursuant to GE's demands, Debtor cancelled its upcoming show at the Rose Bowl in February 2014, which severely impacted Debtor's cash-flow. Notwithstanding these limitations, Debtor experienced a large sales volume in January and February of 2014.

Also in early 2014, GE demanded Debtor hire an outside consulting company, at a cost over $50,000, or an accounting firm to do audited financials, at a cost between $70,0000 to $100,000; otherwise, as had become standard with GE – it would force Debtor out of business.  As a result, Debtor hired an outside consulting company, Focus Management Group ("FMG").  FMG's final report, dated March 25, 2014, after FMG submitted more than $50,000 worth of invoices to the Debtor, presented an extremely one-sided, negative view of the company, failing to highlight very few, if any, of the positive attributes which made the Debtor successful.  Notably, even FMG's negative report of the Debtor recognized the course of dealing with payments made out of trust: "Based on December to February deal data, 69.8% of sales are paid to GE under the floor plan line of credit. It is assumed those payments will be made the week after the sale."

### I.    GE Sweeps the Debtor's Accounts and Forces the Debtor into Bankruptcy

Within days after FMG issued its final report to GE, GE issued a Notice of Acceleration, dated March 31, 2014 (the "Notice of Acceleration"), stating Debtor owed outstanding floor payments in the amount of $3,205,448.49, a relatively small amount that Debtor had previously cured and could cure again in a matter of weeks due to its consistently high sales.  Shortly thereafter, and less than 90 days before the Petition Date, GE, acting on a clause of the Control Agreement that Debtor was forced to sign, swept over $5,000,000 from Debtor's bank accounts in consecutive days and placed a lock on the account so that Debtor had no monies with which to operate.

The sweep was unprecedented in the dealership industry, in which it is customary for a financing institution to give a dealership 30 to 60 days to find a new flooring institution in order to avoid destroying the dealership's business.  It was also unprecedented in the course of dealing between GE and the Debtor because GE regularly forgave defaults regarding out of trust payments. Instead of following industry standards and the parties' course of dealing, GE seized all of Debtor's funds, including $1,858,308.25 in excess of the alleged default amount. GE acted with complete and utter indifference as to how its sweep affected the interests of other creditors. Indeed, most of the monies swept by GE were funds held by Debtor in trust for others, including, inter alia, the following:

    (1) sales tax collected for the benefit of BOE;

    (2) license and registration fees collected for the benefit of the Department of Motor Vehicles;

    (3) monies allocated for trade payoffs;

    (4) monies earmarked for employee payroll; and

    (5) hundreds of thousands of dollars in customer deposits.

GE's sweep of the accounts and subsequent shuttering of Debtor's business interrupted the normal commercial process of financed contracts being purchased by financial institutions ("contracts in transit"). These paper buyers would not go forward because there was no longer anyone to stand behind the dealership's representations and warranties with respect to the contracts and the purchased units. There are approximately $2 million of contracts in transit leaving scores of customers in limbo.

Over the following weeks, Debtor repeatedly asked GE to release those funds held in trust. In particular, Debtor advocated for the release of the contracts in transit so that customers who had fully paid for RVs could take possession of their vehicles. GE refused. And, GE continues to refuse to restore any of the funds that Debtor had held in trust, including the contracts in transit, to the detriment of other creditors.

On April 4, 2014, GE filed a complaint in United States District Court, Central District of California, Santa Ana Division, for possession of personal property, temporary restraining order, and preliminary injunction. Within days the Court issued a temporary restraining order, enjoining the Debtor from selling or otherwise disposing of GE's collateral until further order of the Court. On June 15, 2014, Debtor filed the above-referenced chapter 11 case to halt GE's destructive collection efforts.

As of June 26, 2014, GE asserts that Debtor owes $31,507,448.44 to GE, while the fair market value of GE's collateral is "at most $25,031,926" and is purportedly "subject to decline based on the aging of the units of inventory and upon the deterioration of the condition of the units." GE admits in that same declaration that it is undersecured by an amount "in excess of $5.0 million." Similarly, GE was undersecured for the final year leading up to and on the Petition Date.

///

## III.

## **CURRENT STATUS OF THE BANKRUPTCY CASE**

Since the Petition Date, the Debtor has made significant progress towards administering its bankruptcy estate and has developed three alternative strategies towards liquidating this estate.

The first option centers on the sale of the Debtor's assets. To that end, the Debtor employed J. Michael Issa of GlassRatner Advisory and Capital Group, LLC ("GlassRatner") to serve as the Debtor's financial adviser and to manage the process of selling the Debtor's assets to industry players. Mr. Issa is a well-known and eminent authority on dealership operations and has been involved in dozens of completed transactions involving franchised dealerships. Mr. Issa has aggressively marketed the Debtor's assets and will continue to do so until he consummates a sale or the Debtor ultimately chooses to pursue a different strategy.

The second option is reaching a global settlement with GE. The Debtor asserts certain claims against GE for its role in the destruction of the Debtor's business, including causes of action for equitable subordination and preferential transfer, among others. The Debtor has employed Brown Rudnick LLP as its special litigation counsel. The Debtor and GE continue to engage in settlement negotiations. On October 13-14, 2014, the Debtor and GE will formally mediate their disputes before Judge Goldberg (ret.). The Debtor is hopeful that a settlement can be reached with GE that will, among other things, provide for payment to the Debtor's other creditors, including its customers, who were harmed by GE's unprecedented sweep.

The third option is prosecution of the Debtor's claims against GE in an adversary proceeding before this Court or in another forum. The Debtor is hopeful that litigation will not be necessary but is willing and preparing to litigate its claims against GE if a global settlement cannot be reached.

## IV.

## **ARGUMENT**

In chapter 11, a debtor-in-possession has the exclusive right to file a plan during the first 120 days following the petition date, and to obtain acceptance of such plan during the first 180 days following the petition date. 11 U.S.C. § 1121(b), (c)(3). The court may, on the request of a

party in interest, reduce or increase the 120-day period or the 180-day period. 11U.S.C. § 1121(d)(1). The party seeking an extension or reduction bears the burden of establishing cause for the court to do so based upon the facts and circumstances of the particular case. See e.g., In re Dow Corning Corp., 208 B.R. 661, 663 (Bankr. E.D. Mich. 1997).

When determining whether "cause" exists to extend a debtor-in-possession's exclusivity period, courts consider the following nine factors:

1. the size and complexity of the case;
2. the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;
3. the existence of good faith progress toward reorganization;
4. the fact that the debtor is paying its bills as they become due;
5. whether the debtor has demonstrated reasonable prospects for filing a viable plan;
6. whether the debtor has made progress in negotiations with its creditors;
7. the amount of time which has elapsed in the case;
8. whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and
9. whether an unresolved contingency exists

In re Meatco Provisions, LLC, 2014 Bankr. LEXIS 914 (Bankr. C.D. Cal. 2014) (citing In re Dow Corning Corp.,208 B.R. at 664-665).

At this time, the totality of the Dow Corning factors weigh in favor of granting the Debtor's Motion. Clearly, the Debtor's case is large and complex as the Debtor operated dealerships at three locations leased from three separate landlords. After the GE sweep, the Debtor has no liquid assets to pay its accumulating administrative expenses. The Debtor's reorganization is dependent upon either (i) the Debtor selling its assets; (ii) the Debtor reaching a settlement of its claims against GE; or (iii) the Debtor litigating its claims against GE to judgment. All three strategies are complex and time-intensive. One hundred and twenty (120) days is simply not enough time to determine the most appropriate strategy, let alone file a plan of reorganization based on such strategy.

To date, the Debtor has made good faith progress towards administrating this estate. As discussed above, the Debtor has aggressively marketed its assets for sale and is conducting settlement negotiations with GE. The Debtor has also resolved numerous motions for relief from the automatic stay by stipulation, and has also opposed several such motions that would adversely

affect the estate.  This is the Debtor's first request to extend the exclusivity periods.  By the time of the hearing on this Motion, this case will have been pending for approximately five (5) months. Based upon such circumstances, there is clearly "cause" to extend the Debtor's exclusivity periods for ninety (90) days pursuant to 11 U.S.C. § 1121(d).

## IV.

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests entry of an order (i) extending the Debtor's exclusive right to file a plan of reorganization and gain acceptance of a plan of reorganization to and including January 11, 2015 and March 12, 2015, respectively, and (ii) granting the Debtor such other and further relief as is just.

DATED:  October 10, 2014

Respectfully submitted by:

**GOE & FORSYTHE, LLP**

By: /s/Robert P. Goe
    Robert P. Goe
    For Debtor and Debtor-in-Possession,
    Mega RV, Inc.

**DECLARATION OF ROBERT P. GOE**

I, Robert P. Goe, declare and state:

1. I am a partner of Goe & Forsythe, LLP, (the "Firm") general insolvency counsel to the debtor and debtor-in-possession, Mega RV Corp. ("Debtor"). I am over 18 years of age. Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently thereto. I make this declaration in support of the Motion to which this declaration is attached. Any terms not otherwise defined herein have the same meanings as in the Motion.

2. On June 15, 2014 ("Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code. Pursuant to 11 U.S.C. § 1121(b) and (c)(3), Debtor's exclusivity periods for filing a plan of reorganization and obtaining acceptance of a plan of reorganization will expire on October 13, 2014 and December 12, 2014, respectively. By way of this Motion, the Debtor is requesting the Court extend such periods for ninety (90) days to January 11, 2015 and March 12, 2015, respectively. The Debtor contends that "cause" exists to extend the exclusivity periods pursuant to 11 U.S.C. 1121(d).

3. Since the Petition Date, the Debtor has made significant progress towards administering its bankruptcy estate and has developed three alternative strategies towards liquidating this estate.

4. The first option centers on the sale of the Debtor's assets. To that end, the Debtor employed J. Michael Issa of GlassRatner Advisory and Capital Group, LLC ("GlassRatner") to serve as the Debtor's financial adviser and to manage the process of selling the Debtor's assets to industry players. Mr. Issa is a well-known and eminent authority on dealership operations and has been involved in dozens of completed transactions involving franchised dealerships. Mr. Issa has aggressively marketed the Debtor's assets and will continue to do so until he consummates a sale or the Debtor ultimately chooses to pursue a different strategy.

5. The second option involves the Debtor's settlement negotiations with GE. The Debtor asserts certain claims against GE for its role in the destruction of the Debtor's business, including causes of action for equitable subordination and preferential transfer, among others.

The Debtor has employed Brown Rudnick LLP as its special litigation counsel. The Debtor and GE continue to engage in settlement negotiations. On October 13-14, 2014, the Debtor and GE will formally mediate their disputes before Judge Goldberg (ret.). The Debtor is hopeful that a settlement can be reached with GE that will, among other things, provide for payment to the Debtor's other creditors, including its customers, who were harmed by GE's unprecedented sweep.

6. The third option is prosecution of the Debtor's claims against GE in an adversary proceeding. The Debtor is hopeful that litigation will not be necessary but is willing and preparing to litigate its claims against GE if a global settlement cannot be reached.

7. To date, the Debtor has made good faith progress towards administrating its estate. As discussed above, the Debtor is marketing its assets for sale and is conducting settlement negotiations with GE. The Debtor has also resolved numerous motions for relief from the automatic stay by stipulation, and has opposed several such motions that would adversely affect the estate.

8. This Motion represents the Debtor's first request for an extension of the exclusivity periods. By the time of the hearing on this Motion, this case will have been pending for approximately five (5) months. The Debtor contends that the foregoing circumstances warrants "cause" to continue the exclusivity periods for ninety (90) days.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 10th day of October 2014 in Irvine, California.

*/s/ Robert P. Goe*
Robert P. Goe

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 18101 Von Karman Avenue, Suite 510, Irvine, CA 92612

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF MOTION AND MOTION FOR ORDER EXTENDING DEBTOR'S EXCLUSIVITY PERIOD FOR FILING A PLAN OF REORGANIZATION AND OBTAINING ACCEPTANCE OF A PLAN OF REORGANIZATION PURSUANT TO 11 U.S.C. § 1121(d); DECLARATION OF ROBERT P. GOE IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) October 10, 2014, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) October 10, 2014, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows: Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Greenberg Glusker Fields Claman & Machtinger LLP, 1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: (state the method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) October 10, 2014, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows: Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

- The Honorable Mark Wallace, USBC, 411 West Fourth Street, Santa Ana, CA 92701

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 10, 2014 | Susan C. Stein | /s/Susan C. Stein |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

- **James C Bastian**   jbastian@shbllp.com
- **James C Behrens**   jbehrens@greenbergglusker.com, jreinglass@ggfirm.com;kwoodson@ggfirm.com;sgaeta@ggfirm.com;calendar@ggfirm.com
- **Michelle M Bertolino**   mbertolino@fwwlaw.com, dgeorge@fwwlaw.com
- **Ryan S Carrigan**   rscarriganecf@gmail.com, rscarriganlaw@gmail.com
- **Louis S Chronowski**   lchronowski@dykema.com
- **Donald H Cram**   dhc@severson.com, jc@severson.com
- **Brian L Davidoff**   bdavidoff@greenbergglusker.com, kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;jking@greenbergglusker.com
- **Vincent W Davis**   v.davis@vincentwdavis.com, mary@vincentwdavis.com;e.bershatski@vincentwdavis.com
- **Rennee R Dehesa**   rdehesa@rstlegal.com, alopez@rstlegal.com
- **Andrew S Elliott**   ase@severson.com, pag@severson.com
- **Lauren N Gans**   lgans@shensonlawgroup.com
- **Duane M Geck**   dmg@severson.com, pag@severson.com
- **Janel M Glynn**   janel.glynn@gknet.com, rachel.milazzo@gknet.com
- **Robert P Goe**   kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- **Richard H Golubow**   rgolubow@winthropcouchot.com, pj@winthropcouchot.com;vcorbin@winthropcouchot.com
- **Gregory K Jones**   GJones@dykema.com, CPerez@dykema.com
- **John H Kim**   jkim@cookseylaw.com
- **Andrew B Levin**   alevin@winthropcouchot.com, bayrelevin@hotmail.com;pj@winthropcouchot.com;mconour@winthropcouchot.com
- **Erica T Loftis**   bknotice@rcolegal.com
- **Elizabeth A Lossing**   elizabeth.lossing@usdoj.gov
- **Melissa Davis Lowe**   mdavis@shbllp.com, lverstegen@shbllp.com
- **Marc S Mazer**   mazer@bwmlaw.com, elizabeth@bwmlaw.com
- **David W. Meadows**   david@davidwmeadowslaw.com
- **Joel S. Miliband**   jmiliband@brownrudnick.com
- **Scott Montgomery**   smontgomery@abbeylaw.com, ldabbs@abbeylaw.com
- **Gerard W O'Brien**   gerardwobrien@gmail.com, missjanperalta@gmail.com
- **Barry L O'Connor**   udlawBK@aol.com
- **Aram Ordubegian**   ordubegian.aram@arentfox.com
- **Courtney E Pozmantier**   cpozmantier@greenbergglusker.com, kwoodson@greenbergglusker.com;jking@greenbergglusker.com;calendar@greenbergglusker.com
- **Yuval M Rogson**   yuval@rogsonlaw.com, yrogson@hotmail.com
- **Gregory M Salvato**   gsalvato@salvatolawoffices.com, calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com
- **Allan D Sarver**   ADSarver@aol.com
- **Kenneth Schnur**   schnur@bwmlaw.com, elizabeth@bwmlaw.com
- **Summer Shaw**   hanlaw@aol.com
- **Jonathan Shenson**   jshenson@shensonlawgroup.com
- **Arash Shirdel**   ashirdel@pacificpremierlaw.com, ECF@pacificpremierlaw.com
- **Ramesh Singh**   claims@recoverycorp.com
- **Arjun Sivakumar**   asivakumar@brownrudnick.com
- **Wayne R Terry**   wterry@hemar-rousso.com
- **United States Trustee (SA)**   ustpregion16.sa.ecf@usdoj.gov
- **Danielle K Wakefield**   dwakefield@bplawgroup.com, danielle@wakefieldlawfirm.com
- **Sam S Yebri**   syebri@mylawllp.com

**TO BE SERVED BY UNITED STATES MAIL**:

United States Trustee (SA)
411 West Fourth Street, Suite 9041
Santa Ana, CA 92701

Bank of the West
c/o Mark S. Blackman, Esq.
6345 Balboa Blvd., Suite 300
Encino, CA 91316

Forest River, Inc.
55470 County Road 1
P.O. Box 3030
Elkhart, IN 46514
Attn: Joe Greenlee, CFO

Winnebago Industries, Inc.
605 W. Crystal Lake Road
Forest City, IA 50436
Attn: Scott C. Folkers, VP and General Counsel

GE Capital Commercial
c/o Wayne Terry, Esq.
Hemar Rousso & Heald LLP
15910 Ventura Blvd., 12th Fl
Encino, CA 91436-2829