1 | **DYKEMA GOSSETT** LLP
Gregory K. Jones (SBN 181072)
2 | *gjones@dykema.com*
333 South Grand Avenue, Suite 2100
3 | Los Angeles, CA 90071
Telephone: (213) 457-1800
4 | Facsimile: (213) 457-1850

5 | Attorneys for ROADTREK MOTORHOMES, INC.
a CANADA CORPORATION

6

7

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | **SANTA ANA DIVISION**

11 | In re

12 | MEGA RV CORP., a CALIFORNIA
CORPORATON,
13

14 | Debtor.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 8:14-bk-13770-MW

Chapter 11

Honorable Mark Wallace

**ROADTREK'S OBJECTION TO
DISCLOSURE STATEMENT**

<u>Hearing</u>

Date: July 27, 2015
Time: 9:00 a.m.
Place: Courtroom 6C

*(left margin, vertical text)* **DYKEMA GOSSETT LLP** 333 SOUTH GRAND AVENUE, SUITE 2100 LOS ANGELES, CA 90071

---

**ROADTREK'S OBJECTION TO DISCLOSURE STATEMENT**

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CA 90071

1 **TO THE UNITED STATES BANKRUPTCY COURT, THE DEBTOR, THE TRUSTEE,**

2 **THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:**

3     Creditor Roadtrek Motorhomes, Inc. ("Roadtrek") files this objection to Mega RV Corp.'s

4 ("Mega RV") disclosure statement because it significantly misleads creditors and overstates the

5 value of litigation between Roadtrek and Mega RV.  This Court should require Mega RV to revise

6 its disclosure statement so that it more accurately reflects reality, especially since the Roadtrek

7 Litigation is a significant so-called "asset" of the estate.  Mega RV's chance of recovery in the

8 Roadtrek Litigation is virtually zero.  Mega RV was a Roadtrek dealer from approximately 2002

9 until early 2010.

10     Mega RV describes the "Roadtrek State Court Action," as the appeals pending before the

11 California Court of Appeals.  The appeal is a consolidated appeal of each parties' respective appeal

12 of decisions from the California New Motor Vehicle Board.  Mega RV is appealing the NMVB's

13 decision allowing Roadtrek to terminate Mega RV's dealer agreements.  Roadtrek is appealing

14 other decisions of the NMVB.  In its brief, Mega RV states that "[i]f there is no recovery from the

15 Roadtrek State Court Action, the $25,000 plus costs does not have to be paid to [attorney Belcher]

16 by Mega RV or the estate." (Mega RV Br. at 39:21-23).  Mega RV has zero chance of recovering

17 any money in the Roadtrek State Court Action.   That is because it is axiomatic that the NMVB has

18 no jurisdiction to award money damages. *Duarte & Witting, Inc. v. New Motor Vehicle Bd.*, 104

19 Cal. App. 4th 626, 638 (Cal. Ct. App. 2002); *Hardin Oldsmobile v. New Motor Vehicle Bd.*, 52 Cal.

20 App. 4th 585, 593 (Cal. Ct. App. 1997).  Indeed, none of the NMVB decisions that are subject of

21 the appeal award money damages to either party.

22     The idea that there is a chance of a recovery represents a continued fundamental

23 misunderstanding by Mega RV's current counsel as to what happened before the NMVB.  Even

24 Mega RV's litigation counsel was not involved in the NMVB matters, except for the last hearing

25 before the entire board when the decisions were finalized.  Mega RV was represented by different

26 counsel in the NMVB matters.  Mega RV's motion to lift the bankruptcy stay regarding the

27 Roadtrek litigation contained significant inaccuracies about the litigation.  Roadtrek brought this to

28

<div align="center">2</div>

**ROADTREK'S OBJECTION TO DISCLOSURE STATEMENT**

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CA 90071

1    the Court's attention when Roadtrek objected to Mega RV's motion to lift the stay.  [Docket No.

2    556].

3         Mega RV's evaluation of its chances of recovery in the Federal Court Action is equally off-

4    base.  Mega RV states that it "believes . . . that the estimated recovery could be in excess of $5

5    million."  (Mega RV Br. 39:12-13).  Mega RV has never produced any contemporaneous business

6    report or expert report in any action pending between Mega RV and Roadtrek that establishes any

7    amount of damages owed to Mega RV.  Mega RV's prediction of a $5 million recovery has no more

8    basis in reality than any random number Mega RV could assert.

9         Mega RV's claim for relief in the Federal Court Action is apparently based on its belief that

10   Roadtrek should have continued to provide motorhomes to Mega RV despite Mega RV's default of

11   its security agreement with Roadtrek.  Mega RV's mass default of its obligations to Roadtrek in the

12   fall of 2009 and early 2010 is set forth in the NMVB decision affirming Roadtrek's termination of

13   Mega RV's dealer agreements.  A copy of the termination decision is attached as Exhibit A.  The

14   NMVB, and the Superior Court, approved findings that:

15        Mega RV, by its own actions in failing to respond to Roadtrek's request for

16        "adequate assurances," has placed itself in the position of being without Roadtrek

17        inventory, parts and factory support, and it therefore unable to carry out the functions

18        of a Roadtrek franchisee.

19   (NMVB Termination Dec. at 37:1-3, Ex. A).  Interestingly, Mega RV's default of its obligations to

20   Roadtrek in late 2009 is similar to Mega RV's default of its obligations to GE CDF which led to this

21   bankruptcy.

22        There are numerous reason why Roadtrek was not obligated to continue providing

23   motorhomes to Mega RV and could not sell them after early 2010.  First, Mega RV's material prior

24   breach under the security agreement and dealer agreement excused Roadtrek's further performance.

25   See e.g.,  Filet Menu, Inc. v. C.C.L. & G., Inc., 79 Cal. App. 4th 852, 862 (Cal. Ct. App. 2000).

26   Roadtrek was not obligated to continue providing motorhomes to Mega RV when it defaulted on

27   payment for four motorhomes totaling over $200,000.  Those motorhomes remain unpaid.  Mega

28

3

**ROADTREK'S OBJECTION TO DISCLOSURE STATEMENT**

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CA 90071

1  RV stopped paying Roadtrek for parts in September 2008.  There is no court of theory of law that

2  will require Roadtrek to pay damages to Mega RV after its default of its obligations to Roadtrek.

3        Second, as discussed above, Mega RV failed to provide adequate assurances after demand

4  pursuant to the UCC Section 2-609.  Section 2-609 required Mega RV to provide adequate

5  assurance before Roadtrek was required to provide additional goods.  Mega RV had no available

6  floor plan credit to floor any Roadtrek motorhomes after Roadtrek withdrew its floorplan lending.

7  Without floorplan financing, Mega RV could not stock and sell Roadtrek motorhomes.  Indeed,

8  Roadtrek demanded adequate assurances under the UCC from Mega RV on December 14, 2009.

9  Mega RV never provided adequate assurances.

10        Even if Mega RV had the capacity to sell Roadtrek motorhomes, Mega RV will not be able

11  to recover any damages from Roadtrek.  The only contemporaneous accounting between Roadtrek

12  and Mega RV was produced by Roadtrek and entered in evidence in the NMVB.  A copy of that

13  accounting entered as Exhibit 496 is attached as Exhibit B.  Mega RV never produced any

14  contemporaneous business record or report presenting an alternative accounting or refuting

15  Roadtrek's accounting.  Roadtrek's accounting shows that net all obligations between the parties

16  Mega RV owes Roadtrek nearly $600,000[1].

17        Roadtrek appreciates that the estate has hired contingent fee counsel to represent the estate

18  in the pending federal court case.  Creditors may feel like there is nothing to lose by pursuing

19  litigation if Belcher will be paid on a contingency.  This cannot be further from the truth.  Briefing

20  will not be completed in the State Court Action until late this year.  Oral argument will follow and

21  the Court of Appeals will need time to issue a decision.  After the State Court Action is resolved,

22  the parties will jointly ask the Federal Court to lift the stay that it put in place pending the State

23  Court Action.  Then, the parties will likely file summary judgment motions.  If summary judgment

24  does not resolve all issues, a jury trial will ensue.  If that case is appealed, it will likely be years

25  before any distribution to creditors, if Mega RV is successful, which as discussed is extremely

26  _____

27      [1]    Roadtrek's claim in this bankruptcy, Claim No. 30-1,  is greater than $600,000 because Roadtrek has
other claims against Mega RV in the Federal Court Action.

28                                            4

**ROADTREK'S OBJECTION TO DISCLOSURE STATEMENT**

1   unlikely.  During this process, the estate will continue to spend money on professional expenses by

2   filing periodic reports and other filings.  Of course, the estate has largely been consumed by

3   professional expenses already.

4          Roadtrek's counsel has suggested to the Creditor's Committee counsel that the parties

5   discuss settlement.  Mutual interest has not been returned.  A reasonable settlement would benefit

6   creditors more than the so-called litigation that the estate intends to prosecute.

7          WHEREFORE, Roadtrek Motorhomes, Inc. objects to Mega RV's disclosure statement and

8   requests that the Court order Mega RV modify it for the reasons set forth above.

9

Dated:  July 13, 2015                          DYKEMA GOSSETT LLP

10

11

12                                        By:  /s/  Gregory K. Jones
                                              Gregory K. Jones
13                                            Attorneys for
                                              Roadtrek Motorhomes, Inc., a Canadian
14                                            corporation

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ROADTREK'S OBJECTION TO DISCLOSURE STATEMENT**

PAS01\854129.1
ID\GKJ - 110932\0001

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CA 90071

**EXHIBIT A**

NEW MOTOR VEHICLE BOARD
1507 - 21st Street, Suite 330
Sacramento, California 95811
Telephone: (916) 445-1888

### STATE OF CALIFORNIA

### NEW MOTOR VEHICLE BOARD

| | |
|---|---|
| In the Matter of the Protest of | |
| MEGA RV CORP. dba MCMAHONS RV, | **Protest Nos. PR-2244-10 and PR-2245-10** |
| Protestant, | |
| v. | |
| ROADTREK MOTORHOMES, INC., | |
| Respondent. | |

### DECISION

At its regularly scheduled meeting of August 23, 2012, the Public and Dealer Members of the Board met and considered the administrative record and Proposed Decision in the above-entitled matters. After such consideration, the Board adopted the Proposed Decision as its final Decision in these matters.

This Decision shall become effective forthwith.

IT IS SO ORDERED THIS 23rd DAY OF AUGUST 2012.

RAMON ALVAREZ C.
President
New Motor Vehicle Board

002803
A0097

NEW MOTOR VEHICLE BOARD
1507 – 21ST Street, Suite 330
Sacramento, California 95811
Telephone: (916) 445-1888

CERTIFIED MAIL

STATE OF CALIFORNIA

NEW MOTOR VEHICLE BOARD

In the Matter of the Protest of

MEGA RV CORP. dba MCMAHON'S RV,

                    Protestant,

          v.

ROADTREK MOTORHOMES, INC.,

                    Respondent.

Protest Nos. PR-2244-10 and PR-2245-10

**PROPOSED DECISION**
Vehicle Code section 3070)
[Termination – Colton & Irvine]

PROCEDURAL BACKGROUND

Parties and Counsel

1.     Protestant Mega RV Corp doing business as McMahon's RV (herein "Mega RV" or

"Protestant") is a recreational vehicle dealership, with several California and Arizona locations.  Until

early 2012, its primary dealership location was in Irvine, California at 6441 Burt Road, #10; on or about

March 31, 2012, Protestant relocated that dealership to 5400 Garden Grove Boulevard, Westminster,

California.

2.     Mega RV is a California corporation owned by Brent McMahon.  Mega RV is a

///

///

///

1

002804

A0098

1  "franchisee" within the meaning of Vehicle Code section 331.1.[1]

2      3.    Protestant is represented by the Law Offices of Michael J. Flanagan, by Michael J.

3  Flanagan, Esquire; Gavin M. Hughes, Esquire; Erin R. Hegedus McIntosh, Esquire; and Danielle R.

4  Vare, Esquire (as of 11/21/11), 2277 Fair Oaks Boulevard, Suite 450, Sacramento, California.

5      4.    Respondent Roadtrek Motorhomes, Inc. (herein "Roadtrek" or "Respondent")

6  manufactures Class B motorhomes.  It is located in Kitchener, Ontario, Canada.

7      5.    Roadtrek is a Canadian corporation.  Roadtrek is a "franchisor" within the meaning of

8  Section 331.2.

9      6.    Respondent is represented by Seyfarth Shaw, LLP, by Louis S. Chronowski, Esquire; and

10  Kavitha Janardhan, Esquire (until 5/1/12), 131 South Dearborn Street, Suite 2400, Chicago, Illinois.

11                          Preliminary Procedural Note

12      7.    Between January and July of 2010, Mega RV filed with the New Motor Vehicle Board

13  ("Board") 18 protests alleging violations of the Vehicle Code by Respondent Roadtrek involving Mega

14  RV's dealership locations in Irvine, Colton, Scotts Valley and Palm Desert.  By the first day of the hearing

15  in August 2011, 12 protests had been consolidated for hearing, and six protests had been dismissed.[2]

16      8.    Also in 2010, Mega RV filed with the Board two petitions (Petition Nos. P-456-10 and

17  P-457-10) against Roadtrek.  Both petitions were rejected upon first consideration and the portions of the

18  petitions that sought adjudication of the dispute pursuant to Section 3050(c)(2) were dismissed by the

19  Board at the June 15, 2010, and December 3, 2010, General Meetings, respectively.  The petitions also

20  requested that the Board direct the Department of Motor Vehicles (hereinafter "DMV") to conduct an

21  investigation of the allegations contained in the petitions and to order DMV to exercise any and all

22  authority over Respondent's Occupational License.  These requests were also denied at the meetings noted

23  above.

24

25  _____

[1] Hereinafter, unless otherwise indicated, all Section references are to the Vehicle Code.  The statutory references are subject to
26  some qualification: although the parties are properly identified as "franchisee" and "franchisor" under Sections 331.1 and
331.2, it was only as of January 1, 2009 that Section 331.3 ("recreational vehicle franchise"), as well as Sections 11713.22 and
27  11713.23 ("written [RV] franchise agreement" and "sale of new [RV]") were enacted.  Section 3072 ("establishing or
relocating RV dealerships") became effective January 1, 2004.
[2] In the 19 months between the first filing and the first day of hearing, several pre-hearing matters were heard and decided by
28  Presiding Administrative Law Judge ("ALJ") Anthony M. Skrocki.

                                    2
                          PROPOSED DECISION

002805

A0099

9.      On January 31, 2012, the September 20, 2010 order of consolidation for purposes of the merits hearing was amended for preparation of the Proposed Decisions and Decision by the Board; the new order consolidated the 12 protests into five groups, as follows:

| Section | Type of Violation | Date Filed | Protest Nos. |
|---|---|---|---|
| Section 3070(b) | Modification | January 29, 2010<br>January 29, 2010<br>January 29, 2010 | PR-2198-10 (Scotts Valley)[3]<br>PR-2199-10 (Colton)<br>PR-2201-10 (Irvine) |
| Section 3075 | Warranty reimbursement violations | February 9, 2010<br>February 18, 2010<br>February 18, 2010 | PR-2206-10 (Colton)<br>PR-2208-10 (Irvine)<br>PR-2209-10 (Scotts Valley) |
| Section 3076 | Franchisor incentive program violations | February 9, 2010<br>February 18, 2010<br>February 18, 2010 | PR-2205-10 (Colton)<br>PR-2211-10 (Scotts Valley)<br>PR-2212-10 (Irvine) |
| Section 3072(a) | Establishment violations | May 11, 2010 | PR-2233-10 (Colton) |
| Section 3070(a) | "De facto termination" | July 13, 2010<br>July 13, 2010 | PR-2244-10 (Colton/Irvine)<br>PR-2245-10 (Scotts Valley) |

10.     A hearing on the merits of the 12 protests was held before Administrative Law Judge Diana Woodward Hagle on the following dates in 2011: August 9 through 12, inclusive; August 15 through 19, inclusive; September 21 through 23, inclusive; September 30; November 7 through 11, inclusive; November 14 and 15; November 17 and 18; and November 28 through December 2, inclusive. Hearing dates in 2012 were the following: January 9 and 10; January 12 and 13; January 18 and 19; January 31; and February 1.

11.     The hearing was re-opened for a telephonic hearing on April 26, 2012 to provide evidence of the relocation of Mega RV's primary dealership location from Irvine to Westminster.

12.     The matters were submitted on May 3, 2012.[4]

---

[3] Subsequently, Protestant requested dismissal of Protest PR-2198-10, which was ordered on March 6, 2012.

[4] In October 2010, counsel for the parties stipulated to extend the time the ALJ has to render the proposed decisions from 30 to 60 days after the matters were deemed submitted; the time for the Board to consider the proposed decisions was also extended from 30 to 60 days from the date the ALJ submits the proposed decisions. On May 29, 2012, counsel stipulated to extend the ALJ's time to final and sign the proposed decisions from 60 days to 90 days, or August 1, 2012.

3

002806

A0100

*Pendant Federal Case*

13.     The parties to these protests are also parties to an action for money damages currently pending in United States District Court in the Central District of California, Case No. CV 09-09466 SJO. The federal proceeding is stayed pending the Board's Decision in these protests. (RT 9/21: 36-37)[5]

*Statement of the Case (Termination Protest PR-2244-10 - Colton and Irvine)*[6]

14.     By letter dated June 14, 2010 (Exh 710),[7] Roadtrek gave notice to Mega RV pursuant to Section 3070(a)(1)(A) of its intention to terminate the Roadtrek franchise at Mega RV's Colton and Irvine dealership locations.[8] The letter stated that "Roadtrek understands that McMahon's RV[9] is no longer stocking new Roadtreks at either of these dealership locations and that McMahon's RV will not provide warranty service to all Roadtrek customers" and "Roadtrek also has good cause to terminate McMahon's RV's Dealer Agreement (Exh 600) because McMahon's RV is in violation of, at least, the following provisions of the Dealer Agreement:

- Failing to stock the required number of Roadtrek motorhomes as required by Section 109;

- Failing to purchase for retail sale the number of Roadtrek motorhomes as required by Section 111;

- Using Roadtrek leads to sell other manufacturer's Class B motorhomes;

- Failing to service or provide warranty service on Roadtrek motorhomes as required by Sections 189, 190, 192, 194;

- Failing to maintain adequate lines of wholesale credit as required by Section 330;

- Failing to submit annual financial reports as required by Section 350; and

- Failing to operate a dealership in a way that reflects favorably on it and Roadtrek as required by Section 370."

15.     The Board received the notice on June 15, 2010.

---

[5] References herein to "RT" followed by a date (excluding the year) are to the transcripts of the proceedings. References to "Exh" are to Exhibits.
[6] Protest PR-2244-10 covers two Mega RV dealership locations, Colton and Irvine. This is unusual, but is dictated by the fact that the same Dealer Agreement covers both locations, and both therefore are considered the same "franchise".
[7] Since most exhibits were marked for identification by the parties prior to the hearing, they were not offered or introduced in numerical order; also, some pre-marked items may not have been used in the hearing at all, so there may be numerical gaps in the Exhibit List.
[8] Such notice is required whenever a franchisor seeks to terminate the franchise of a dealer of new recreational vehicles. (Section 3070(a))
[9] Protestant Mega RV Corp does business as McMahon's RV.

4

002807

A0101

16.   On July 13, 2010, Mega RV filed Protest No. PR-2244-10 with the Board; an amended protest was filed on July 14, 2010. The protest and amended protest alleged that Roadtrek violated Section 3070 and that Roadtrek does not have good cause to terminate Mega RV's franchise.

### Statement of the Case (Termination Protest 2245-10 - Scotts Valley)

17.   By letter dated June 14, 2010 (Exh 702), Roadtrek gave notice to Mega RV pursuant to Section 3070(a)(1)(A) of its intention to terminate the Roadtrek franchise at Mega RV's Scotts Valley dealership location.[10] The letter stated that "Roadtrek understands that McMahon's RV has ceased to conduct customary sales and service operations at its dealership,...is no longer stocking new Roadtrek[s] [and] will not provide warranty service to all Roadtrek customers." The letter further stated that "Roadtrek also has good cause to terminate McMahon's RV's Dealer Agreement (Exh 604) because McMahon's RV is in violation of, at least, the following provisions of the Dealer Agreement:

* Failing to achieve minimum annual sales of Roadtrek motorhomes as required by Sections 109 and 112;

* Failing to stock the required number of Roadtrek motorhomes as required by Section 110;

* Using Roadtrek leads to sell other manufacturer's Class B motorhomes as prohibited by Section 140;

* Failing to service or provide warranty service on Roadtrek motorhomes as required by Sections 189, 190, 192, 194;

* Failing to maintain adequate lines of wholesale credit as required by Section 330;

* Failing to submit annual financial reports as required by Section 350; and

* Failing to operate a dealership in a way that reflects favorably on it and Roadtrek as required by Section 370.

18.   The Board received the notice on June 15, 2010.

19.   On July 13, 2010, Mega RV filed Protest No. PR-2245-10 with the Board. The protest alleged that Roadtrek violated Section 3070 and that Roadtrek does not have good cause to terminate Mega RV's franchise.

20.   On January 12, 2012, Roadtrek filed a Motion to Dismiss Protests - Scotts Valley, which motion was argued on February 17, 2012 before Administrative Law Judge ("ALJ") Anthony M. Skrocki.

---

[10] The Roadtrek Dealer Agreement for Mega RV's dealership at the Scotts Valley location was not the same as the one for Colton/Irvine and had been executed on a different date. (Exh 604)

5

PROPOSED DECISION

002808

A0102

21.     On March 13, 2012, ALJ Skrocki issued an Order stating an intention to issue a Proposed Order Granting Respondent's Motion to Dismiss Protest No. PR-2245-10, with prejudice.[11]  However, ALJ Skrocki also "...determined that it would be appropriate to defer such Proposed Order until the Board has before it the findings of fact and proposed decisions as to all of the other consolidated protests..." and stated that "...dismissal of the protest prior to the conclusion and final decision of the Board as to all of the other protests may create technical or practical difficulties in unforeseen ways for the parties or the Board in addressing and bringing to a conclusion before the Board the other pending protests..." (Proposed Order, pp. 18-19)

22.     Therefore, in regard to Protest No. PR-2245-10, relating to Mega RV's dealership in Scotts Valley, a Proposed Order Granting Respondent's Motion to Dismiss is submitted to the Board for its consideration concurrently with the Proposed Decisions in the other consolidated protests.

### ISSUES PRESENTED AS TO PROTEST NO. PR-2244-10

23.     What effect, if any, does the relocation of Mega RV's main dealership location from Irvine to Westminster have on the protest challenging the termination of Mega RV's franchise for the Irvine location?

24.     Did Roadtrek sustain its burden of proof of establishing "good cause" to terminate the Roadtrek franchise of Mega RV for its dealership in Colton, California and, if appropriate, its dealership formerly located in Irvine?

### PROTESTANT'S CONTENTION

25.     Roadtrek's course of conduct (culminating in its appointment of Mike Thompson's RV Center ("MTRV") as a Roadtrek franchisee) made it difficult, if not impossible, for Mega RV to carry out its functions as a Roadtrek franchisee, and resulted in the "*de facto*" termination of its franchise. Therefore, there was not good cause to terminate the Roadtrek franchise of Mega RV for its dealerships in Colton and in Irvine.

### RESPONDENT'S CONTENTION

26.     Roadtrek has sustained its burden of proving "good cause" for terminating the franchise of

---

[11] By Order dated March 13, 2012, ALJ Skrocki denied Roadtrek's motion to dismiss Mega RV's warranty claims protest (PR-2209-10) and incentive claims protest (PR-2211-10) pertaining to the Scotts Valley location.

6

PROPOSED DECISION

1   Mega RV because Mega RV's failure to perform its obligations under the Dealer Agreement resulted in

2   Mega RV's repudiation of its franchise.

3             <u>PRE-HEARING ORDER RELATIVE TO ADJUDICATION OF ISSUES</u>

4        27.     On August 3, 2011, Presiding ALJ Skrocki issued an Order Granting in Part and Denying

5   in Part Protestant's Motions in Limine.

6        28.     Among other issues, the order discussed (and denied) Mega RV's motion asking for an

7   order dispensing with a hearing regarding the "good cause" factors in Section 3071. Mega RV had argued

8   that there had already been a "*de facto* termination" of its Roadtrek franchise because of its "…inability to

9   acquire Roadtrek vehicles, parts, and compensation for warranty service, as well as the establishment of

10   MTRV as a Roadtrek franchisee…within protestant's exclusive territory…".

11        29.    The substance of the Order is the following:

12       In order to reach the conclusion that there has been a *de facto* termination of Protestant's
franchises would require that there be a factual analysis as to whether the alleged conduct

13       or lack thereof of Respondent constituted material breaches of the franchises sufficient to
conclude that Respondent has wrongfully terminated the franchise agreements… These

14       factual issues as presented are not within the jurisdiction of the Board as the relief being
sought is essentially that the franchises no longer exist as there have been "*de facto*

15       terminations". The Board's powers under Section 3070 are limited to whether there is
good cause for a termination and provide a hearing as to these issues. The Board is not

16       empowered…to declare that there has been a termination of a franchise and that there is
therefore *no need for the hearing* the Board would have otherwise been charged with

17       providing. …

18       The proper venue for obtaining a finding that there has been a material breach of the
franchise agreements constituting a *de facto* termination would be the courts.

19

20       As to any prejudice to Protestant regarding the good cause factors to be addressed in the
termination protests - first, the burden of proving good cause for the termination is

21       statutorily allocated to Respondent and it will be Respondent that will be addressing why
there is good cause for a termination. Second, the conduct of Respondent which is

22       claimed to have resulted in prejudice to Protestant's abilities to litigate the assertions as to
good cause will be part of the 'existing circumstances' that can be thoroughly explored and
resolved during the hearing on the termination protests.

23

24       …

25       The alleged conduct of both parties, including that occurring before the notices of
termination, are the '*existing circumstances*' that must be considered by the Board in

26       determining whether Respondent has good cause to terminate the franchises.

27       If evidence is adduced to show that Respondent has engaged in conduct that includes the
allegations made in this motion, the administrative law judge ("ALJ") presiding over the
merits hearing may recommend that the Board exercise its powers pursuant to Section

28   ///

<div align="center">7</div>

<div align="center">PROPOSED DECISION</div>

1   3050(c)(1) and (c)(3).

2

3   <u>IDENTIFICATION OF WITNESSES</u>

4   <u>Protestant's Witnesses</u>

5      30.   Brent McMahon is the president and CEO of Mega RV Corp, doing business as

6   McMahon's RV.  (RT 8/9: 76-173; 8/10: 14-244; 8/11: 6-267; 8/12: 7-249; 8/15: 6-205; 8/16: 6-124)

7      31.   Paul Schilperoort is the Director of Operations at Mega RV, a position he has held since

8   mid-2008. His duties include overseeing the "...daily operations of the entire company, which entail

9   service and parts, the sales operations, and the accounting office".  He initially was hired in November

10   2005 as service and parts director. (RT 8/16:127-220; 8/17:117-218; 8/18:6-215; 8/19:8-211; 9/21:9-190;

11   9/22: 6-71; 1/31:207-226; 2/1:6-144; 4/26:30-100)

12      32.   Mike Lankford, since October 1, 2009, has been vice president for California sales for

13   Mega RV.  He previously worked for Frank De Gelas as sales manager at Mike Thompson's RV Super

14   Stores in Colton, California.  (RT 11/15:167-228; 11/17:7-196; 11/18:7-105; 11/28:7-129)

15      33.   Laurie Fosdick was initially hired by Mega RV in September of 2006 (during a "growing

16   phase") as Controller for all Mega RV locations.  Since January 2011, she has been the Office Manager of

17   Mega RV's Colton and Palm Desert dealerships. (RT 8/10:82; 1/9:6-86)

18      34.   Jennifer Fresh is an independent contractor who has been working as Warranty

19   Administrator for Mega RV since March 31, 2009.  (RT 1/9:7-221)

20      35.   Marshall Maresh is Mega RV's Sales Manager - Motorhomes.  He started in sales with

21   Brent McMahon in early 2001, having previously worked for Brent McMahon's stepfather's RV

22   dealership.  In late 2009 or early 2010, he was promoted to his current position. (RT 1/12:7-44)

23      36.   Phil Martinelli has been, since February 1, 2011, Finance Manager for Mega RV.

24   Previously, he worked for Frank De Gelas at MTRV's dealership in Santa Fe Springs (1994 to August

25   2005), as Director of Sales for Mega RV (August 2005 to November 2007), at Giant RV in Irvine for six

26   months (January 2008 to June 2008), and then again at MTRV in Santa Fe Springs (August 2008 to

27   January 2011). (RT 1/19:6-119)

28      37.   Conrad Plomin is President of Sunbelt Capital Corporation.  In October 2009, Brent

<div align="center">8</div>

002811

A0105

1  McMahon hired him to provide Mega RV "strategic financial consulting work".  (RT 8/17:7-112)

2       38.  Frank De Gelas[12] is the President of Mike Thompson's RV Super Stores, which operates

3  RV dealerships in five locations in Southern California, including Colton, California.[13]  (RT 1/13:7-77)

**Respondent's Witnesses**

5       39.  Jeff Hanemaayer is the son of the founder of Roadtrek.  Until 2009, he was Chairman of

6  the company, handling marketing, finance and accounting.  He described himself and James Hammill

7  "...more as co-CEO's...", each involved in different areas of the company.  (Exh 601; RT 11/14:11-249;

8  11/15:6-166)

9       40.  James Hammill is President and CEO of Roadtrek.  He was initially hired as General

10  Manager in April 2005.  He was appointed President around the beginning of 2007 and was named a

11  Director of the company in 2008.  He oversees "...all operations, everything tangible about the company,

12  reporting to the board of directors... sales, manufacturing, engineering, quality, materials, purchasing...

13  [e]ssentially all departments."  (RT 9/22: 73-242; 9/23: 6-220; 11/7: 8-217; 11/8: 9-187; 11/9: 6-225;

14  11/10: 6-208; 11/11: 6-93)

15       41.  Paul Cassidy is Vice President of Sales and Service at Roadtrek, a position he has held

16  since the fall of 2007; he was initially hired as sales director in 2005.  Previously, he had represented

17  Roadtrek motorhomes as an independent representative from 1998 to 2001.  (RT 1/18:7-203)

18       42.  Dawn Crowe started working at Roadtrek in May 2005 as a receptionist.  Soon thereafter,

19  she became a sales and shipping assistant and technical sales representative.  Since mid-2011, she has

20  been Regional Sales Manager.  Her duties have included administrative work supporting regional sales

21  managers, attending trade shows, providing dealer support and answering consumer complaints.  (RT

22  1/10:87-173)

23       43.  Chris Deakins, Roadtrek's Service, Warranty and Parts Coordinator, is the main person

24  handling warranty claims.  He worked at Roadtrek from 1993 to 2002, first in the plant as an assembler

25  and inspector, later as a service, warranty and parts specialist.  He returned to Roadtrek in May of 2005, to

26

27  [12] Frank De Gelas was called as an adverse witness under Evidence Code section 776.

28  [13] MTRV has three year-round locations in Southern California and one temporary location.  The Fountain Valley location has an address on both sides of the freeway and is counted as two locations.  (RT 1/13: 8)

9

002812

A0106

1  his former job as a service, warranty and parts specialist. In January 2006, when he was promoted to his

2  present position, Roadtrek launched its Warranty Claim Management System, an electronic database for

3  processing warranty claims, replacing the former system of paper warranty claims. (RT 11/29: 7-124;

4  11/30:6-185; 12/1:6-169; 12/2:6-71)

5       44.   Ken Mitchell has been working for Roadtrek since March 2010 as an independent sales

6  contractor. Previously (from 2003 to 2008), he worked for Mega RV and later for Pleasure-Way. (RT

7  9/30:5-273)

8       45.   Paul A. Baumann, CPA, is a principal with Baumann Moreau Consulting Group in Tampa,

9  Florida. He testified as Roadtrek's expert witness. (RT 1/31:7-206)

10  <div align="center">**Deposition Witnesses**[14]</div>

11       46.   Amanda Hirchert is the Underwriting Director for GE Capital in Arizona. She is

12  "responsible for managing the risk, underwriting new deals, increases, managing existing accounts for RV

13  dealers for the whole country". (Depo Tr of Amanda Hirchert, pp. 4-30)

14       47.   Barbara Andino is an Account Manager with GE Capital in Arizona. Until February 2010,

15  she was responsible for the Mega RV flooring account. (Depo Tr of Barbara Andino, pp. 4-79)

16       48.   John Print is an Account Manager with GE Capital in Arizona. Among other things, he

17  has been responsible for the Mega RV flooring account since February 2010. (Depo Tr of John Print, pp.

18  4-37)

19       49.   Kurt Brittain purchased a Roadtrek 210 Popular from Mega RV's Scotts Valley dealership

20  in August 2008. (Depo Tr of Kurt Brittain, pp. 5-14)

21       50.   Robin Hays purchased a Roadtrek 170 Popular from Mega RV's Irvine dealership in

22  August 2008. (Depo Tr of Robin Hays, pp. 4-21)

23       51.   Thomas DeRossett purchased a Roadtrek 210 Popular from Mega RV's Irvine dealership in

24  late August or early September of 2009. (Depo Tr of Thomas DeRossett, pp. 4-24)

25  ///

26  ///

27

28  [14] The deposition transcripts were lodged on July 26, 2012.

<div align="center">10</div>

002813

A0107

## FINDINGS OF FACT[15]

### Preliminary Findings

### *Respondent Roadtrek Motorhomes, Inc. (formerly Home & Park Motorhomes)*

52.     Roadtrek is a Class B motorhome manufacturer headquartered in Kitchener, Ontario, Canada. (RT 11/14:12-13). The company, founded by Jacques Hanemaayer, was previously known as Home & Park Motorhomes.  (RT 11/14:12-15; 1/10:148-149)

53.     Jacques Hanemaayer's son, Jeff Hanemaayer, started running the company in 1985, building it up from an annual production of 250-300 vans in 1985 to 1,500 vans in mid-2006. Until 2009, Jeff Hanemaayer was Chairman of the company, handling marketing, finance and accounting. (Exh 601; RT 11/14:24)

54.     James Hammill was hired as General Manager by Jeff Hanemaayer in April of 2005.  He became President and CEO in early 2007 and a director of the company in 2008.  (RT 9/22:73)

55.     Between 1981 or 1982 and at least 2006, Roadtrek was the largest manufacturer of Class B motorhomes in North America.  In 2006, the average price to the dealer for a Roadtrek motorhome was $65,000.00.[16] Roadtrek's main Class B competitor is a line-make called Pleasure-Way.

56.     Class B motorhomes (also called "vans") are built on General Motors and Chrysler manufactured chassis.  (RT 9/23:212)

57.     Roadtrek maintains a website, a part of which is dedicated for use by Roadtrek dealers. (RT 8/12:31)

58.     Roadtrek does not require its dealers to renovate their dealerships, to create special showroom space, or to purchase signs or special tools to service Roadtrek products. (RT 11/9:153-155; 11/11:63)

///

---

[15] References herein to testimony, exhibits or other parts of the record are examples of evidence relied upon to reach a finding and are not intended to be all-inclusive.
    Findings of Fact are organized under topical headings for readability only and are not to be considered relative to only the particular topic under which they appear, but rather may apply to any of the "existing circumstances" or listed "good cause" factors in Section 3071.

[16] Official notice was taken of the Board's Decision in *Manteco Trailer and Camper Inc.* v. *Home and Park Motorhomes Roadtrek* (PR-2036-07 and 2074-07). The references are at page 6.

002814

A0108

1    *Protestant Mega RV Corp doing business as McMahon's RV*

2        59.    Brent McMahon, the owner of Mega RV, started in the recreational vehicle[17] business

3    working with his stepfather, who owned a dealership (and who also sold Roadtrek vans) at TraveLand,

4    which once was a large multi-dealer RV park in Irvine, California.

5        60.    Although his stepfather was unsuccessful in the business, Brent McMahon started his own

6    small dealership selling used RV's on one of the TraveLand lots, incorporating Mega RV Corp on

7    December 1, 2000. On April 9, 2001, he established Mega RV Corp as a new recreational vehicle dealer.

8    TraveLand, in its prime, had many RV dealers as tenants, on "a bunch of individual lots".   (Exh 1; RT

9    11/15: 177; 1/13: 66-67)

10       61.    One of the RV dealers that early-on was located on a portion of the TraveLand property

11   was Frank De Gelas, the owner of MTRV. MTRV, in about 1996, moved out of TraveLand to its main

12   dealership, then in Fountain Valley and, at least by July 1, 1999, had established a dealership in the

13   "Colton RV Expo" at 902 RV Center Drive, Colton, California.   (Exh 685; RT 11/15:177)

14       62.    In mid-March of 2002, Brent McMahon opened Mega RV's Colton dealership in the same

15   RV mall (presently, MTRV and Mega RV are the only two tenants in the "Colton RV Expo" and are

16   located directly across the street from one another). MTRV has been one of Mega RV's "significant

17   competitors".  (RT 8/10:180; 11/15: 177; 1/13: 66-67)

18       63.    Mega RV's dealership at the TraveLand location in Irvine was its main location until

19   approximately March 31, 2012, when it relocated to 5400 Garden Grove Boulevard, Westminster,

20   California. Mega RV was the last tenant at TraveLand, "...where everything was kind of dilapidated and

21   probably needed a little more love".  (RT 1/13:66; 4/26:92)

22       64.    Mega RV sells over 60 different RV brands from 10 different manufacturers.  (RT 8/9:77)

23       65.    Brent McMahon eventually expanded Mega RV to other locations throughout California,

24   and into Arizona. In addition to the Irvine dealership located at TraveLand (which was the main

25   location), Mega RV had dealerships in Colton, California and Scotts Valley, California.  (RT 8/9:106,

26   109, 139)

27   _____

28   [17] Hereinafter, recreational vehicles will sometimes be referred to as "RVs".

PROPOSED DECISION

002815

A0109

*The Relationship of Roadtrek & Mega RV*

*The Parties' Relationship between 2001 and 2007*

66.    Mega RV started selling new Roadtrek motorhomes in 2001.[18] When Brent McMahon's stepfather closed his RV dealership, Roadtrek was left without a dealer in the large Southern California market. Although several more established RV dealers were interested, Brent McMahon was aggressive in getting the Roadtrek representation and had the personal connection through his stepfather. Brent McMahon recalled that Roadtrek was Mega RV's "...first line...". Since Mega RV did not have financing ability at the time, Roadtrek assisted Brent McMahon with his first order by co-signing or guaranteeing his initial wholesale financing floor plan with Bombardier, a financial institution.   (RT 8/9: 83-84, 112; 8/10: 73; 11/14: 17-21, 155-156)

67.    Thereafter (until early 2006 when the parties began the "new flooring program" described below), Mega RV floored its wholesale purchases from Roadtrek through Mega RV's own flooring lines with banks. (RT 8/10: 55-76)  All of Roadtrek's dealers, however, benefitted from a plan which was different from other RV manufacturers:  Roadtrek reimbursed its dealers for the first 90 days of interest the dealer had paid to a bank for flooring (or for fewer days if the motorhome was "retail sold" to a customer in fewer than 90 days).  The 90-day period was calculated from the date of delivery of the van to the dealership. (RT 8/10: 79; 8/20: 79-81)

68.    The relationship between the parties, at least in the beginning, was "informal", reflecting general practices in the RV industry at the time. (RT 8/16:146)

69.    In the early years of the relationship, Mega RV was a very successful Roadtrek dealership and Mega RV's sales contributed substantially to Roadtrek's success.  Roadtrek sold more Class B motorhomes in California than its nearest competitor, Pleasure-Way. Mega RV sold 78 Roadtrek vans in 2002 and 85 vans in 2003. By 2005, the year it sold 54 vans, Mega RV was considered by Roadtrek to be the number one dealer from a multiple-location standpoint. (Exhs 68, 709; RT 8/9:106, 113; RT 11/9:52, 194; 11/14:30)  Mega RV sold 124 Roadtrek vans in 2006 and 162 vans in 2007 and was Roadtrek's "top dealer" that year. (Exh 709; RT 8/16:193-194; 11/14:30)

---

[18] The terms of the parties' agreements between 2001 and 2006 are not known.  (RT 11/14:54-56)  Statutes requiring "written" RV franchises became effective much later, on January 1, 2008 and 2009.  (Sections 11713.22, 11713.23)

13

002816

A0110

70.     Mega RV sold about 8% of Roadtrek's output in 2006 and approximately 11% in 2007. (Exhs 68, 709, 601)  With 74 Roadtrek dealers in the country and 7 in California in 2006,[19] Mega RV's sales were an important component of Roadtrek's business. (*Manteca Trailer and Camper Inc.* v. *Home and Park Motorhomes Roadtrek* (PR-2036-07 and 2074-07), pp. 4, 5; Exh 601)

71.     Roadtrek commemorated Mega RV's sales success by presenting custom-made, lithographed photos made into plaques of Roadtrek vans to Brent McMahon. (Exh 68)  When Roadtrek produced its 20,000[th] van in June of 2006, it held a ceremony in Kitchener to present the keys to Brent McMahon, the "top seller of Roadtreks", according to the press release of the occasion. (Exh 601) Roadtrek honored Brent McMahon because of Mega RV's Roadtrek sales, "commitment to the product," and the friendship between James Hammill and Brent McMahon. (RT 11/9:172-173)

72.     Roadtrek motorhomes "...probably represent[ed] only ten percent, maybe 15 percent of [Mega RV's] inventory...". (RT 8/9: 97)  According to Brent McMahon, "Roadtrek's product [] is an anomaly in the RV business.  It represents a very minor percentage of sales.  The number one registered RV on the motorized side is the Class A, which is the typical big box motorhome...like a Winnebago...". (RT 8/9: 91; 1/12: 39-40; Depo Tr of Barbara Andino, p. 53)

73.     After James Hammill came to Roadtrek in April of 2005, he and Brent McMahon developed a close personal friendship where each looked upon the other as a "brother".  They talked frequently and vacationed together.  In June 2006, the Hammill and McMahon families spent five or six days vacationing in Toronto after the ceremony in Kitchener and later vacationed together at Monarch Beach in Southern California.  (RT 8/9: 116-117; 8/16: 46, 157, 165-166, 172; 9/23: 96; 11/15: 194, 208)

74.     "Hold-backs" are monies paid by a manufacturer to an individual dealer, a personal benefit to the owner and an incentive to encourage sales of the manufacturer's product.  Brent McMahon received from Roadtrek a "hold-back" payment for 2006 in the amount of $132,000, calculated by multiplying $1,000 for each Roadtrek delivered to Mega RV in that calendar year---the $132,000 check was given to Brent McMahon by James Hammill when he "took Brent and Paul Cassidy to Vegas to celebrate".  In Las Vegas, James Hammill promised Brent McMahon that he would continue to receive "hold-backs" for the

---

[19] Roadtrek currently has 54 dealers in the United States and, in 2010, sold 660 motorhomes.  (RT 8/9:51)

14

PROPOSED DECISION

002817

A0111

1  following year (2007), presumably on the same terms. The "hold-back" arrangement was not

2  memorialized in writing. (RT 8/10: 27-32; 9/22: 165-166; 1/9:161)

3      75.    In June 2006, Mega RV opened a dealership in Scotts Valley near San Jose in Northern

4  California. This was "Roadtrek's idea", as Brent McMahon was unfamiliar with Northern California. In

5  May 2006, Guarantee RV had closed in Gilroy and Roadtrek wanted representation for its vans. It was a

6  "package deal": along with the Roadtrek franchise, Mega RV got a Roadtrek salesman who had worked

7  for Guarantee RV, Jim Eberhardt, whose allegiance was primarily to Roadtrek, not to Mega RV. Unlike

8  Mega RV's other dealerships, 60 to 70 percent of Scotts Valley's inventory was Roadtrek vans. A Dealer

9  Agreement was finalized on February 8, 2008. (Exh 604) Brent McMahon closed the Scotts Valley

10  location in 2010.

11      _The "New Flooring Program" for Mega RV Proposed by Roadtrek in Late 2005 and Begun_

12      _in Early 2006_

13      76.    In late 2005, when the RV market was hot and inventory was selling "so fast", James

14  Hammill proposed a "new flooring program" to Brent McMahon. Under the arrangement, never reduced

15  to writing, Mega RV would receive Roadtrek vans "on the arm":[20] Roadtrek would deliver to Mega RV a

16  large number of motorhomes, inventory chosen by Roadtrek, and Mega RV would only have to pay for

17  them when they were sold to customers. (RT 8/10: 54-55; 1/9: 195).

18      77.    This arrangement resulted in boosting Mega RV's stocking levels[21] of Roadtrek RVs to

19  "much higher" levels than what was required by the franchise. Roadtrek would have a larger presence on

20  Mega RV's lots, thereby giving Roadtrek a competitive edge over its main Class B competitor Pleasure-

21  Way, and stimulating sales. Mega RV benefited by having no financial outlay for flooring, by offering a

22  large inventory to customers, and by realizing a profit when the vans were ultimately sold. (RT 8/10: 54-

23  58)

24

25  [20] Paul Schilperoort testified that "on the arm" is "...basically it's kind of like a consignment. You take this vehicle, when you
sell it, pay me for the vehicle....[Roadtrek] basically just gave us the units to sell." (RT 8/16:184) Brent McMahon testified

26  that "on the arm" "is referencing the fact that Roadtrek has eliminated the bank process or portion and is shipping product
direct into the dealership without the process, the cost, or any of those other involvements with regard to the typical flooring

27  arrangement with the bank...". (RT 8/10:57) Ken Mitchell testified that "on the arm" is "...an agreement to sell a vehicle that
is given from the manufacturer to the dealer without them putting it on their flooring, and once it's sold, then you pay for the

28  vehicle." (RT 9/30:100)
[21] Presumably, the stocking levels required by the February 22, 2006 Dealer Agreement. (Exh 600)

15

PROPOSED DECISION

002818

A0112

78.     No payment of interest by Mega RV was mentioned at the time the "new flooring program" was proposed in 2005 or when implemented in early 2006. In 2005 and then into 2006 and 2007, RV sales were so high that the payment of interest by Mega RV was not Roadtrek's main concern. Roadtrek's primary focus was actually keeping enough inventory on the lots because the vans were selling so fast. Although there were friendly discussions between James Hammill and Brent McMahon about interest and the terms of the arrangement, nothing was reduced to writing and no invoices were sent to Mega RV for interest. (RT 9/22:143-161)   Moreover, Mega RV may not have had a large enough bank flooring line to accommodate all the vans which Roadtrek was shipping to it; in any case, Mega RV phased out its bank financing to floor Roadtrek motorhomes. (Exh 608; RT 8/10:77-78; 8/16:82, 181-182, 185; 9/22:140-141, 157; 11/14:41)

79.     Unlike prior years, when Roadtrek had "a pretty stringent policy" of generally requiring dealers to sign invoices prior to Roadtrek beginning production of a van, when Roadtrek began "flooding in" motorhomes to Mega RV under this "new flooring program", Brent McMahon rarely signed invoices, except for special orders. Although the models and colors of the vans were chosen by Roadtrek and may have included less popular models, that did not matter to Mega RV because there was no interest charge—"it was free flooring" and a "win-win" situation from Mega RV's perspective. (Exhs 608, 637: 000157, 000176; RT 8/10:64-65, 74; 8/16:82, 181-182, 185; 9/22:140-141, 157; 11/14:41)

80.     Nothing in writing stated the time within which Mega RV was obligated to pay Roadtrek for the vans once they were "retail sold" to customers under the "new flooring program". Although the informal agreement worked well in 2006 and into 2007, Mega RV's payments would sometimes lengthen to a longer period after the "retail sale" than Roadtrek considered reasonable. (RT 9/22:143-161)

81.     Jeff Hanemaayer attended Mega RV's annual Christmas party in December of 2007 (where he gave Mega RV the "top Roadtrek dealer" award). The day after, he asked to meet with Brent McMahon and "made it very clear to him" that Roadtrek expected to be paid interest on the vans shipped to Mega RV "starting then" and, in fact, that Mega RV owed Roadtrek past interest pursuant to the floor plan financing program "through 2006 and 2007". Brent McMahon was "stunned", since he understood that their deal was a "no interest" arrangement—and said that it was never made clear to him by James Hammill that he had to pay interest on the vans while they were in his stock. (Exh 608; RT 8/18:169;

16

PROPOSED DECISION

002819

A0113

1 | 11/14:30-31)

2 |     82.  Brent McMahon's reliance on the representation of James Hammill that no interest would

3 | be owed during the "new flooring program" was reasonable under the circumstances, especially in light of

4 | the failure of Roadtrek to send interest statements to Mega RV during 2006 and 2007.  (Exh 608; RT

5 | 8/18:169; 11/14:30-31)

6 |     *The Roadtrek-Mega RV Dealer Agreement - February 22, 2006 - Irvine, Colton and*

7 |     *Stanton (2006)*

8 |     83.  On February 22, 2006, the parties entered into a Dealer Agreement covering Mega RV's

9 | Irvine, Colton and Stanton dealership locations.  (Exh 600)  The agreement was for a three-year period,

10 | and the parties contemplated that the agreement would be renewed.  (Exh 600, Section 520)

11 |     84.  The Dealer Agreement did not mention or refer to the "new flooring program", then in

12 | place.  Some provisions of the Dealer Agreement (the stocking requirements and the dealer commitments

13 | to purchase, as examples) not only directly contradicted or were inconsistent with the "new flooring

14 | program", but were completely ignored by both parties.

15 |     85.  Among other things, the Dealer Agreement provided the following:

16 |     A.  Roadtrek granted to Mega RV the "exclusive right to purchase, display and resell

17 | Roadtreks, parts and accessories in the [Dealer] Territory", defined as "an area with 60 mile radii of

18 | Irvine, California, Colton, California, and Stanton, California."[22]  (Exh 600, Sections 107, 108)

19 |     B.  In Section 111 ("Dealer Commitment"), Mega RV agreed to "purchase for retail sale a

20 | minimum of one hundred (100) new and demonstrator Roadtreks per calendar year" and "will be

21 | considered in breach of this agreement in the event that Dealer does not purchase and take delivery of 25

22 | Roadtreks by March 31st, 50 by June 30th, 75 by September 30th and 100 by December 31st of each year".

23 | (Exh 600, Section 111)  If Mega RV "materially breached" Section 111, this would be "good cause"

24 | allowing Roadtrek to terminate the agreement.  (Exh 600, Sections 520, 530)

25 |     C.  To remain in "good standing" under the Dealer Agreement, Mega RV was required to

26 | "stock" and "prominently display" a total of 22 Roadtrek vans (four different models) at each of Mega

27 | 

28 | [22] The Stanton dealership has closed and the Irvine dealership has been relocated to Westminster.

002820

A0114

1    RV's three dealership locations. (Exh 600, Section 109) A "material breach" of the stocking obligation

2    would be "good cause" allowing Roadtrek to terminate the agreement. (Exh 600, Section 530)

3        D.    As long as Mega RV remained in "good standing" under the agreement, it would retain its

4    "exclusive" dealer territories and would receive full cooperation from Roadtrek "in all special

5    promotions" (Exh 600, Sections 107, 108, 520).

6        E.    Section 174 of the Dealer Agreement ("Prices and Terms") stated general information

7    about delivery charges, price changes, and the dealer's right to cancel an order and advised that "further

8    details [of dealer payment], terms and conditions", as well as "prices, specifications and equipment",

9    would be found on Roadtrek's order forms, price lists, invoices and on the "dealers" section of Roadtrek's

10    website. (Exh 600, Section 174)

11        F.    The Dealer Agreement required Mega RV to annually furnish to Roadtrek "a complete

12    financial statement". (Exh 600, Section 350)

13        G.    Roadtrek promised to "work with [Mega RV] to expand [Brent McMahon's] operation"

14    and to "ensure that [Mega RV] receives first priority on new product in the State of California". In return,

15    Brent McMahon promised that if he "expands his operation to new locations, Roadtrek will be the number

16    one selling class B motorhome at those locations". (Exh 600, Section 111)

17        H.    It contained a mediation and arbitration clause. (Exh 600, Section 700)

18        *The Economic Downturn Started in Late 2007 and Thereafter Gained Momentum*

19        86.    Starting in early 2008, the RV industry "really got hit" with the effects of a bad economy,

20    although the RV market had "started to tail off near the end of 2007". Both RV manufacturers and dealers

21    would have a difficult time financially through 2008 and even more so in 2009. The recession

22    significantly reduced retail demand. Dealers either went out of business or drastically reduced their

23    inventory; from early 2008 to the third quarter of 2009, Roadtrek saw dealers cut their inventory back 50

24    percent. (RT 11/14:170-173; 1/12:38-40) In addition to losses from greatly diminished sales volume,

25    Mega RV lost millions of dollars when manufacturers such as Monaco, Fleetwood and Country Coach

26    filed for bankruptcy, forcing Mega RV to liquidate aged inventory through "short sales" and to discount

27    accounts receivable. Both Jeff Hanemaayer for Roadtrek and Brent McMahon for Mega RV would infuse

28    substantial amounts of their own money into their respective companies, and both companies reduced

<div align="center">18</div>

<div align="center">PROPOSED DECISION</div>

1    their work staffs.  (RT 8/16:139; 8/17:33-34, 77; 1/13:75; 11/15: 183)

2         87.   Phil Martinelli stated that "...[at the tail end of '07] the market started turning downward

3    ... and we weren't clear yet on why or what was going on, and then the severity of the market really

4    picked up in 2008 to the point where we referred to it as crashing or the Great Depression...It was a pretty

5    tough year. And that continued. We feel like we're still riding along that wave now but coming out of it to

6    the present. Our market is much smaller than it was in, say, '06 and prior days....Less RVs being sold,

7    less dealers in the marketplace, less manufacturers in the marketplace overall." (RT 1/19:113-115)

8         88.   Conrad Plomin was of the opinion that the RV industry was facing hard times into late

9    2009. He observed manufacturers going bankrupt and dealers experiencing financial difficulty.  (RT

10   8/17:68)

11        *Events in Early 2008: the Meeting in Kitchener in March and the Signing of the Security*
         *Agreement in April*[23]

12

13        89.   In early 2008, Jeff Hanemaayer called for a meeting to resolve the parties' differences

14   concerning interest and payment issues which had come to a head under the "new flooring program" that

15   had been in place since late 2005. The meeting at Roadtrek headquarters in Kitchener was held on March

16   28, 2008, with Jeff Hanemaayer, James Hammill, and Paul Cassidy for Roadtrek and Brent McMahon and

17   Paul Schilperoort for Mega RV attending.

18        90.   Before the meeting in Kitchener, Brent McMahon and Paul Schilperoort prepared two

19   letters to Roadtrek.[24] One urged the continuance of the "new flooring program"; it reiterated Brent

20   McMahon's understanding that vans were delivered "basically on the arm, no flooring cost." As for Jeff

21   Hanemaayer's demand in December that Mega RV owed "back flooring interest", the letter stated that

22   "[Brent McMahon] was stunned [and] knew nothing of flooring cost, we were never sent a monthly

23   statement nor did anyone from Roadtrek in almost 2-years mention that we owed any flooring interest."

24   (Exh 608; RT 8/10:25-26)  Under the heading "Topics of Concern", the second letter also stated Mega

25

26   _____

27   [23] There were two other events at about the time of the Kitchener meeting:  on February 8, 2008, the Dealer Agreement for
     Mega RV's Scotts Valley dealership was signed (Exh 604); and Roadtrek paid Mega RV $50,000 for the Anaheim Ducks
     hockey team promotion.  (Exh 605)

28   [24] Although in letter format, they more resembled "talking points" in preparation for the meeting.

                                                    19

002822

A0116

1   RV's preference for a "no floor plan interest program" over the "original floor plan interest [program] -

2   first 90-days free". (Exh 609; RT 8/10: 58-61, 92-95)

3       91.   The meeting started poorly: although Brent McMahon anticipated picking up his $166,000

4   "hold-back" check for 2007, Jeff Hanemayer instead asked him to forego it as an accommodation to a

5   business partner, because of Roadtrek's declining financial condition. Brent McMahon flatly refused.

6   Jeff Hanemayer told Brent McMahon that there would be no "hold back" program for 2008.[25] (RT 8/10:

7   36, 64; 8/16: 187-191)

8       92.   Agreements in principle were reached at the meeting, including resolving the issue of

9   interest—both past interest back to 2006 and prospective going forward. Brent McMahon maintained

10   throughout the Kitchener meeting that the "new flooring program" had been a "no interest" arrangement.

11   Brent McMahon had reservations during the meeting but decided that "if this is what we got to do, it's

12   what we got to do, but I don't agree with it". His intention, unspoken at the meeting, was that he would

13   later talk to James Hammill or Paul Cassidy about these matters, because Jeff Hanemaayer had "push[ed]

14   his agenda to … benefit his organization" and had "driven the bargain that he want[ed] to drive". (RT

15   8/10:128, 142-148)

16       93.   After the Kitchener meeting, Jeff Hanemaayer prepared minutes summarizing the issues

17   discussed and resolved by the parties at the meeting, and sent them to Mega RV. Mega RV was able to

18   make changes to the minutes and, in fact, did so. (Exh 612; RT 11/14:133-134)

19       94.   The minutes recited that the parties had agreed that Roadtrek would provide wholesale

20   financing to Mega RV on the same terms as other Roadtrek dealers (no interest charged for 90 days

21   starting from the date of delivery, or fewer days if the van was "retail sold" earlier, then interest charged

22   after 90 days, or after the van was "retail delivered"). There was a different calculation for 2006 and

23   2007: Mega RV would pay interest on each Roadtrek sold only from "retail delivery date"[26] until the date

24

25

26   [25] In response, Brent McMahon proposed to "finance his own hold backs" by a somewhat complicated plan whereby Roadtrek
     added $1,000 as a transportation cost to the invoice of each motorhome delivered to Mega RV. Jeff Hanemaayer agreed to this;

27   however, he may have added conditions in the post-hearing minutes (Exh 612) which may not have reflected the parties'
     understanding at the meeting. (RT 8/10:121, 150, 172; 8/16:189-191; 1/31: 43-44)

28   [26] "Retail delivered" is different (and may be later in time) than "retail sold", since it is when the customer picks up the vehicle.
     (RT 11/14:45-46)

<div align="center">20</div>

<div align="center">PROPOSED DECISION</div>

002823

A0117

1  payment was made to Roadtrek, an amount that Roadtrek calculated to be $70,000.[27]  Mega RV agreed to

2  pay the $70,000 in two $35,000 installments.  No interest would be charged on model 190 motorhomes on

3  Mega RV's lots until "retail delivery", and Roadtrek promised to remove and dispose of aged inventory, at

4  least 12-14 vans.  The statement that "[l]egal agreements must be signed by [Mega RV] immediately,

5  which is needed for [Roadtrek's] banking arrangements" refers to the Security Agreement signed a few

6  days later.  (Exh 612; RT 8/10:147-164; 11/14:347-48, 88, 133-134, 204-208)

7         95.  Brent McMahon agreed at the Kitchener meeting to sign the Security Agreement, and did

8  so on April 3, 2008.  He did not read it very carefully, stating that he relied on James Hammill's

9  assurances that their relationship would continue as before, saying that James Hammill told him "not to

10  worry" about signing the Security Agreement because it was "just for the bank".  (Exh 614; RT 8/11:182-

11  185; 8/19:66-67; 11/14:48)

12        96.  The Security Agreement and Power of Attorney contained the following provisions:

13        A.  The "subject matter" of the Security Agreement was limited to financial dealings between

14  the parties.  It defined "inventory", "proceeds", "date of delivery", the choice of law in regard to "prime

15  rate" and the calculation of "interest".  It set out the financial terms of the wholesale purchase of vans,

16  included references to security interests and the passing of title upon payment, and described Roadtrek's

17  wholesale flooring program.  It required Mega RV to hold in trust monies received from a sale and to pay

18  Roadtrek immediately the purchase price, other charges and accrued interest.  It obligated Mega RV to

19  protect inventory in its possession by maintaining insurance coverage, and "[t]o pay all rents, taxes, rates,

20  levies, expenses, assessments and other charges…".  It contained an "acceleration clause" that "…all [of

21  Mega RV's] indebtedness [would] become immediately due and payable" if certain financial "defaults"

22  occurred; moreover, upon "default" by Mega RV, Roadtrek could assert "all rights and remedies of [a]

23  secured party under the Uniform Commercial Code", including taking possession of "collateral".  (Exh

24  614, Sections 2 -14)

25        B.  It contained a "merger" or "integration" clause: "This Agreement contains all of the

26  understandings, promises and undertakings of the parties hereto concerning the subject matter.  All prior

27  

28  [27] Although the minutes recited that the $70,000 figure was "subject to audit", there is no evidence that an audit was conducted.

21

PROPOSED DECISION

1    understandings and agreements, oral or written concerning the subject matter, heretofore entered into

2    between the parties hereto, are merged herein." [Emphasis added.] (Exh 614, Section 16)

3       This put an end to the "new flooring program" which had been in effect since late 2005.

4    Moreover, since the Security Agreement only supplemented the existing Dealer Agreement with a new

5    "subject matter" (financial dealings), it did not discharge any part of the Dealer Agreement, then in effect.

6       C.     The Security Agreement provided that "[t]his Agreement may not be modified, altered or

7    amended in any manner whatsoever, except by a further agreement in writing signed by the duly

8    authorized representatives of [Mega RV] and [Roadtrek]." (Exh 614, Section 15)

9       This meant that not only oral or unsigned attempted modifications would be of no legal effect, it

10    also meant that a modification of the Security Agreement could not be established by the course of

11    conduct, or course of performance, of the parties.

12       D.     It provided that Roadtrek would have "...all rights and remedies of [a] secured party under

13    the Uniform Commercial Code...". (Exh 614, Section 14b)

14       E.     It stated that no failure by Roadtrek to enforce its rights under the Security Agreement

15    would be construed as a "course of conduct" or a waiver of rights. (Exh 614, Section 23)

16       F.     It was to be interpreted in accordance with the laws of the Province of Ontario, Canada.

17    (Exh 614, Section 21)

18       G.     Although not stated in the Security Agreement, the parties understood that Mega RV

19    would make payment to Roadtrek for motorhomes sold to consumers no later than 14 days after either the

20    contract date or retail funding date.[28] (Exhs 622; 637: 000111; 8/18:183-185)

21       97.     As of April 3, 2008 (the date the parties executed the Security Agreement), the obligations

22    of the parties were set forth not only in the 2006 Dealer Agreement, but also in the Security Agreement.

23    The Dealer Agreement, signed by the parties two years earlier, was, by its terms, for three years and was

24    in effect at the time the parties signed the Security Agreement.   Nothing in the parties' conduct or

25    negotiations evidenced any intent to repudiate the Dealer Agreement. In fact, the Security Agreement

26

27    [28] This understanding is not inconsistent with Section 111 of the Security Agreement, which states that Mega RV was to pay

28    Roadtrek "...immediately upon the sale [of the inventory]...". Nowhere is the word "sale" defined; the import of Section 111 is
that sales proceeds received by Mega RV would be held in trust. (Exh 614)

PROPOSED DECISION

002825

A0119

1    expressly incorporated the Dealer Agreement in reference to "default[s] by Dealer". (Exh 614, Section

2    13.g.)

3        98.    In April 2008, Roadtrek mailed the $166,000 "hold back" check for 2007 to Brent

4    McMahon. (Exh 615; RT 11/14:44)

5        99.    In April 2008, Mega RV paid Roadtrek $35,000 from a company account, the first

6    installment of the interest payment for vans delivered in 2006-2007; the second payment of $35,000 was

7    due to be paid in August 2008. (Exh 496, RMI 009160; RT 1/9:177)[29]

8        100.    In May 2008, there was email correspondence between the parties to identify vans which

9    had been sold to customers and the status of payments to Roadtrek for those vans. (Exh 637: 000110,

10    000111)

11        *Events From Mid-2008 to Mid-2009*

12        101.    After the meeting in Kitchener, Roadtrek sent invoices to Mega RV for interest. Laurie

13    Fosdick, Mega RV's controller, received the invoices and asked Brent McMahon about them; he said that

14    "we weren't going to have to pay those". Sometime thereafter, in a meeting at Mega RV's Irvine

15    dealership, Laurie Fosdick heard James Hammill tell Brent McMahon "not to worry" about the interest

16    statement bills. Thereafter, when she received interest statements from Roadtrek, she "either put them in

17    a file or tossed them aside" without paying them. (Exh 74A; RT 1/9: 176-177, 181-185)

18        102.    In August 2008, Mega RV did not pay Roadtrek the second interest payment of $35,000.

19    (Exh 496, RMI 009160; RT 8/19:65)

20        103.    James Hammill had repeatedly asked Brent McMahon to produce Mega RV's financial

21    statements for 2007; Brent McMahon would put him off, saying "hey, buddy, I'll get them for you...don't

22    worry about it, buddy, we'll take care of you." Financial statements were required to be maintained and

23    produced to Roadtrek by the Dealer Agreement (paragraph 350 - "Financial Reports") as well as by the

24    Security Agreement (Section 11, subsections h and j - "Covenants of Dealer"). (Exhs 600, 604) By late

25    August of 2008, Mega RV had failed to produce the statements so, on August 22nd, James Hammill wrote

26    an angry email to Paul Schilperoort demanding the financial statements and describing in detail actions

27

28    [29] There is a typo in Exhibit 496, RMI 009160: the $35,000 was received in 2008, not 2009.

PROPOSED DECISION

002826

A0120

1   that Roadtrek felt it could legally take, if it chose to do so. (Exhs 600, 614, 619; RT 9/23:95-98, 103)

2   The next day, Brent McMahon provided James Hammill with a financial statement dated April 24, 2008.

3   (Exh 621)

4       104.  On October 30, 2008, Brent McMahon mailed financial statements through September 30,

5   2008 to James Hammill. During the time period covered (which is unknown), his cover letter states that

6   even though Mega RV's "bottom line" was a $484,000 loss, there was a "positive cash flow" if Brent

7   McMahon's personal compensation of $855,000 and depreciation were excluded. (Exh 629: 8/10:204-

8   209)

9       105.  Late payments to Roadtrek for motorhomes sold to customers also became an issue

10  between the parties. James Hammill's angry email of August 22, 2008 stated: "[Brent McMahon] has also

11  not paid us on time yet...He has been an average of four weeks late on payments forty times this year.

12  His controller [Laurie Fosdick] does not answer even my emails or calls." (Exh 619)

13      106.  Paul Schilperoort responded to the email on August 25th, stating that he was "responsible

14  for ... making sure that all units are paid to you within the time allotted in our flooring agreement (...14-

15  days after contract date)" and "guarantee[ing]"... that from this point forward there will be little or no

16  complaints regarding [the late payment] issue". He described a daily 10 a.m. meeting he had instituted

17  with Mega RV's Controller Laurie Fosdick and finance managers to discuss all deals. (Exh 622)

18      107.  However, by September 9, 2008, Roadtrek was still awaiting payment from Mega RV for

19  four motorhomes that had not been paid for within two weeks after sale. In an email to Paul Schilperoort,

20  James Hammill stated that Mega RV's failure to pay for the four "out of trust" vans had put Roadtrek in

21  default with its bank and that Mega RV was the only dealer not paying on time. He regretted not having a

22  "normal business relationship" with Mega RV since he "has to chase collections". (Exh 626)

23      108.  In James Hammill's understanding, "out of trust" is a term commonly used in the RV

24  industry and "...means that the product has been sold. The dealer has received the money for it. The

25  product has been retail delivered and is in the hands of the retail customer. And at that point, the

26  manufacturer or the bank that financed it doesn't have any recourse to recover the money if the dealer

27  ///

28  ///

24

PROPOSED DECISION

002827

A0121

1   goes under. So it creates a situation where it's out of trust".[30]  (RT 9/22:169)

2       109.    In December 2008, Roadtrek was asking Laurie Fosdick about late payments on six "retail

3   sold" vans, one aged from August and one from October.  On January 7, 2009, Roadtrek stated there were

4   six vans for which payment had not been made within 14 days of retail sale, with retail sale dates ranging

5   from August 11th to December 3rd, 2008.  (Exh 637: 000080, 000081, 000082)

6       110.    The phrase "short payments" refers to payments Mega RV made for vans that were less

7   than the dollar amount to which Roadtrek believed itself entitled.  Paul Cassidy understood that "short

8   payments are when...the check that arrives [to the franchisor in payment for a van] doesn't match the

9   invoice amount that's outstanding".  (RT 1/8:44; 1/9:193)

10      111.    In about August 2008, Laurie Fosdick "started the practice" of "short paying" Roadtrek for

11  vans that had been sold to customers.  She deducted $5,000 on at least two occasions, $1,500 on at least

12  one occasion and $1,000 at least once, all without explanation.[31]  She stated she did so because Roadtrek

13  "...had stopped paying us for the rebates that...were on the contract for the customers" which she

14  understood to be amounts which Mega RV had "advance[d]" to the customers and "need[ed]" to be

15  reimbursed to us".  Her testimony that the "short payments" were made on her own initiative---that she

16  "just started doing it"---is not credible.[32]  (Exhs 623, 637: 000091, 000096; RT 1/9:193-198; 1/10:27;

17  1/11:197)

18      112.    In mid-2008, Mega RV also still owed Roadtrek for "short payments" back to 2006 and

19  2007, although Laurie Fosdick's explanation was that the vans were selling "so fast" in those years that

20  Roadtrek's final wholesale invoices often had not arrived before the customers bought the vans.  However,

21

---

22  [30] Conrad Plomin, Mega RV's financial advisor, testified that "out of trust" is "...when a dealer receives payment from the
23  purchaser, either directly from the purchaser or the institution that's financing the purchase, and doesn't pay the floor plan
    lender within a specified period of time".  (RT 8/17:71)  Amanda Hirchert, Underwriting Director for GE Capital, testified that
24  "...'SOT' or "sold out of trust" ... simply means the unit has technically been sold and we have not been paid."  (Depo Tr of
    Amanda Hirchert, p. 15)  Frank De Gelas testified that "out of trust" is a legal term that applies where a dealer who has a trust
25  agreement or flooring agreement with a financial lender in order to purchase vehicles is "supposed to be in trust, which is when
    [you] pay for them when you sell them. 'Out of trust' means that you've sold the coach and not paid the bank."  (RT 1/13:60)
26  Ken Mitchell testified that "...out of trust is selling manufacturer's vehicles and not reporting the sale to the manufacturer
    immediately and floating the money....[which means] not paying your debt on that vehicle right away."  (RT 9/30:101)
27  [31] Although she testified"...and I think 1 explained it [to Roadtrek]...".  (RT 1/9:197)
    [32] Not only because Paul Schilperoort had started daily staff meetings to insure that Roadtrek was timely paid, but also because
28  a September 5, 2008 email to her from a Roadtrek staff member alluded to "Brent McMahon direct[ing] you [Laurie Fosdick]
    to make these short payments...".  (Exhs 622, 623)

25

PROPOSED DECISION

1    no explanation was made for delays in payments after Mega RV did receive the final wholesale invoices.

2    (Exh 637: 000106; RT 1/9:195)

3    113.    Mega RV did not pay Roadtrek for parts invoiced after September 5, 2008,[33] even though

4    Roadtrek continued to supply parts to Mega RV through April 6, 2010.[34]  (Exh 496: 009155-009158)

5    114.    There was a "warranty reimbursement program" in place between the parties whereby

6    Mega RV would be paid by Roadtrek for labor and parts used to fulfill warranty obligations.

7    115.    In about July of 2008, Roadtrek determined that some, if not all, of the warranty claims

8    submitted by Mega RV and approved by Roadtrek would be used to "offset" amounts which Roadtrek

9    contended were "Mega obligations to Roadtrek".[35]  In about the third quarter of 2008, Paul Schilperoort

10    noted that warranty claims previously sent to Roadtrek had started to "age" which, in his experience in the

11    RV industry, meant that they had been submitted more than 60 days before----he stated that "...the average

12    claim takes about 60 days to get paid from all manufacturers."[36]  He said that the last warranty check from

13    Roadtrek that he could document was in July or August of 2008. (RT 9/21:128, 133-134; 8/19:65)

14.    116.    Roadtrek did not advise Mega RV that it was "offsetting" approved warranty claims

15    against amounts it contended were owed to it by Mega RV.  (RT 8/19: 128, 132-133)

16    117.    Roadtrek also offered a "franchisor incentive program" to its dealers.  Each Friday,

17    Roadtrek posted "Dealer Notes" on its website which, among other things, listed the motorhome models

18    eligible for "Consumer Cash Back Incentives" for the coming week.[37]  Roadtrek did not pay incentives

19    directly to customers: after a customer and a dealer signed the "CCB Incentive Claim Form" and

20    submitted it to Roadtrek, Roadtrek would then issue a check to the dealership, presumably to pass along

21    to the customer.  (Exhs 516, 642; RT 9/23: 41, 54, 83)

22    · 118.    Beginning at an unknown time, but at least as early as September 12, 2008, Roadtrek

23

24    [33] Roadtrek's Exhibit 496 may not be accurate in implying that Mega RV paid for no parts: Exhibit 76, pp 02018, 02356 and
02357 appear to be parts invoices paid by Mega RV in 9/09 and 11/09.
25    [34] There is a substantial question as to whether Roadtrek's Exhibit 496 reflects all the parts ordered by Mega RV or just a
selected number of parts that Roadtrek chose to ship to Mega RV. (RT 9/21:133-136)
26    [35] See Order Overruling Protestant's Objection to Introduction of Evidence of James E. Hammill's Declaration Re: Warranty
Reimbursement Claims; Findings Related Thereto (March 20, 2102).
27    [36] A manufacturer's failure to pay beyond 60 days after the warranty claim is submitted is a violation of Section 3075.
[37] Neither SPIFFs (cash incentives paid directly to the salesperson by the manufacturer) nor informal price concessions made
28    over the phone or by email to clinch a sale are "franchisor incentive programs" under Section 3076. (RT 1/12:13)

26

PROPOSED DECISION

002829

A0123

1 | would "offset" approved franchisor incentive program claims submitted by Mega RV against amounts it

2 | contended were owed to it by Mega RV.[38]

3 |    119.   Roadtrek did not advise Mega RV that it was "offsetting" approved franchisor incentive

4 | program claims against amounts it contended were owed to it by Mega RV. (Exh 496; RT 8/19: 61, 85;

5 | 11/9; 81-84; 1/10: 31-34)

6 |    120.   In late 2008, Paul Cassidy traveled to California, meeting with Paul Schilperoort and

7 | Laurie Fosdick "...to get things cleaned up with respect to the outstanding accounts between our 2

8 | companies", as Roadtrek was concerned about Mega RV's "short payments" and late payments for vans.

9 | However, the parties "made no progress" in getting accounts "cleaned up". (Exh 632; RT 1/18:68-69)

10 |    121.   On April 9, 2009, Mega RV received a $200,000 loan from Dean Rumpel, owner of

11 | Pleasure-Way. Brent McMahon told Ken Mitchell, an independent sales contractor for Mega RV, "...that

12 | there was things that you can do to guarantee that we'd sell more Pleasure-Ways over Roadtrek, and that

13 | was to assign a minimum front end gross to all Roadtreks to steer the Class B sales towards Pleasure-

14 | Ways." With each Pleasure-Way sale, the dealer incentives would be used to pay down the loan. (Exhs

15 | 42, 43; RT 9/30:67-68; 71-72)

16 |    122.   The parties again met in May and in June of 2009. Jeff Hanemaayer stated that he and

17 | James Hammill flew to California "...to read [Brent McMahon] the riot act". In one meeting, at the "Mill

18 | House" at TraveLand in Irvine, attended by James Hammill, Brent McMahon and Paul Schilperoort, the

19 | parties reached a "check for check" settlement. This settlement, however, also fell through. There was no

20 | evidence that termination of Mega RV's franchise was a topic of discussion at either meeting. (RT 9/21:

21 | 92-93; 11/14: 241-243)

22 |    123.   In May 2009, following a meeting with Brent McMahon, Jeff Hanemaayer and James

23 | Hammill met with Frank De Gelas, who had "expressed interest" in handling Class B motorhomes at his

24 | MTRV dealerships. This was, according to Jeff Hanemaayer, "... part of the normal course to establish

25 | and maintain relationships with alternatives in case we lose a dealer at a given market". Although Jeff

26 |

27 | [38] The reference is found in the Order Overruling Protestant's Objection in Evidence of James E. Hammill's

28 | Declaration Re: Franchisor Incentive Program Claims; Findings Related Thereto, attached to the Proposed Decision in Protest Nos. PR-2205-10, PR-2211-10 and PR-2212-10 as Exhibit A, at page 9 of the exhibit.

<div align="center">27</div>

<div align="center">PROPOSED DECISION</div>

002830

A0124

1  Hanemaayer had not met Frank De Gelas before, James Hammill had met him "many times" because his

2  practice was to "... develop relationships with the bigger players in the industry...". (RT 11/7:145-146;

3  11/14: 241-244)

4      124.  After the June 2009 meeting, Mega RV's payment record "disintegrated from 20 days

5  average to 45 days average"---longer than the 14 days after sale, or even after "retail funding date", that

6  the parties had agreed upon.  On August 7, 2009, James Hammill emailed Paul Schilperoort that Mega

7  RV must bring its "payment status current" before any settlement could take place and that he needed to

8  speak personally with Brent McMahon about the "problem" of the "out of trust" motorhomes.  (Exh 644)

9      *Events From Mid-2009 and Mid-2010*

10      125.  On August 12, 2009, Mega RV's attorney, Michael Sjeving, Esquire, wrote a demand letter

11  to Roadtrek's counsel, Louis Chronowski, Esquire.  In a September 2, 2009 email, Mr. Sieving stated that

12  "[Mega RV] just opened a new flooring line, and will put the Roadtrek units on within the next 30 days.

13  The SOT's will be taken care of at that time. [Brent McMahon is] not willing to terminate as a Roadtrek

14  dealer....We need to discuss the outstanding obligations from Roadtrek to [Mega RV]..." (Exhs 645, 651)

15  According to Brent McMahon, the reference in Mr. Sieving's email to "SOT's" was "sold out of trust".

16  (RT 8/11:67)

17      126.  In September 2009, Roadtrek advised Mega RV that it would be removing Mega RV from

18  its flooring program.  In an email to Brent McMahon on September 2, 2009, Jeff Hanemaayer stated his

19  preference that Brent McMahon give up his Roadtrek franchise, citing Mega RV's failure to meet recent

20  commitments to pay for two out-of-trust vans and to stay current in payments which, in turn, affected

21  Roadtrek's ability to get accounts receivable insurance. (Exh 654; RT 8/12:245-247)

22      127.  On September 8, 2009, Jeff Hanemaayer's email to Brent McMahon memorialized the

23  parties' "lengthy conference call" a few days before.  Roadtrek was prodding Mega RV to try to get GE

24  Capital to raise Mega RV's current floorplan limit by $1.7 million to finance 23 unsold Roadtrek vehicles,

25  presumably so that Roadtrek could remove Mega RV from its own floorplan program and receive

26  payment for the vans on Mega RV's lots.  Roadtrek offered to try to sell some of the Roadtrek vehicles to

27  other dealers but, "[f]ailing that, [Mega RV would] have to find financing for them". (Exh 654)

28      128.  On October 14, 2009, Mega RV requested GE Capital to "reallocate" its credit line so that

28

PROPOSED DECISION

1  Roadtrek vehicles may be included on Mega RV's flooring line.  However, no part of the flooring line

2  would have been available to Mega RV for Roadtrek vehicles until it cleared up the Monaco line.  (Depo

3  Tr of Barbara Andino, pp. 55-59)

4      129.   At the 2009 Pomona RV show, held in mid-October, Roadtrek repossessed Mega RV's

5  inventory of Roadtrek vehicles.   Roadtrek hired Quality Drive-Away to take the motorhomes to a storage

6  location.  (RT 9/22:33, 100)

7      130.   After the Pomona RV show, Roadtrek did not deliver any new motorhomes to Mega RV.

8  (RT 1/12: 37)

9      131.   Conrad Plomin, a CPA and business financial consultant, was retained by Brent McMahon

10  in October of 2009 to review Mega RV's financial and accounting systems and to liaison with Mega RV's

11  floor plan lenders.  (RT 8/17:7-112)

12      132.   At the time of Conrad Plomin's consultancy, Mega RV was flooring Roadtrek RVs (as well

13  as Monaco, Thor, "Winnebago probably, and "other minor [RV line-makes]") with GE Capital.[39]  Mega

14  RV enjoyed a positive relationship with GE Capital, but was on the lender's "watch list", which meant

15  "...more frequent review, more frequent discussions, more frequent scrutiny with their senior

16  management".  Mega RV's placement on the "watch list" was prompted by having units coded SOT or

17  "sold out of trust"—units that have "technically been sold [but] GE has not been paid...".  Mega RV was

18  "more frequent than the other...[dealers]..." with respect to the number of SOT units.  (RT 8/17: 34-36,

19  38-39, 73, 74, 81; Depo Tr of Amanda Hirchert, pp. 11-13; Depo Tr of John Print, pp. 8, 12-13, 36; Depo

20  Tr of Barbara Andino, p. 77)

21      133.   In November 2009, Mega RV was "...nearing or near above [its $10 million flooring line

22  with GE Capital]".  It appears that several deals could not be floored by GE Capital because Mega RV

23  was "...over their credit limit as well as needing to remit payments [i.e., out of trust]...".  (Depo Tr of

24  ///

25  ///

26  ///

27

28  [39] However, Conrad Plomin was unaware of the number of Roadtrek units which were on the GE Capital flooring line in the fourth quarter of 2009. (RT 8/17:73, 74)

<div align="center">29</div>

<div align="center">PROPOSED DECISION</div>

1  Barbara Andino, pp. 36-37, 61-69)[40]

2    134.    As part of Conrad Plomin's role as a strategic financial adviser to Mega RV, the "Roadtrek

3  issue" came up; Conrad Plomin was aware that "...[t]here was monies owed to Roadtrek and Roadtrek

4  owed McMahon's money". Brent McMahon and Paul Schilperoort told him that Mega RV was owed

5  more than it owed Roadtrek, but he did not independently verify this representation. Conrad Plomin

6  advised Brent McMahon that "...until he was able to reach a satisfactory agreement with Roadtrek... he

7  [should] not pay them the money that was purportedly owed to them..." in order to retain leverage in

8  settlement talks. He also encouraged Brent McMahon to attempt to reach an agreement with Roadtrek, a

9  "global settlement". (RT 8/17:46-47, 89)

10    135.    Brent McMahon followed (part of) Conrad Plomin's advice and did not pay Roadtrek for

11  four motorhomes, as he felt he had no other option to protect Mega RV in the event Roadtrek became

12  insolvent. The "value" of the four motorhomes totaled approximately $200,000 to $220,000. (RT

13  1/10:18-21)

14    136.    However, despite being impacted by bad economic times, there was no evidence that

15  Roadtrek would not stay in business or would be unable to manufacture and deliver motorhomes and parts

16  and provide support to its dealers.

17    137.    On November 26, 2009, a few days before an annual manufacturers' RV show in

18  Louisville, James Hammill wrote a letter to Brent McMahon via both email and regular mail.. The letter

19  laid out Roadtrek's positions on what Roadtrek considered the issues of controversy between the parties:

20  Roadtrek's expectation of payment by Mega RV for four out-of-trust motorhomes, Roadtrek's willingness

21  to renegotiate minimum stocking levels at Mega RV's dealerships, Roadtrek's request that Mega RV

22  designate a specific amount of flooring for Roadtrek vans with GE Capital, and Roadtrek's readiness to

23  "...[consider] all outstanding amounts between the parties..." to resolve "...the other amounts (interest,

24  holdbacks, etc.) owed to each company...". The letter stated that "[w]e have no present intention to

25  appoint another dealer in your area. However, we have been keeping our options open because of [Mega

26

27  [40] Barbara Andino also testified to at least one sale that apparently could not be floored because Mega RV did not provide to
    Roadtrek a "PO number" which Roadtrek needed in order to input its approval to GE Capital to floor a custom-ordered

28  Roadtrek van for Mega RV. It is unclear whether a manufacturer's "involvement" in the flooring process is needed just for
    custom orders or for any RV order. (Depo Tr of Barbara Andino, pp. 61-65)

                                          30

                              PROPOSED DECISION

002833

A0127

RV's] inability or unwillingness to meet its obligations to us.  We reserve the right to exercise any remedies available to us under the law".  In closing, James Hammill wrote, "[w]e...welcome a face-to-face discussion next week in Louisville".  (Exh 664; RT 8/15: 64)

138.    On December 1, 2009, during the manufacturers' RV show in Louisville, the parties met for dinner. James Hammill and Jeff Hanemaayer from Roadtrek, and Brent McMahon, Paul Schilperoort and Mike Lankford from Mega RV were there.  They orally agreed to the terms of a settlement, which they agreed to reduce to writing to be signed by the parties.  Termination of Mega RV's franchise was not part of the oral agreement, nor is there any evidence that it was a topic of discussion during the dinner meeting.  (RT 8/11: 143; 8/19: 163-164; 11/14: 74-76, 110-111; 11/17: 20-21, 37; 11/28: 43)

139.    Brent McMahon designated Mike Lankford to be his representative to work with Jeff Hanemaayer to put the oral agreement in writing.  Between December 2ⁿᵈ and December 11ᵗʰ, 2009 Jeff Hanemaayer produced no fewer than five versions of a Settlement Agreement.  Points of difference were identified in various drafts of the settlement agreement, negotiated with success and approved by both parties. None of the settlement drafts called for the termination of Mega RV's franchise.  (Exhs 27, 668; RT 8/11: 143; 11/14: 108, 116-117)

140.    Ultimately, Brent McMahon did not sign the fifth version of the Settlement Agreement. His sole objection to the document was the use of the phrase "out of trust" to describe the four vans for which payment to Roadtrek was still outstanding.  (RT 11/17: 184-185)  Mike Lankford stated that Mega RV would not agree with "...that one line that says 'out of trust,' because we are not out of trust. We always had the intent and we always had the means to pay.  A dealer that's out of trust means he doesn't have the money, nor will he ever have the money. He doesn't have the intention to pay, nor does he ever have the intention to pay."  (RT 11/28: 77-78)  Mega RV's situation, according to Mike Lankford, was that "...[Mega RV] didn't pay timely enough...".  (RT 11/17: 59-61, 64, 78-79, 108, 189, 191; 11/18: 12, 24)

141.    Mega RV's reason for refusing to sign the settlement agreement is not credible.  Brent

///

///

///

31

002834

A0128

1  McMahon's understanding of the term "out of trust" does not comport with others in the RV industry[41]---

2  the phrase means that a dealer has not paid for a vehicle after selling it and, although negative, it does not

3  necessarily mean that the dealer cannot and will not pay for the product. Brent McMahon's own attorney

4  had used the phrase in his demand letter to Roadtrek in September of 2009, without apparent objection by

5  Brent McMahon. (Exh 651) The "out of trust" phrase had been used in each settlement draft to refer to

6  the four motorhomes for which Mega RV still owed payments. When the fifth version of the settlement

7  document, already signed by Jeff Hanemaayer, was presented to Brent McMahon, he refused to sign it.

8  (Exh 27)

9       142.    In a December 14, 2009, email to Brent McMahon, Jeff Hanemaayer called off the

10  settlement talks. He wrote that "[w]e will need adequate assurances as defined under the UCC before

11  completing any further transactions. Those adequate assurances must take the form of: (1) payment of

12  out-of-trust units; (2) for future deliveries, an irrevocable letter of credit OR a 25% deposit before

13  production and payment by cashiers check before delivery." The email also stated that the "adequate

14  assurances as defined under the UCC" from Mega RV must be received before Roadtrek "...[completes]

15  any further transactions...", presumably referring to delivery of motorhomes and parts.[42] (Exh 674)

16       143.    Brent McMahon's December 14, 2009 email response to Roadtrek's demand for adequate

17  assurances was "Good luck". (Exh 674)

18       144.    Mega RV did not provide adequate assurances to Roadtrek, either in the form requested or

19  otherwise.

20       145.    Under the UCC, Roadtrek's position is that it may consider that Mega RV's failure to

21  provide adequate assurances of performance a repudiation of the Dealer Agreement after the passage of

22  30 days from the request.

23       146.    On December 30, 2009, Mega RV's attorney wrote Jeff Hanemaayer advising that a

24  proposed termination of an RV franchise "...requires statutory notice, which would trigger a protest

25

26  _____

27  [41] See footnote 30 above, which sets forth the testimonies of Conrad Plomin, Amanda Hirchert, Frank De Gelas and Ken
    Mitchell defining "out of trust".
    [42] However, between 12/16/09 and 4/6/10, Roadtrek stated that it did fill sixteen invoice requests from Mega RV for parts.

28  There is no evidence that Mega RV paid for the parts. Roadtrek's last shipment of parts to Mega RV was on 4/6/10. (Exh 496,
    RMI 009158)

                                         32

                                 PROPOSED DECISION

002835

A0129

1   before the New Motor Vehicle Board...". Further, the letter stated that "Vehicle Code Section 3070

2   prohibits the unilateral modification of a dealer agreement, such as the establishment of a dealership in

3   another dealer's exclusive territory...". The letter concluded with a stated intention to pursue, on Mega

4   RV's behalf, "...any and all remedies...against Roadtrek...".   (Exh 681)

5          147.   On January 29, 2010, Roadtrek signed a Dealer Agreement with Frank De Gelas of Mike

6   Thompson's RV Center ("MTRV").   Among other things, the Dealer Agreement gave MTRV "exclusive"

7   Roadtrek dealership rights in the counties of Los Angeles, Ventura, Orange, Riverside and San

8   Bernardino for the next five years, with automatic renewals for each successive five-year period.

9   Roadtrek also promised to indemnify MTRV for any expenses arising out of any protest that Mega RV

10  may file with the Board. (Exh 685)

11         148.   The four Roadtrek motorhomes for which Brent McMahon withheld payment to Roadtrek

12  are still "out of trust".  (RT 1/10:21)

13  **FINDINGS RELATIVE TO THE RELOCATION OF MEGA RV'S**

14  **DEALERSHIP AT "TRAVELAND" IN IRVINE TO WESTMINSTER**

15         149.   In March of 2012, Mega RV relocated its RV dealership at TraveLand in Irvine, California

16  to a new location in Westminster, California. (RT 4/26: 30-31)

17         150.   There is no "written RV franchise agreement" between the parties referencing Mega RV's

18  dealership location in Westminster, California.

19         151.   Nothing in the 2006 Dealer Agreement supports an argument that it would encompass a

20  relocated dealership location.  Although Roadtrek promised to "work with [Brent McMahon] to expand

21  his operation..." and "...expansions will be negotiated at the time of the expansion"---these phrases

22  connote not only active participation by Roadtrek, but also the establishment of additional dealerships, not

23  relocation of an existing dealership. (Exh 600, Section 111)

24         152.   Therefore, there is no franchise for Mega RV to sell Roadtrek vans from its Westminster

25  dealership. As Mega RV is no longer operating a dealership at the Irvine location, there is no existing

26  Roadtrek dealership the closure of which would be caused by the termination of the franchise for the

27  Irvine location.  This location has already been closed and the impact upon the public, the franchisee and

28  the RV business has already occurred.  The Board could not order that the protest be sustained and enable

<center>33</center>

---

<center>PROPOSED DECISION</center>

002836

A0130

1   Mega RV to remain in operation at the former Irvine location. Additionally, the Board lacks jurisdiction

2   to consider the termination of Mega RV's Roadtrek franchise at its Westminster location pursuant to

3   Section 3079 because Article 5 (commencing with Section 3070 et seq.) "…applies only to a franchise

4   entered into or renewed on or after January 1, 2004." As indicated above, there is no Roadtrek franchise

5   for Mega RV's Westminster location.

6       153.    The closure of Mega RV's Irvine dealership is not, however, fatal to the entire Dealer

7   Agreement, which also covers Mega RV's Colton dealership. The instant protest may proceed in regard

8   to the Colton location. Evidence received during the hearing in regard to the Irvine location, unless

9   relevant to issues concerning Mega RV's Colton dealership, shall be disregarded.

10      **<u>FINDINGS RELATED TO "GOOD CAUSE" FACTORS OF SECTION 3071</u>**

11      154.    In determining whether "good cause" has been established for terminating a franchise of a

12  dealer of new recreational vehicles, the Board shall take into consideration the existing circumstances

13  including, but not limited to, seven listed inquiries. (Section 3071) The burden of proof is on Roadtrek to

14  establish that there was "good cause" to terminate the franchise of Mega RV. (Section 3066(b))

15      **<u>Findings Relating to "Existing Circumstances" (Section 3071)</u>**

16      155.    The starting point to consider existing circumstances is April 3, 2008. This is the date the

17  parties executed the Security Agreement which, along with the February 22, 2006 Dealer Agreement,

18  governed the parties' relationship. (Exhs 600, 614)

19      156.    For background, events before April 3, 2008, may be summarized as follows:

20      A.      Initially, between about 2001 and about 2005, the parties enjoyed a mutually profitable

21  relationship which brought financial success to both. Both businesses grew significantly, fueled by a

22  good economy and consumers with disposable money or credit to buy expensive recreational vehicles.

23  Business relationships and deal-making were informal.

24      B.      In late 2005, with the economy on the upswing, James Hammill proposed, and Brent

25  McMahon agreed, that Roadtrek would "flood" Mega RV's lots with Roadtrek motorhomes. This

26  informal, oral arrangement worked very well to sell Roadtrek RVs off the lots through 2006 and into late

27  2007. It was a "win-win" situation. (The stocking levels and dealer's ordering commitments in the

28  parties' February 2006 Dealer Agreement were ignored during this period.)

<div align="center">34</div>

<div align="center">PROPOSED DECISION</div>

002837

A0131

C.   The robust economy ended quickly in late 2007, and the RV industry was hit hard. The arrangement that had been in place during the good times could not continue. The parties met in Kitchener at Roadtrek headquarters in March of 2008 and, in spite of resentment on the part of Brent McMahon, the parties did execute the Security Agreement on April 3, 2008. Mega RV remained a Roadtrek franchisee, with exclusive territorial dealer rights, and Roadtrek would continue to deliver motorhomes to Mega RV, and their financial dealings were formalized.

157.   After the parties signed the Security Agreement, their business relationship was governed by four[43] separate and discrete statements of their rights and responsibilities to one another: (1) their franchise agreement (the February 22, 2006 Dealer Agreement); (2) the April 3, 2008 Security Agreement; (3) the California Vehicle Code and Title 13 of the California Code of Regulations governing recreational vehicles; and (4) the Uniform Commercial Code (UCC).

158.   After April 3, 2008, either party was free to assert rights and pursue remedies pursuant to any of these four authorities, unless there was a prohibition or preemption precluding such action. However, where a franchisor seeks to terminate an RV franchise, the only manner of doing so (absent an agreement of the parties) is pursuant to the procedures in the California Vehicle Code and the Board's regulations (13 CCR § 550, et seq.).

A.   Section 3070(a) ("Termination of Franchise") states that "[n]otwithstanding...the terms of any franchise, a franchisor of a dealer of new recreational vehicles...may not terminate or refuse to continue a franchise unless [the franchisor has given notice to the franchisee and to the Board in a prescribed form, thereby giving the franchisee the opportunity to request a hearing]." (Emphasis added.) Therefore, an RV franchise may not be terminated by "the terms of any franchise".

B.   In the fall of 2009, Roadtrek elected to pursue its remedies under the UCC.[44] Roadtrek repossessed from Mega RV the Roadtrek motorhomes in which Roadtrek asserted that it had security interests. In December 2009, it demanded "adequate assurances" under the UCC from Mega RV as to its financial ability to pay for inventory. (Exh 674) In mid-January 2010, Roadtrek declared that since Mega RV had failed to provide the requested "adequate assurances", it had therefore---under the UCC---

[43] Also, the Province of Ontario, Canada, is the choice of law forum stated in the Security Agreement.
[44] The Board does not have jurisdiction in regard to the legality of Roadtrek's procedures under the UCC.

35

PROPOSED DECISION

002838

A0132

1  "repudiated" its Dealer Agreement. Roadtrek's declaration that Mega RV had "repudiated" the Dealer

2  Agreement under the UCC presumably gives Roadtrek certain legal rights under the UCC, but it does not

3  terminate Mega RV's franchise.

4        C.    Mega RV contends that Roadtrek's act of establishing the MTRV franchise was the

5  culmination of a course of conduct which effectively resulted in the termination of Mega RV's franchise

6  (Mega RV calls it a *de facto* termination).[45]  This argument is flawed because an RV franchise may not

7  be terminated by a course of conduct or by a particular act. Roadtrek must comply with the provisions of

8  Section 3070.[46]

9        159.   It is not within the Board's jurisdiction to determine the legality of Roadtrek's pursuit of its

10  remedies under the UCC, but its actions and Mega RV's response to them may legitimately be considered

11  as "existing circumstances" in determining whether Roadtrek has "good cause" to terminate the franchise

12  pursuant to Section 3071.

13        160.   After the repossession of the motorhomes in October 2009, Mega RV failed to negotiate in

14  good faith with Roadtrek to settle their accounts.  Mega RV bears responsibility for the failure of the

15  parties' final settlement effort in mid-December of 2009.

16        161.   Brent McMahon's email response to Roadtrek's request for "adequate assurances" was

17  "Good luck".  No timely assurances were made that Mega RV was financially able to meet its obligations,

18  even though Mega RV may have secured financing sources, or had the potential for such financing.

19        162.   In mid-January 2010, Roadtrek gave notice to Mega RV that it was in default and had

20  "repudiated" the Dealer Agreement (the UCC remedy) by failing to provide "adequate assurances".  As

21  Roadtrek had determined that Mega RV had breached the Dealer Agreement, Roadtrek was entitled to

22  advise Mega RV that it would no longer deliver inventory or parts to Mega RV.[47]

23

24  _____

[45] The Roadtrek-MTRV Dealer Agreement <u>does</u> affect Mega RV's franchise, but not by terminating it.  The franchise which
25  Roadtrek awarded MTRV did not establish an "additional" franchise in Colton; by giving MTRV "exclusive" franchise rights,
    MTRV completely pre-empted Mega RV's formerly "exclusive" area.  Had this protest been sustained, Roadtrek would have
26  had the task of resolving two incompatible franchises.
[46] Similarly, the Security Agreement provided that "[it] may not be modified, altered or amended in any manner whatsoever,
27  except by a further agreement in writing signed by the duly authorized representatives of [the parties]", meaning that not only
    oral or unsigned attempted changes would be of no legal effect, but also that the Security Agreement could not be modified by
28  a course of conduct, or course of performance, of the parties.  (Exh 614, Section 15)
[47] As noted above, the legality of the parties' actions under the UCC is not within the jurisdiction of the Board.

36

PROPOSED DECISION.

002839

A0133

163.   Mega RV, by its own actions in failing to respond to Roadtrek's request for "adequate assurances", has placed itself in the position of being without Roadtrek inventory, parts and factory support, and is therefore unable to carry out the functions of a Roadtrek franchisee.

164.   Mega RV's failure to provide "adequate assurances" under the UCC had consequences under the parties' franchise agreement and security agreement: since Mega RV was not able to order Roadtrek inventory, it failed to meet the stocking levels required by the Dealer Agreement. It was therefore not in "good standing" under the terms of the Dealer Agreement, which resulted in loss of its "exclusive territories" as a Roadtrek dealer. Mega RV no longer had "exclusive" territorial rights as a Roadtrek dealer on January 29, 2010 when Roadtrek executed a Dealer Agreement with MTRV, establishing a new franchise location across the street from Mega RV's Colton dealership.

165.   "Existing circumstances" will inevitably include an examination of the practice by both parties' of "offsetting" payments against debts each maintained was owed by the other party or, in the case of Mega RV, "short-paying" Roadtrek for motorhomes. Both parties are so deeply at fault in this practice---which caused both parties monetary losses and the destruction of confidence in each other--- that it is impossible to assign primary blame. It is even difficult to pinpoint when the practice started. Because each party kept the other in the dark as to what accounts they were "offsetting" and why they were "offsetting", their business relationship became a financial nightmare. Their failure, at almost any juncture after the "offsetting" started in mid-2008, to settle their accounts is inexplicable.

166.   "Existing circumstances" would also encompass Mega RV's withholding of payments to Roadtrek for four Roadtrek motorhomes, the value of which totals approximately $200,000 to $220,000 and then failing to negotiate in good faith a resolution of the accounts between the parties in mid-December 2009.

167.   "Existing circumstances" would also include Mega RV's delay in the application to GE Capital for Roadtrek flooring until October 14, 2009, well after Mega RV's lawyer had promised, in a September 2, 2009 email, that "[Mega RV] just opened a new flooring line, and will put the Roadtrek units on within the next 30 days. The SOT's will be taken care of at that time." (Exh 651) Thereafter, it appears that the GE Capital flooring line was unavailable for Roadtrek purchases, as it was at or over the flooring limit.

<div align="center">37</div>

002840

A0134

## Findings Relating to the Amount of Business Transacted by the Franchisee, as Compared To the Business Available to the Franchisee (Section 3071(a))

168.  No evidence was presented as to the business available to Mega RV.  Therefore, reference points to evaluate Mega RV's sales success or lack thereof, are missing.

169.  However, even in the absence of direct evidence, one may assume that there is some consumer demand for Roadtrek motorhomes.  For example, Roadtrek sold 660 motorhomes through 54 dealers in the U.S. in 2010.  (RT 8/9: 51)  There are previously-sold Roadtrek vans on the road which are under warranty, and there are older model Roadtrek vans which, although out of warranty, need to be serviced by those familiar with the line-make.  Mega RV has found itself, as a result of its own acts, without Roadtrek inventory, source of parts, or factory support; it can neither sell nor service Roadtrek motorhomes.  Mega RV has placed itself in the position of not being able to transact any Roadtrek business, despite its past marketing successes with the line-make.[48]

170.  As there is no Roadtrek business transacted by Mega RV, Roadtrek has therefore sustained its burden of proof in establishing "good cause" to terminate under Section 3071(a).

## Findings Relating to the Investment Necessarily Made and Obligations Incurred by the Franchisee to Perform Its Part of the Franchise (Section 3071(b))

171.  No evidence was presented that Roadtrek required Mega RV to make an investment or incur an obligation to acquire the dealership or to make any type of investment in its physical plant or facilities in order to sell Roadtrek vans.  Roadtrek does not require its dealers to renovate their dealerships, to build or create special showroom space, or to purchase signs or special tools to service Roadtrek products.  (RT 9/22:94-95; 11/9:153-155; 11/11:63)

172.  Roadtrek does require dealers to have facilities adequate to display the Roadtrek motorhomes; dealerships must be "...capable of meeting the sales and service potential of Dealer's Territory".  (Exh 600, Section 301).

173.  Sales of Roadtrek motorhomes represented only "a very minor percentage of sales" according to Brent McMahon, between 8% and 11% and "maybe 15%" of Mega RV's inventory.  Mega

---

[48] In the last two years in which Mega RV had a Roadtrek franchise, it ordered 55 motorhomes in 2008 and 49 in 2009.  (Exh 508)

38

002841

A0135

1   RV represented many other RV line-makes, over 60 different RV brands from 10 different manufacturers.

2   (RT 8/9: 77, 97)  Any investments which Mega RV made in facilities would benefit all line-makes offered

3   for sale.  In regard to Mega RV's Colton dealership, no evidence was presented of the initial investment in

4   the property or the nature and costs of any improvements which might have been made since the

5   dealership opened in March 2002.

6       174.  Similarly, Mega RV's advertising did not benefit Roadtrek products exclusively.  Brent

7   McMahon stated "…[w]e weren't spending $140,000 a month [referring to Mega RV's advertising budget]

8   just focusing on Roadtrek" and "advertising expenses" were not "for Roadtrek alone" but would include

9   "the dealership branding…all the advertising that we do for the company…"  (RT 8/10:96-98)

10      175.  In the event of termination, pursuant to Section 11713.13(e)(2), Roadtrek is obligated to

11   pay Mega RV "…for all unused and undamaged supplies, parts and accessories" and "…the fair market

12   value of all special tools…".  Therefore, any purchases of parts or equipment Mega RV may have made in

13   order to sell or service Roadtrek vans would be reimbursed by Roadtrek to Mega RV.

14      176.  Roadtrek has therefore sustained its burden of proof of establishing "good cause" to

15   terminate under Section 3071(b).

16         **Findings Relating to the Permanency of the Investment (Section 3071(c))**

17      177.  Brent McMahon has been in the RV business for over 20 years and, in that time, has grown

18   a small operation into a large business enterprise.  He is aggressive in his commitment to the success of

19   his dealerships.  He has survived the economic downturn, unlike many other RV dealers.  In 2007, Mega

20   RV's average monthly advertising budget was $140,000 for marketing campaigns (such as "Van City

21   USA") on TV and on the radio, in print advertising, and at sport venues and shows.  In 2008, Mega RV

22   had a sales staff of over 100 employees.  To maintain service facilities, there are expenditures for parts,

23   maintenance of infrastructure, service technicians, diagnostic and service equipment.  (Exh 609; RT

24   8/9:134; 8/10: 96, 100)

25      178.  Brent McMahon established Mega RV's Colton dealership at 1312 RV Center Drive in

26   the "Colton RV Expo" on March 14, 2002, where it is located today.

27      179.  Roadtrek has not sustained its burden of proof of establishing "good cause" to terminate

28   under Section 3071(c), as it has not established that Mega RV does not have permanency of its

<center>39</center>

<center>*PROPOSED DECISION*</center>

1   investment.

2   ## Findings Relating to Whether it is Injurious or Beneficial to the
    ## Public Welfare for the Franchise to be Modified or Replaced or the Business of the
3   ## Franchisee Disrupted (Section 3071(d))

4       180.    Since Mega RV has not conducted <u>any</u> Roadtrek business for several years, termination

5   of Mega RV's Roadtrek franchise will not cause any further disruption or loss to the public of the

6   benefits that should have been available and provided by a Roadtrek franchisee in Colton.  MTRV has

7   been located in the "Colton RV Expo" for a long time, since at least July 1, 1999, and is therefore well

8   established.  It will provide a Roadtrek presence for sales and service in a large RV market.

9       181.    Moreover, even when Mega RV was selling Roadtrek motorhomes, the Roadtrek line-

10   make represented a "minor percentage of sales", buyers apparently preferring Class A motorhomes such

11   as Winnebago or RVs which have more space and amenities at half the price.[49]  Mega RV's business

12   would therefore not be "disrupted" by the loss of the Roadtrek franchise.[50]

13       182.    Roadtrek has therefore sustained its burden of proof of establishing "good cause" to

14   terminate under Section 3071(d).

15   ## Findings Relating to Whether the Franchisee has Adequate New Recreational Vehicle Sales
    ## and, if Required by the Franchise, Service Facilities, Equipment, Vehicle Parts, and
16   ## Qualified Service Personnel, to Reasonably Provide for the Needs of the Consumers
    ## of the Recreational Vehicles Handled by the Franchisee and Has Been and Is Rendering
17   ## Adequate Services to the Public (Section 3071(e))

18       183.    As noted above, in regard to facilities, Roadtrek requires its dealers to have dealership

19   locations adequate to display the Roadtrek motorhomes and to meet sales and service obligations.  (Exh

20   600, Section 301)

21       184.    The Dealership Agreement also requires dealers to acquire and maintain "diagnostic

22   equipment, tools, other equipment and machinery" necessary to service Roadtrek vehicles (Exh 600,

23   Section 187), to "maintain a stock of replacement parts, including genuine parts" (Exh 600, Section 210),

24   and to maintain and direct "trained, quality service and parts departments" (Exh 600, Section 190).

25   Roadtrek will annually evaluate a dealer's "effectiveness" by reviewing its "…retail sales…stocking of

26

27   ――――――――――――――――――
     [49] Sales Manager Marshall Maresh also stated that Mega RV carries "about 35 to 40 other product lines", so Roadtrek RVs
28   were just a small portion of my pie…my income."  (RT 1/12: 39-40)
     [50] Mega RV still has another Class B franchise, Pleasure-Way.

40

PROPOSED DECISION

002843

A0137

1  Roadtreks and Roadtrek service parts, sales and service personnel and facilities, customer satisfaction, and

2  warranty and service performance." (Exh 600, 112)   No evidence was presented that Roadtrek conducted

3  the annual review contemplated by Section 112.

4      185.   Starting in 2001, Mega RV was a high-volume Roadtrek dealer, the "top dealer" at least

5  one year and consistently selling a larger percentage of Roadtrek's production than any other dealer in

6  the United States. Brent McMahon had the admiration of Roadtrek's executive, James Hammill.

7  Therefore, one may assume that during those earlier years as a Roadtrek dealer, Mega RV did have

8  "adequate" sales and service facilities, equipment, vehicle parts and qualified personnel sufficient to

9  render "adequate" services to the public.   One may also assume that if Roadtrek's annual reviews of

10  "dealer effectiveness" were in fact made, Mega RV would pass muster.

11      186.   The love affair between Roadtrek and Mega RV continued until the bad economy hit the

12  RV industry, starting in late 2007. Mega RV survived, but reduced its work force and closed two

13  locations.   Since late 2009 or early 2010, Roadtrek has not delivered to Mega RV inventory or parts;

14  Mega RV has therefore not been rendering any Roadtrek services ("adequate" or not) to the public.[51]

15      187.   However, Mega RV's stellar performance in the past should not be ignored. While it is

16  true that Mega RV is currently not rendering "adequate services to the public", it had been doing so for

17  many years. It presently has the same facility in Colton that it had when it was a successful Roadtrek

18  dealer and, one may assume, it also presently has sales and service personnel who previously worked with

19  Roadtrek RVs and retain familiarity with the Roadtrek line-make.

20      188.   Mega RV's current situation of being without Roadtrek inventory, parts or factory support

21  is the result of its own actions.[52]

22      189.   Instances of customer dissatisfaction with Mega RV are anecdotal and isolated.

23      190.   Even though Mega RV is not presently conducting Roadtrek business, it has done so in the

24  past and maintains an "adequate" facility and sales and service personnel to provide for the needs of

25  Roadtrek consumers. Roadtrek therefore has not sustained its burden of proof of establishing "good

26  cause" to terminate under Section 3071(e).

27

28  [51] Mega RV may be performing some services on Roadtrek vehicles, just not selling new vans or performing warranty work.
    [52] As noted above, the legality of Roadtrek's pursuit of its remedies under the UCC is not an issue to be decided in this forum.

PROPOSED DECISION

002844

A0138

**Findings Relating to Whether the Franchisee Fails to Fulfill the Warranty Obligations
Agreed to be Performed by the Franchisee in the Franchise (Section 3071(f))**

191.    Starting in about mid-2008, Roadtrek failed to give notice to Mega RV that it was
"paying" Mega RV's approved warranty reimbursement claims by "offsetting" those claims against
amounts it asserted were debts owed by Mega RV, a violation of Section 3075.

192.    Also starting in about mid-2008, Mega RV failed to pay Roadtrek for parts, a violation of
the franchise agreement, even though Roadtrek continued to deliver parts to Mega RV so that it could
perform warranty work. It is unclear whether the parts which Roadtrek chose to deliver to Mega RV were
sufficient in type and number to allow Mega RV to effectively fulfill its warranty obligations under the
franchise. Paul Schilperoort stated that "...sometime in '09...it became more difficult to complete
warranty, financially for us to even do warranty because basically we funded our own warranties, and I
couldn't get the parts." (RT 9/21:133-136)

193.    By "offsetting" payments on approved warranty reimbursement claims from Mega RV,
Roadtrek was not only withholding money for parts (which Roadtrek argues that even though Mega RV
was not paying for parts, it was sending them so that warranty work could be performed), but also for
labor. Paul Schilperoort's comment that Mega RV was "...fund[ing their] own warranties..." is well
taken.

194.    Roadtrek has not sustained its burden of proof of establishing "good cause" to terminate
under Section 3071(f), in that it violated Section 3075 which adversely impacted Mega RV's ability to
fulfill the warranty obligations it agreed to perform in the franchise agreement.

**Findings Relating to the Extent of the Franchisee's Failure to Comply with the
Terms of the Franchise (Section 3071(g))**

195.    As discussed above, the "terms of the franchise" are contained in the February 22, 2006
Dealer Agreement.

196.    Roadtrek's Notice of Termination stated the following:

A.    "That [Mega RV] has ceased to conduct customary sales and service operations at its
[Colton dealership]";

B.    "That [Mega RV] is no longer stocking new Roadtreks at [this] dealership location[] and

42

PROPOSED DECISION

002845

A0139

1   [Mega RV] will not provide warranty service to all Roadtrek customers"; and

2           C.      That "...[Mega RV] is in violation of, at least, the following provisions of the Dealer

3   Agreement: failing to stock the required number of Roadtrek motorhomes as required by Section 109;

4   failing to purchase for retail sale the number of Roadtrek motorhomes as required by Section 111; using

5   Roadtrek leads to sell other manufacturer's Class B motorhomes; failing to service or provide warranty

6   service on Roadtrek motorhomes as required by Sections 189, 190, 192, 194; failing to maintain

7   adequate lines of wholesale credit as required by Section 330; failing to submit annual financial reports

8   as required by Section 350; and failing to operate a dealership in a way that reflects favorably on it and

9   Roadtrek as required by Section 370".  (Exh 701)

10          197.    The only thing that Mega RV needed to do under the Dealer Agreement "...to remain in

11  'good standing'..." was to ensure that Roadtrek vehicles would be "...stocked and prominently displayed

12  at each of [Mega RV's] sales outlets within Dealer's territory according to the following schedule: [a

13  total of 22 vans, allocated among four models]."  (Exh 600, Section 109)  By Mega RV's own actions

14  (discussed above) which resulted in Roadtrek curtailing deliveries of inventory, Mega RV failed to

15  maintain the stocking levels required by the Dealer Agreement and therefore ceased to conduct

16  customary sales and service operations at its Colton dealership.  Mega RV therefore violated the terms

17  of the Dealer Agreement in these respects.

18          198.    In the fall of 2009, Mega RV obtained a floor plan financing line for Roadtrek vehicles

19  from GE Capital.  However, since it was already nearing or near above its $10 million flooring limit, the

20  flooring line could not accommodate Roadtrek vans.  Moreover, Mega RV was out of trust in regard to

21  payment on other RV line-makes, so it could not fund additional units until it remitted those payments to

22  GE Capital.  (Depo Tr of Barbara Andino, pp. 36, 68)  In mid-December, Mega RV failed to provide

23  "adequate assurances" to Roadtrek that it was able to finance the purchase of Roadtrek inventory.[53]

24  Mega RV therefore violated the Dealer Agreement in regard to maintenance of adequate lines of

25  wholesale credit.

26

27

28  _____
    [53] Much later, in August of 2010, John Print of GE Capital emailed that "McMahon's RV can floor Roadtrek motorhomes", but
    this was not a timely response and was subject to qualifications.  (Depo Tr of John Print, pp. 18, 21)

                                              43

                                    PROPOSED DECISION

1    199.    It was only in late August of 2008, that Mega RV produced its 2007 financial statements,

2  and then only after numerous (and eventually angry) demands by James Hammill. (Exhs 600, 614, 619,

3  621; RT 9/23:95-98, 103) On October 30, 2008, Brent McMahon mailed financial statements through

4  September 30, 2008 to James Hammill, but the time period is unknown. (Exh 629; 8/10:204-209) There

5  is no evidence that Mega RV submitted 2008 or 2009 financial statements to Roadtrek. Mega RV

6  therefore violated the Dealer Agreement in regard to production of financial statements.

7    200.    Customer leads are generated using marketing programs developed and maintained by

8  Roadtrek which are very costly. (RT 9/22:124, 130-131). Roadtrek reviews the leads once a week and

9  sends the information to its dealers then, before an RV show, contacts the prospective customers again

10  about the Roadtrek display. Since Roadtrek has invested heavily to generate the leads, it expects dealers

11  to honor the Dealer Agreement by not using them to sell other line-makes. James Hammill recognized

12  the difficulties of enforcing this provision, observing that Roadtrek's expectation that dealers will "work

13  our product on those leads" was also based on moral and ethical grounds. (RT 9/22:124, 130-131)

14  However, in April of 2009, Mega RV received a $200,000 loan from the owner of Pleasure-Way, the

15  repayment of which was to come from incentives generated by sales of Pleasure-Ways over Roadtrek

16  RVs, thereby raising the inference that, after the loan date, potential Roadtrek buyers were diverted to

17  Mega RV's other Class B motorhome line-make, Pleasure-Ways.[54]

18    201.    Although three Mega RV customers (Kurt Brittain, Robin Hays and Thomas DeRossett)

19  came forward with various complaints about their experience with Mega RV, their stories are isolated and

20  anecdotal and do not sustain a finding that Mega RV failed to operate it dealership in a manner that

21  reflected favorably on Roadtrek.

22    202.    Roadtrek has sustained its burden of proof of establishing "good cause" to terminate

23  under Section 3071(g), as it has established that Mega RV has failed to comply with the terms of the

24  franchise.

25  ///

26

27  [54] Also, at least in 2007, Pleasure-Way's "hold-back" program paid Brent McMahon $1,000 per vehicle delivered to Mega RV.
(RT 9/22: 166) In 2008 or 2009, Dean Rumpel of Pleasure-Way advanced "hold-back" funds to Brent McMahon. (RT 8/12:
28  241)

44

PROPOSED DECISION

## DETERMINATION OF ISSUES

203. In regard to "existing circumstances", Roadtrek has sustained its burden of proving "good cause". (Section 3071(a))

204. Roadtrek has established that Mega RV was not conducting an adequate amount of business as compared to the business available to it. Roadtrek has sustained its burden of proof in regard to Section 3071(a).

205. Roadtrek has established that Mega RV has not made the investment necessary and incurred the obligations necessary to perform its part of the franchise. Roadtrek has sustained its burden of proof in regard to Section 3071(b).

206. Roadtrek has not established that Mega RV's investment was not permanent. Roadtrek has not sustained its burden of proof in regard to Section 3071(c).

207. Roadtrek has established that it would not be injurious to the public welfare for the franchise to be replaced. Roadtrek has sustained its burden of proof in regard to Section 3071(d).

208. Roadtrek has not established that Mega RV does not have adequate new recreational vehicle sales and service facilities, equipment, vehicle parts, and qualified service personnel to reasonably provide for the needs of the consumers for the recreational vehicles handled by Mega RV even though it is not rendering adequate services to the public. Roadtrek has not sustained its burden of proof in regard to Section 3071(e).

209. Roadtrek has not established that Mega RV failed to fulfill the warranty obligations to be performed by Mega RV. Roadtrek has not sustained its burden of proof in regard to Section 3071(f).

210. Roadtrek has established that Mega RV failed to comply with the terms of the franchise. Roadtrek has sustained its burden of proof in regard to Section 3071(g).

### *Referral to the Department of Motor Vehicles is Not Appropriate Here*

211. Protestant requested that Roadtrek's conduct in pursuing a course of conduct which resulted in the *de facto* termination of Mega RV's Roadtrek franchise in Colton, California be referred to the DMV for investigation and action pursuant to Section 3050.

212. For the reasons stated above, Protestant's request is denied.

///

45

PROPOSED DECISION

002848

A0142

PROPOSED DECISION

Based on the evidence presented and the findings herein, IT IS HEREBY ORDERED THAT the Protest in *Mega RV Corp., dba McMahon's RV v. Roadtrek Motorhomes, Inc.*, Protest No. PR-2244-10 is overruled. Respondent Roadtrek Motorhomes, Inc. has met its burden of proof under Vehicle Code section 3066(c) to establish that there is good cause to terminate the Roadtrek franchise of Mega RV Corp dba McMahon's RV at 1312 RV Center Drive, Colton, California.

I hereby submit the foregoing which constitutes my Proposed Decision in the above-entitled matter, as the result of a hearing before me, and I recommend this Proposed Decision be adopted as the decision of the New Motor Vehicle Board.

DATED:  July 30, 2012

By: *Diana Woodward Hagle*

DIANA WOODWARD HAGLE
Administrative Law Judge

George Valverde, Director, DMV
Mary Garcia, Branch Chief,
  Occupational Licensing, DMV

46

PROPOSED DECISION

**EXHIBIT B**

McMahon's Outstanding AR
Summary

| | Invoice Amt | McMahon's Payments | Balance Due | RMI Cks applied | Internal Balance due |
|---|---|---|---|---|---|
| Units | $3,541,779.00 | ($3,075,853.40) | $465,925.60 | ($162,576.93) | $303,348.67 |
| Parts | $57,830.36 | $0.00 | $57,830.36 | ($46,171.64) | $11,658.72 |
| Shows | $65,385.38 | ($271.00) | $65,114.38 | ($26,503.11) | $38,611.27 |
| Interest | $365,831.00 | ($45,094.00) | $320,737.00 | ($17,785.75) | $302,951.25 |
| TOTALS | $4,030,825.74 | ($3,121,218.40) | $909,607.34 | ($253,037.43) | $656,569.91 |

Amount owed to Roadtrek prior to Contra's       $909,607.34

Contra's applied                                ($253,037.43)

Shipping Holdbacks                              ($57,000.00)

Net amount owed to Roadtrek                     $599,569.91

NEW MOTOR
VEHICLE BOARD
ID
Exhibit 496
File No. PR-2198-10
EVID

CONFIDENTIAL

RMI 009153

00920

A0666



rmpexcel.xls
UNITS

| | Date | Ref | SO # | VIN | Amount | McMahon's Check # | Date | Amount paid | Amount Open | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | TOTAL RMI Cks Applied | Internal balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MCMCA | 8/29/2007 | INV95635 | 84872 | 71216355 | $ 61,750.00 | 18499 | 28-Aug-08 | $ 56,750.00 | $ 5,000.00 | 57384 | $ 3,000.00 | 57383 | $1,000.00 | 57379 | $1,000.00 | | | $ 5,000.00 | $ - |
| MCMCA | 9/21/2007 | INV96090 | 84415 | 71219724 | $ 69,140.00 | 13660 | 1-Nov-07 | $ 68,570.00 | $ 570.00 | 56857 | $ 570.00 | | | | | | | $ 570.00 | $ - |
| MCMCA | 9/30/2007 | INV96264 | 85017 | 71218694 | $ 52,430.00 | 2021189 | 20-Apr-09 | $ 57,430.00 | $ 5,000.00 | 57379 | $ 5,000.00 | | | | | | | $ 5,000.00 | $ - |
| MCVCA | 10/17/2007 | INV96548 | 85770 | 71218018 | $ 56,270.00 | 20295 | 2-Feb-09 | $ 52,270.00 | $ 4,000.00 | 57382 | $ 4,000.00 | | | | | | | $ 4,000.00 | $ - |
| MCMCA | 12/17/2007 | INV97602 | 85984 | 81120781 | $ 74,360.00 | 18866 | 1-Oct-08 | $ 71,360.00 | $ 3,000.00 | 57384 | $ 2,000.00 | 57383 | $1,000.00 | | | | | $ 3,000.00 | $ - |
| MCMCA | 12/20/2007 | INV97673 | 86938 | 81121026 | $ 74,930.00 | 19396 | 12-Nov-08 | $ 73,430.00 | $ 1,500.00 | 57384 | $ 1,500.00 | | | | | | | $ 1,500.00 | $ - |
| MCVCA | 12/30/2007 | INV97748 | 82616C | 66875558 | $ 68,299.00 | 16262 | 14-Mar-08 | $ 67,578.40 | $ 720.60 | 57382 | $ 720.60 | | | | | | | $ 720.50 | $ 0.00 |
| MCVCA | 1/9/2008 | INV97834 | 87659 | 75223150 | $ 83,680.00 | 2020592 | 12-Mar-09 | $ 79,680.00 | $ 4,000.00 | 56561 | $ 1,500.00 | 57376 | $2,500.00 | | | | | $ 4,000.00 | $ - |
| MCMCA | 2/4/2008 | INV98387 | 88151 | 75222728 | $ 80,180.00 | 2020591 | 9-Mar-09 | $ 77,680.00 | $ 2,500.00 | 57383 | $ 2,500.00 | | | | | | | $ 2,500.00 | $ - |
| MCSCA | 2/15/2008 | INV98578 | 87743 | 75204000 | $ 81,280.00 | 2020771 | 19-Mar-09 | $ 78,780.00 | $ 2,500.00 | 57381 | $ 2,500.00 | | | | | | | $ 2,500.00 | $ - |
| MCVCA | 2/29/2008 | INV98853 | 88400 | 75200873- | $ 78,490.00 | 18697 | 15-Sep-08 | $ 76,999.00 | $ 1,491.00 | 56180 | $ 1,491.00 | | | | | | | $ 1,491.00 | $ - |
| MCVCA | 3/31/2008 | INV99389 | 88675 | 76149081 | $ 77,570.00 | 18697 | 15-Sep-08 | $ 76,161.00 | $ 1,509.00 | 56180 | $ 1,509.00 | | | | | | | $ 1,509.00 | $ - |
| MCMCA | 5/12/2008 | INV10146 | 89183 | 85235590 | $ 85,070.00 | 18698 | 12-Sep-08 | $ 83,570.00 | $ 1,500.00 | 57384 | $ 1,500.00 | | | | | | | $ 1,500.00 | $ - |
| MCMCA | 5/23/2008 | INV10285 | 86878 | 81132106 | $ 66,610.00 | 18495 | 26-Aug-08 | $ 61,610.00 | $ 5,000.00 | 57384 | $ 2,000.00 | 57383 | $1,000.00 | 57379 | $2,000.00 | | | $ 5,000.00 | $ - |
| MCMCA | 6/24/2008 | IN90192C | 79608C | 71113341- | $ 61,920.00 | 188860 | 1-Oct-08 | $ 56,460.00 | $ 5,460.00 | 57384 | $ 1,000.00 | 56611 | $ 460.00 | 56181 | $4,000.00 | | | $ 5,460.00 | $ - |
| MCMCA | 6/24/2008 | IN93301C | 82493C | 71178094 | $ 60,780.00 | 19085 | 23-Oct-08 | $ 56,780.00 | $ 4,000.00 | 56562 | $ 4,000.00 | | | | | | | $ 4,000.00 | $ - |
| MCVCA | 8/20/2008 | IN10099C | 87955C | 81127816 | $ 79,320.00 | 19396 | 12-Nov-08 | $ 77,820.00 | $ 1,500.00 | 55590 | $ 1,500.00 | | | | | | | $ 1,500.00 | $ - |
| MCVCA | 8/21/2008 | IN10124C | 89101C | 81163729 | $ 78,160.00 | 18698 | 12-Sep-08 | $ 77,160.00 | $ 1,000.00 | 56180 | $ 1,000.00 | | | | | | | $ 1,000.00 | $ - |
| MCMCA | 8/21/2008 | IN10481C | 89178C | 81186125 | $ 79,380.00 | 2021917 | 16-Jun-09 | $ 78,380.00 | $ 1,000.00 | 59323 | $ 1,000.00 | | | | | | | $ 1,000.00 | $ - |
| MCMCA | 8/21/2008 | IN99719C | 88977C | 85260452 | $ 82,780.00 | 2021042 | 8-Apr-09 | $ 84,780.00 | $ (2,000.00) | | | | | | | | | $ - | $ (2,000.00) |
| MCMCA | 9/26/2008 | IN11577A | 89442A | 85266077 | $ 78,660.00 | | | $ - | $ 78,660.00 | 734 | $ 5,000.00 | | | | | | | $ 5,000.00 | $ 73,660.00 |
| MCMCA | 9/26/2008 | INV12177 | 87920 | 81121555 | $ 62,020.00 | 2023710 | 14-Oct-09 | $ 61,020.00 | $ 1,000.00 | 59033 | $ 1,000.00 | | | | | | | $ 1,000.00 | $ - |
| MCMCA | 9/26/2008 | INV12179 | 89487 | 81198486 | $ 78,690.00 | 2023699 | 5-Oct-09 | $ 75,690.00 | $ 3,000.00 | 59319 | $ 3,000.00 | | | | | | | $ 3,000.00 | $ - |
| MCVCA | 9/30/2008 | IN10867C | 88841C | 85246771 | $ 76,620.00 | 2022492 | 20-Jul-09 | $ 71,620.00 | $ 5,000.00 | 59319 | $ 5,000.00 | | | | | | | $ 5,000.00 | $ - |
| MCVCA | 9/30/2008 | INV12218 | 89701 | 85234968 | $ 83,570.00 | 2023058 | 26-Aug-09 | $ 81,570.00 | $ 2,000.00 | 58674 | $ 2,000.00 | | | | | | | $ 2,000.00 | $ - |
| MCMCA | 9/30/2008 | INV12230 | 89519 | 85242103 | $ 83,570.00 | 2022491 | 21-Jul-09 | $ 80,570.00 | $ 3,000.00 | 59034 | $ 3,000.00 | | | | | | | $ 3,000.00 | $ - |
| MCMCA | 9/30/2008 | INV12307 | 89526 | 85270780 | $ 85,370.00 | 2023443 | 14-Sep-09 | $ 83,370.00 | $ 2,000.00 | 59321 | $ 1,000.00 | 59319 | $1,000.00 | | | | | $ 2,000.00 | $ - |
| MCMCA | 10/31/2008 | IN85481C | 85481C | 71218217 | $ 63,580.00 | 2022219 | 8-Jul-09 | $ 57,880.00 | $ 5,700.00 | 736 | $ 2,521.33 | | | | | | | $ 2,521.33 | $ 3,178.67 |
| MCMCA | 10/31/2008 | IN94216C | 82488C | 71168492 | $ 72,630.00 | 2023698 | 14-Oct-09 | $ 56,005.00 | $ 16,625.00 | 59323 | $16,625.00 | | | | | | | $ 16,625.00 | $ - |
| MCMCA | 10/31/2008 | IN96164C | 85769C | 71219217 | $ 63,820.00 | 2021651 | 9-Jun-09 | $ 57,120.00 | $ 6,700.00 | 736 | $ 478.67 | 59319 | $1,000.00 | 733 | $ 221.33 | 57575 | $5,000.00 | $ 6,700.00 | $ - |
| MCMCA | 10/31/2008 | IN96250C | 85738C | 71218496 | $ 63,850.00 | 2020929 | 2-Apr-09 | $ 59,150.00 | $ 4,700.00 | 57383 | $ 4,700.00 | | | | | | | $ 4,700.00 | $ - |
| MCVCA | 12/22/2008 | INV12988 | 89514 | 85246775 | $ 81,550.00 | 2022061 | 24-Jun-09 | $ 76,550.00 | $ 5,000.00 | 57813 | $ 5,000.00 | | | | | | | $ 5,000.00 | $ - |
| MCVCA | 2/28/2009 | IN97496C | 87137C | 81121726 | $ 67,990.00 | | | | $ 67,990.00 | | | | | | | | | $ - | $ 67,990.00 |
| MCVCA | 2/28/2009 | IN97497C | 87138C | 81126744 | $ 67,850.00 | 2021651 | 9-Jun-09 | $ 61,980.00 | $ 5,870.00 | 58874 | $ 2,000.00 | 59319 | $ 870.00 | 57574 | $3,000.00 | | | $ 5,870.00 | $ - |
| MCVCA | 2/28/2009 | IN97740C | 86435C | 81120371 | $ 67,850.00 | 2023709 | 14-Oct-09 | $ 58,980.00 | $ 8,870.00 | 59322 | $ 1,000.00 | | | | | | | $ 1,000.00 | $ 7,870.00 |
| MCVCA | 2/28/2009 | IN97833C | 86976C | 81128153 | $ 77,490.00 | 2023509 | 17-Sep-09 | $ 68,580.00 | $ 8,910.00 | 59320 | $ 5,000.00 | 59319 | $ 580.00 | | | | | $ 5,580.00 | $ 3,330.00 |
| MCMCA | 2/28/2009 | IN98729C | 87872C | 81128016 | $ 60,750.00 | 2022652 | 4-Aug-09 | $ 58,930.00 | $ 1,920.00 | 733 | $ 1,018.67 | 59323 | $ 901.33 | | | | | $ 1,920.00 | $ - |
| MCMCA | 2/28/2009 | IN98849C | 88504C | 75191112 | $ 79,390.00 | 2021300 | 28-May-09 | $ 73,490.00 | $ 5,900.00 | 57690 | $ 5,900.00 | | | | | | | $ 5,900.00 | $ - |
| MCMCA | 7/14/2009 | IN98588Y | 88156Y | 81119588 | $ (1,920.00) | | | $ - | $ (1,920.00) | | | | | | | | | $ - | $ (1,920.00) |
| MCMCA | 2/28/2009 | IN98588C | 88156C | 81119588 | $ 60,220.00 | 2022147 | 30-Jun-09 | $ 53,300.00 | $ 6,920.00 | 58010 | $ 4,000.00 | 57988 | $1,000.00 | | | | | $ 5,000.00 | $ 1,920.00 |
| MCMCA | 2/28/2009 | IN99347C | 88640C | 85246770 | $ 79,940.00 | 2023649 | 5-Oct-09 | $ 74,740.00 | $ 5,200.00 | 59323 | $ 5,200.00 | | | | | | | $ 5,200.00 | $ - |
| MCMCA | 2/28/2009 | IN99718C | 88559C | 75157060 | $ 78,870.00 | 2023056 | 19-Aug-09 | $ 71,670.00 | $ 7,200.00 | 733 | $ 760.00 | 59319 | $6,000.00 | 735 | $ 440.00 | | | $ 7,200.00 | $ - |
| MCVCA | 2/28/2009 | IN99831C | 88635C | 81175748 | $ 57,830.00 | | | | $ 57,830.00 | 741 | $ 1,000.00 | | | | | | | $ 1,000.00 | $ 56,830.00 |
| MCVCA | 6/25/2009 | INV14829 | 89367 | 85246766 | $ 78,870.00 | 2023057 | 19-Aug-09 | $ 75,320.00 | $ 3,550.00 | 59319 | $ 3,550.00 | | | | | | | $ 3,550.00 | $ - |
| MCMCA | 6/30/2009 | IN14389C | 90225C | 91115903 | $ 71,710.00 | 2023446 | 14-Sep-08 | $ 70,450.00 | $ 1,260.00 | 735 | $ 1,260.00 | | | | | | | $ 1,260.00 | $ - |
| MCMCA | 6/30/2009 | IN14392C | 90037C | 91116788- | $ 72,110.00 | | | | $ 72,110.00 | 735 | $ 1,500.00 | | | | | | | $ 1,500.00 | $ 70,610.00 |
| MCMCA | 2/10/2010 | IN14392D | 90037D | 91116788- | $ (70,610.00) | | | | $ (70,610.00) | | | | | | | | | $ - | $ (70,610.00) |
| MCVCA | 6/30/2009 | INV14828 | 89937 | 85323975 | $ 87,490.00 | | | | $ 87,490.00 | | | | | | | | | $ - | $ 87,490.00 |
| MCVCA | 6/30/2009 | INV14886 | 89322 | 85270567 | $ 77,920.00 | 2023444 | 11-Sep-08 | $ 73,920.00 | $ 4,000.00 | 59319 | $ 4,000.00 | | | | | | | $ 4,000.00 | $ - |
| MCVCA | 6/30/2009 | INV14887 | 89265 | 85246773 | $ 78,870.00 | 2023943 | 29-Oct-09 | $ 74,400.00 | $ 4,470.00 | 59032 | $ 4,000.00 | | | | | | | $ 4,000.00 | $ 470.00 |
| MCVCA | 7/8/2009 | IN14887Z | 89265Z | 85246773 | $ (470.00) | | | | $ (470.00) | | | | | | | | | $ - | $ (470.00) |
| MCMCA | 10/31/2009 | INV16625 | 90648 | 85312668 | $ 88,200.00 | 2024427 | 17-Nov-09 | $ 86,400.00 | $ 1,800.00 | 735 | $ 1,800.00 | | | | | | | $ 1,800.00 | $ - |
| MCMCA | 4/6/2010 | IN96164D | 96164D | 71219217 | $ 5,000.00 | | | | $ 5,000.00 | | | | | | | | | $ - | $ 5,000.00 |
| | | | | | $3,641,779.00 | | | $3,075,853.40 | $485,925.60 | | | | | | | | | $162,576.93 | $303,348.67 |

Page 1 of 1

CONFIDENTIAL

RMI 009154

00921

A0667

RMI 009155

00922

CONFIDENTIAL

tmpexcel.xls
PARTS

| | Date | Ref | Amount | McMahon's Check # | Date | Amount paid | Amount Open | | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | TOTAL RMI Cks Applied | Internal balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| P-MCMCA | 9/5/2008 | INV11833 | $ 403.18 | | | $ - | $ 403.18 | | 55472 | $ 333.54 | 56368 | $ 69.64 | | | | | $ 403.18 | $ - |
| P-MCVCA | 9/8/2008 | INV11848 | $ 98.77 | | | $ - | $ 98.77 | | 55355 | $ 30.38 | 56015 | $ 41.05 | 56014 | $ 27.34 | | | $ 98.77 | $ - |
| P-MCMCA | 9/9/2008 | INV11855 | $ 142.63 | | | $ - | $ 142.63 | | 56366 | $ 142.63 | | | | | | | $ 142.63 | $ - |
| P-MCVCA | 9/10/2008 | INV11892 | $ 412.50 | | | $ - | $ 412.60 | | 56355 | $ 412.50 | | | | | | | $ 412.50 | $ - |
| P-MCMCA | 9/11/2008 | INV11899 | $ 240.82 | | | $ - | $ 240.82 | | 56359 | $ 240.82 | | | | | | | $ 240.82 | $ - |
| P-MCMCA | 9/12/2008 | INV11923 | $ 261.98 | | | $ - | $ 261.98 | | 56358 | $ 70.99 | 56823 | $ 190.99 | | | | | $ 261.98 | $ - |
| P-MCVCA | 9/15/2008 | INV11958 | $ 690.29 | | | $ - | $ 690.29 | | 56014 | $ 690.29 | | | | | | | $ 690.29 | $ - |
| P-MCMCA | 9/17/2008 | INV11983 | $ 439.78 | | | $ - | $ 439.78 | | 56823 | $ 439.78 | | | | | | | $ 439.78 | $ - |
| P-MCMCA | 9/18/2008 | INV12005 | $ 201.30 | | | $ - | $ 201.30 | | 56823 | $ 201.30 | | | | | | | $ 201.30 | $ - |
| P-MCMCA | 9/24/2008 | INV12084 | $ 271.87 | | | $ - | $ 271.87 | | 56823 | $ 271.87 | | | | | | | $ 271.87 | $ - |
| P-MCMCA | 9/24/2008 | INV12093 | $ 375.00 | | | $ - | $ 375.00 | | 56823 | $ 375.00 | | | | | | | $ 375.00 | $ - |
| P-MCMCA | 9/25/2008 | INV12129 | $ 85.38 | | | $ - | $ 85.38 | | 56823 | $ 85.38 | | | | | | | $ 85.38 | $ - |
| P-MCMCA | 9/29/2008 | INV12168 | $ 25.00 | | | $ - | $ 25.00 | | 56823 | $ 25.00 | | | | | | | $ 25.00 | $ - |
| P-MCVCA | 10/1/2008 | INV12233A | $ 80.00 | | | $ - | $ 80.00 | | 56693 | $ 80.00 | | | | | | | $ 80.00 | $ - |
| P-MCMCA | 10/2/2008 | INV12246 | $ 242.58 | | | $ - | $ 242.58 | | 56823 | $ 242.58 | | | | | | | $ 242.58 | $ - |
| P-MCMCA | 10/6/2008 | INV12289 | $ 25.00 | | | $ - | $ 25.00 | | 56823 | $ 25.00 | | | | | | | $ 25.00 | $ - |
| P-MCMCA | 10/7/2008 | INV12312 | $ 86.89 | | | $ - | $ 86.89 | | 56823 | $ 86.89 | | | | | | | $ 86.89 | $ - |
| P-MCMCA | 10/8/2008 | INV12341 | $ 1,158.58 | | | $ - | $ 1,158.58 | | 55357 | $1,130.09 | 56823 | $ 28.49 | | | | | $ 1,158.58 | $ - |
| P-MCMCA | 10/8/2008 | INV12356 | $ 90.00 | | | $ - | $ 90.00 | | 56823 | $ 90.00 | | | | | | | $ 90.00 | $ - |
| P-MCMCA | 10/10/2008 | INV12364 | $ 596.83 | | | $ - | $ 596.83 | | 56823 | $ 596.83 | | | | | | | $ 596.83 | $ - |
| P-MCMCA | 10/10/2008 | INV12365 | $ 186.72 | | | $ - | $ 186.72 | | 56823 | $ 186.72 | | | | | | | $ 186.72 | $ - |
| P-MCMCA | 10/14/2008 | INV12375 | $ 95.79 | | | $ - | $ 95.79 | | 56823 | $ 95.79 | | | | | | | $ 95.79 | $ - |
| P-MCMCA | 10/17/2008 | INV12442 | $ 236.28 | | | $ - | $ 236.28 | | 56823 | $ 236.28 | | | | | | | $ 236.28 | $ - |
| P-MCMCA | 10/20/2008 | INV12446 | $ 880.00 | | | $ - | $ 880.00 | | 56823 | $ 177.34 | 56963 | $ 634.16 | 56366 | $ 68.50 | | | $ 880.00 | $ - |
| P-MCMCA | 10/21/2008 | INV12486 | $ 42.24 | | | $ - | $ 42.24 | | 55356 | $ 42.24 | | | | | | | $ 42.24 | $ - |
| P-MCMCA | 10/27/2008 | INV12514 | $ 41.68 | | | $ - | $ 41.68 | | 56366 | $ 41.68 | | | | | | | $ 41.68 | $ - |
| P-MCMCA | 10/29/2008 | INV12530 | $ 70.67 | | | $ - | $ 70.67 | | 55356 | $ 70.67 | | | | | | | $ 70.67 | $ - |
| P-MCMCA | 10/30/2008 | INV12545 | $ 35.00 | | | $ - | $ 35.00 | | 55356 | $ 35.00 | | | | | | | $ 35.00 | $ - |
| P-MCMCA | 11/4/2008 | INV12592 | $ 236.28 | | | $ - | $ 236.28 | | 55354 | $ 61.67 | 55696 | $ 163.50 | 55356 | $ 11.11 | | | $ 236.28 | $ - |
| P-MCMCA | 11/11/2008 | INV12667 | $ 141.34 | | | $ - | $ 141.34 | | 55354 | $ 141.34 | | | | | | | $ 141.34 | $ - |
| P-MCMCA | 11/13/2008 | INV12687 | $ 141.34 | | | $ - | $ 141.34 | | 55354 | $ 141.34 | | | | | | | $ 141.34 | $ - |
| P-MCMCA | 11/14/2008 | INV12792 | $ 75.41 | | | $ - | $ 75.41 | | 55354 | $ 75.41 | | | | | | | $ 75.41 | $ - |
| P-MCMCA | 11/14/2008 | INV12711 | $ 96.98 | | | $ - | $ 96.98 | | 55354 | $ 96.98 | | | | | | | $ 96.98 | $ - |
| P-MCMCA | 11/18/2008 | INV12734 | $ 167.09 | | | $ - | $ 167.09 | | 55354 | $ 167.09 | | | | | | | $ 167.09 | $ - |
| P-MCMCA | 11/20/2008 | INV12782 | $ 221.38 | | | $ - | $ 221.38 | | 55354 | $ 221.38 | | | | | | | $ 221.38 | $ - |
| P-MCVCA | 11/23/2008 | INV12843 | $ 173.25 | | | $ - | $ 173.25 | | 56015 | $ 173.25 | | | | | | | $ 173.25 | $ - |
| P-MCMCA | 12/4/2008 | INV12877 | $ 312.13 | | | $ - | $ 312.13 | | 55354 | $ 312.13 | | | | | | | $ 312.13 | $ - |
| P-MCMCA | 12/15/2008 | INV12940 | $ 1,312.01 | | | $ - | $ 1,312.01 | | 55334 | $1,312.01 | | | | | | | $ 1,312.01 | $ - |
| P-MCVCA | 12/16/2008 | INV9591A | $ 1,201.50 | | | $ - | $ 1,201.50 | | 56693 | $ 236.10 | 56014 | $ 965.40 | | | | | $ 1,201.50 | $ - |
| P-MCVCA | 12/16/2008 | INV9702A | $ 1.94 | | | $ - | $ 1.94 | | 56014 | $ 1.94 | | | | | | | $ 1.94 | $ - |
| P-MCVCA | 12/16/2008 | INV12958 | $ 26.70 | | | $ - | $ 26.70 | | 56014 | $ 26.70 | | | | | | | $ 26.70 | $ - |
| P-MCMCA | 12/15/2008 | INV12967 | $ 323.21 | | | $ - | $ 323.21 | | 55354 | $ 323.21 | | | | | | | $ 323.21 | $ - |
| P-MCMCA | 12/19/2008 | INV12979 | $ 170.84 | | | $ - | $ 170.84 | | 55354 | $ 170.84 | | | | | | | $ 170.84 | $ - |
| P-MCMCA | 1/9/2009 | INV13007 | $ 371.93 | | | $ - | $ 371.93 | | 55354 | $ 215.86 | 56820 | $ 156.07 | | | | | $ 371.93 | $ - |
| P-MCMCA | 1/14/2009 | INV13058 | $ 46.93 | | | $ - | $ 46.93 | | 56820 | $ 46.93 | | | | | | | $ 46.93 | $ - |
| P-MCMCA | 1/16/2009 | INV13095 | $ 21.53 | | | $ - | $ 21.53 | | 56820 | $ 21.53 | | | | | | | $ 21.53 | $ - |
| P-MCMCA | 1/21/2009 | INV13129 | $ 1,401.86 | | | $ - | $ 1,401.86 | | 56820 | $1,401.86 | | | | | | | $ 1,401.86 | $ - |

A0668

tmpexcel.xls
PARTS

| | Date | Ref | Amount | McMahon's Check # | Date | Amount paid | Amount Open | | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | TOTAL RMI Cks Applied | Internal balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| P-MCMCA | 1/21/2009 | INV13130 | $ 382.42 | | | $ - | $ 382.42 | | 56820 | $ 382.42 | | | | | | | | | $ 382.42 | $ - |
| P-MCMCA | 1/23/2009 | INV13145 | $ 723.37 | | | $ - | $ 723.37 | | 56820 | $ 723.37 | | | | | | | | | $ 723.37 | $ - |
| P-MCMCA | 1/23/2009 | INV13166 | $ 440.00 | | | $ - | $ 440.00 | | 55694 | $ 57.62 | 56820 | $ 382.38 | | | | | | | $ 440.00 | $ - |
| P-MCMCA | 1/29/2009 | INV13181 | $ 6.16 | | | $ - | $ 6.16 | | 55694 | $ 6.16 | | | | | | | | | $ 6.16 | $ - |
| P-MCMCA | 2/5/2009 | INV13229 | $ 86.69 | | | $ - | $ 86.69 | | 55694 | $ 86.69 | | | | | | | | | $ 86.69 | $ - |
| P-MCMCA | 2/9/2009 | INV13245 | $ 241.93 | | | $ - | $ 241.93 | | 55694 | $ 241.93 | | | | | | | | | $ 241.93 | $ - |
| P-MCMCA | 2/11/2009 | INV13264 | $ 43.30 | | | $ - | $ 43.30 | | 55694 | $ 43.30 | | | | | | | | | $ 43.30 | $ - |
| P-MCMCA | 2/18/2009 | INV13303 | $ 286.59 | | | $ - | $ 286.59 | | 55694 | $ 286.59 | | | | | | | | | $ 286.59 | $ - |
| P-MCMCA | 2/20/2009 | INV13329 | $ 120.05 | | | $ - | $ 120.05 | | 55694 | $ 120.05 | | | | | | | | | $ 120.05 | $ - |
| P-MCMCA | 2/27/2009 | INV13351 | $ 142.47 | | | $ - | $ 142.47 | | 55694 | $ 142.47 | | | | | | | | | $ 142.47 | $ - |
| P-MCMCA | 3/4/2009 | INV13421 | $ 962.50 | | | $ - | $ 962.50 | | 55694 | $ 267.59 | 56365 | $ 694.91 | | | | | | | $ 962.50 | $ - |
| P-MCMCA | 3/5/2009 | INV13443 | $ 1,041.84 | | | $ - | $ 1,041.84 | | 56365 | $ 889.19 | 56821 | $ 352.65 | | | | | | | $ 1,041.84 | $ - |
| P-MCMCA | 3/9/2009 | INV13468 | $ 487.99 | | | $ - | $ 487.99 | | 56821 | $ 416.84 | 56962 | $ 71.15 | | | | | | | $ 487.99 | $ - |
| P-MCMCA | 3/9/2009 | INV13482 | $ 248.30 | | | $ - | $ 248.30 | | 56962 | $ 103.67 | 57377 | $ 144.63 | | | | | | | $ 248.30 | $ - |
| P-MCMCA | 3/12/2009 | INV13511 | $ 35.00 | | | $ - | $ 35.00 | | 57377 | $ 35.00 | | | | | | | | | $ 35.00 | $ - |
| P-MCMCA | 3/17/2009 | INV13537 | $ 10.34 | | | $ - | $ 10.34 | | 57377 | $ 10.34 | | | | | | | | | $ 10.34 | $ - |
| P-MCMCA | 3/17/2009 | INV13538 | $ 711.90 | | | $ - | $ 711.90 | | 57377 | $ 697.60 | 57378 | $ 14.30 | | | | | | | $ 711.90 | $ - |
| P-MCMCA | 3/17/2009 | INV13542 | $ 510.48 | | | $ - | $ 510.48 | | 57378 | $ 510.48 | | | | | | | | | $ 510.48 | $ - |
| P-MCMCA | 3/20/2009 | INV13570 | $ 248.22 | | | $ - | $ 248.22 | | 57378 | $ 248.22 | | | | | | | | | $ 248.22 | $ - |
| P-MCMCA | 3/26/2009 | INV13621 | $ 408.08 | | | $ - | $ 408.08 | | 57378 | $ 408.08 | | | | | | | | | $ 408.08 | $ - |
| P-MCMCA | 4/2/2009 | INV13695 | $ 9.61 | | | $ - | $ 9.61 | | 57378 | $ 9.61 | | | | | | | | | $ 9.61 | $ - |
| P-MCMCA | 4/14/2009 | INV13778 | $ 180.73 | | | $ - | $ 180.73 | | 57378 | $ 180.73 | | | | | | | | | $ 180.73 | $ - |
| P-MCMCA | 4/17/2009 | INV13851 | $ 412.50 | | | $ - | $ 412.50 | | 57378 | $ 412.50 | | | | | | | | | $ 412.50 | $ - |
| P-MCMCA | 4/17/2009 | INV13852 | $ 412.50 | | | $ - | $ 412.50 | | 57378 | $ 412.50 | | | | | | | | | $ 412.50 | $ - |
| P-MCMCA | 4/17/2009 | INV13853 | $ 10.34 | | | $ - | $ 10.34 | | 57378 | $ 10.34 | | | | | | | | | $ 10.34 | $ - |
| P-MCMCA | 4/23/2009 | INV13900 | $ 96.81 | | | $ - | $ 96.81 | | 57850 | $ 96.81 | | | | | | | | | $ 96.81 | $ - |
| P-MCMCA | 4/23/2009 | INV13907 | $ 78.59 | | | $ - | $ 78.59 | | 57850 | $ 78.59 | | | | | | | | | $ 78.59 | $ - |
| P-MCMCA | 4/24/2009 | INV13949 | $ 12.87 | | | $ - | $ 12.87 | | 57850 | $ 12.87 | | | | | | | | | $ 12.87 | $ - |
| P-MCMCA | 4/27/2009 | INV13966 | $ 327.30 | | | $ - | $ 327.30 | | 57850 | $ 214.48 | 58052 | $ 112.82 | | | | | | | $ 327.30 | $ - |
| P-MCMCA | 4/30/2009 | INV14007 | $ 185.85 | | | $ - | $ 185.85 | | 58052 | $ 185.85 | | | | | | | | | $ 185.85 | $ - |
| P-MCMCA | 5/12/2009 | INV14013 | $ 492.53 | | | $ - | $ 492.53 | | 58052 | $ 283.06 | 58794 | $ 209.47 | | | | | | | $ 492.53 | $ - |
| P-MCMCA | 5/11/2009 | INV14148 | $ 70.00 | | | $ - | $ 70.00 | | 58794 | $ 70.00 | | | | | | | | | $ 70.00 | $ - |
| P-MCMCA | 5/17/2009 | INV14152 | $ 199.50 | | | $ - | $ 199.50 | | 58794 | $ 115.68 | 59301 | $ 83.82 | | | | | | | $ 199.50 | $ - |
| P-MCMCA | 5/11/2009 | INV14155 | $ 606.70 | | | $ - | $ 606.70 | | 58052 | $ 309.06 | 59301 | $ 264.92 | 57744 | $ 32.70 | | | | | $ 606.70 | $ - |
| P-MCMCA | 5/15/2009 | INV14213 | $ 63.45 | | | $ - | $ 63.45 | | 57852 | $ 63.45 | | | | | | | | | $ 63.45 | $ - |
| P-MCMCA | 5/22/2009 | INV14268 | $ 748.65 | | | $ - | $ 748.65 | | 57852 | $ 748.65 | | | | | | | | | $ 748.65 | $ - |
| P-MCMCA | 5/22/2009 | INV14277 | $ 9.24 | | | $ - | $ 9.24 | | 57852 | $ 9.24 | | | | | | | | | $ 9.24 | $ - |
| P-MCMCA | 5/28/2009 | INV14314 | $ 271.48 | | | $ - | $ 271.48 | | 57852 | $ 271.48 | | | | | | | | | $ 271.48 | $ - |
| P-MCMCA | 6/2/2009 | INV14418 | $ 645.34 | | | $ - | $ 645.34 | | 57852 | $ 544.43 | 58053 | $ 100.91 | | | | | | | $ 645.34 | $ - |
| P-MCMCA | 6/4/2009 | INV14449 | $ 691.67 | | | $ - | $ 691.67 | | 57852 | $ 691.67 | | | | | | | | | $ 691.67 | $ - |
| P-MCMCA | 6/5/2009 | INV14495 | $ 11.13 | | | $ - | $ 11.13 | | 58053 | $ 11.13 | | | | | | | | | $ 11.13 | $ - |
| P-MCMCA | 6/8/2009 | INV14506 | $ 37.27 | | | $ - | $ 37.27 | | 58053 | $ 37.27 | | | | | | | | | $ 37.27 | $ - |
| P-MCMCA | 6/17/2009 | INV14573 | $ 160.79 | | | $ - | $ 160.79 | | 58053 | $ 160.79 | | | | | | | | | $ 160.79 | $ - |
| P-MCMCA | 6/17/2009 | INV14632 | $ 418.84 | | | $ - | $ 418.84 | | 58053 | $ 418.84 | | | | | | | | | $ 418.84 | $ - |
| P-MCMCA | 8/17/2009 | INV14644 | $ 272.14 | | | $ - | $ 272.14 | | 58053 | $ 272.14 | | | | | | | | | $ 272.14 | $ - |
| P-MCMCA | 8/25/2009 | INV14784 | $ 343.32 | | | $ - | $ 343.32 | | 58053 | $ 331.19 | 58359 | $ 12.13 | | | | | | | $ 343.32 | $ - |
| P-MCMCA | 8/30/2009 | INV14847 | $ 506.00 | | | $ - | $ 506.00 | | 58359 | $ 209.19 | 58500 | $ 296.81 | | | | | | | $ 506.00 | $ - |

Page 2 of 4

RMI 009156
00923
CONFIDENTIAL
A0669

RMI 009157

00924

CONFIDENTIAL

tmpexcel.xls
PARTS

| | Date | Ref | Amount | McMahon's Check # | Date | Amount paid | Amount Open | | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | TOTAL RMI Cks Applied | Internal balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| P-MCMCA | 6/30/2009 | INV14843 | $ 508.00 | | | $ - | $ 508.00 | | 58500 | $ 508.00 | | | | | | | | | $ 508.00 | $ - |
| P-MCMCA | 7/1/2009 | INV14844 | $ 412.50 | | | $ - | $ 412.50 | | 58359 | $ 412.50 | | | | | | | | | $ 412.50 | $ - |
| P-MCMCA | 7/1/2009 | INV14845 | $ 414.89 | | | $ - | $ 414.89 | | 58359 | $ 414.89 | | | | | | | | | $ 414.89 | $ - |
| P-MCMCA | 7/2/2009 | INV14858 | $ 57.46 | | | $ - | $ 57.46 | | 58500 | $ 57.46 | | | | | | | | | $ 57.46 | $ - |
| P-MCMCA | 7/14/2009 | INV16010 | $ 440.00 | | | $ - | $ 440.00 | | 58500 | $ 440.00 | | | | | | | | | $ 440.00 | $ - |
| P-MCMCA | 7/16/2009 | INV15045 | $ 186.72 | | | $ - | $ 186.72 | | 58500 | $ 186.72 | | | | | | | | | $ 186.72 | $ - |
| P-MCMCA | 7/17/2009 | INV16038 | $ 271.36 | | | $ - | $ 271.36 | | 58500 | $ 271.36 | | | | | | | | | $ 271.36 | $ - |
| P-MCMCA | 7/21/2009 | INV15093 | $ 86.69 | | | $ - | $ 86.69 | | 58500 | $ 86.69 | | | | | | | | | $ 86.69 | $ - |
| P-MCMCA | 7/22/2009 | INV15116 | $ 317.97 | | | $ - | $ 317.97 | | 58500 | $ 317.97 | | | | | | | | | $ 317.97 | $ - |
| P-MCMCA | 7/27/2009 | INV15172 | $ 55.00 | | | $ - | $ 55.00 | | 58500 | $ 55.00 | | | | | | | | | $ 55.00 | $ - |
| P-MCMCA | 8/8/2009 | INV15284 | $ 457.76 | | | $ - | $ 457.76 | | 58500 | $ 457.76 | | | | | | | | | $ 457.76 | $ - |
| P-MCMCA | 8/5/2009 | INV15309 | $ 180.66 | | | $ - | $ 180.66 | | 58500 | $ 62.34 | 58795 | $ 118.32 | | | | | | | $ 180.66 | $ - |
| P-MCMCA | 8/6/2009 | INV16319 | $ 311.34 | | | $ - | $ 311.34 | | 58795 | $ 311.34 | | | | | | | | | $ 311.34 | $ - |
| P-MCMCA | 8/6/2009 | INV16322 | $ 275.00 | | | $ - | $ 275.00 | | 58795 | $ 275.00 | | | | | | | | | $ 275.00 | $ - |
| P-MCMCA | 8/9/2009 | INV16328 | $ 322.97 | | | $ - | $ 322.97 | | 58795 | $ 322.97 | | | | | | | | | $ 322.97 | $ - |
| P-MCMCA | 8/7/2009 | INV15349 | $ 1,029.54 | | | $ - | $ 1,029.54 | | 58795 | $ 496.13 | 59302 | $ 533.41 | | | | | | | $ 1,029.54 | $ - |
| P-MCMCA | 8/11/2009 | INV15382 | $ 36.61 | | | $ - | $ 36.61 | | 59302 | $ 36.61 | | | | | | | | | $ 36.61 | $ - |
| P-MCMCA | 8/19/2009 | INV15606 | $ 412.50 | | | $ - | $ 412.50 | | 59302 | $ 412.50 | | | | | | | | | $ 412.50 | $ - |
| P-MCMCA | 8/20/2009 | INV15284 | $ 25.52 | | | $ - | $ 25.52 | | 59302 | $ 25.52 | | | | | | | | | $ 25.52 | $ - |
| P-MCMCA | 8/21/2009 | INV15551 | $ 131.76 | | | $ - | $ 131.76 | | 59302 | $ 131.76 | | | | | | | | | $ 131.76 | $ - |
| P-MCMCA | 8/25/2009 | INV15582 | $ 197.94 | | | $ - | $ 197.94 | | 59302 | $ 197.94 | | | | | | | | | $ 197.94 | $ - |
| P-MCMCA | 8/26/2009 | INV15511 | $ 25.39 | | | $ - | $ 25.39 | | 59302 | $ 25.39 | | | | | | | | | $ 25.39 | $ - |
| P-MCMCA | 9/4/2009 | INV15764 | $ 120.51 | | | $ - | $ 120.51 | | 59302 | $ 120.51 | | | | | | | | | $ 120.51 | $ - |
| P-MCMCA | 9/10/2009 | INV15833 | $ 176.00 | | | $ - | $ 176.00 | | 59302 | $ 176.00 | | | | | | | | | $ 176.00 | $ - |
| P-MCMCA | 9/10/2009 | INV15848 | $ 825.00 | | | $ - | $ 826.00 | | 58358 | $ 163.40 | 58498 | $ 205.21 | 58793 | $ 62.44 | 59302 | $ 393.95 | | | $ 826.00 | $ - |
| | 8/18/2009 | INV15865 | $ 55.00 | | | $ - | $ 35.00 | | | | | | | | | | | | $ - | 35.00 |
| MCMCA | 12/19/2008 | INV84883.4 | $ 367.97 | | | $ - | $ 367.97 | | 57383 | $ 300.00 | 56611 | $ 67.97 | | | | | | | $ 367.97 | $ - |
| MCMCA | 12/19/2008 | INV84884A | $ 367.97 | | | $ - | $ 367.97 | | 56611 | $ 259.03 | 56857 | $ 108.94 | | | | | | | $ 367.97 | $ - |
| MCVCA | 12/19/2008 | INV84883 | $ 367.97 | | | $ - | $ 367.97 | | 57382 | $ 279.40 | 56286 | $ 49.78 | | | | | | | $ 329.16 | $ 38.81 |
| MCVCA | 9/10/2009 | INV15850 | $ 650.00 | | | $ - | $ 650.00 | | | | | | | | | | | | $ - | 650.00 |
| MCMCA | 9/29/2008 | INV12172 | $ 25.00 | | | $ - | $ 25.00 | | 56911 | $ 25.00 | | | | | | | | | $ 25.00 | $ - |
| MCVCA | 10/10/2008 | INV99366 | $ 440.00 | | | $ - | $ 440.00 | | 55926 | $ 414.76 | 56286 | $ 25.24 | | | | | | | $ 440.00 | $ - |
| MCVCA | 12/9/2008 | INV12903 | $ 25.00 | | | $ - | $ 25.00 | | 56286 | $ 25.00 | | | | | | | | | $ 25.00 | $ - |
| MCMCA | 2/3/2009 | INV13209 | $ 241.93 | | | $ - | $ 241.93 | | 56857 | $ 241.93 | | | | | | | | | $ 241.93 | $ - |
| MCMCA | 4/17/2009 | INV13848 | $ 375.00 | | | $ - | $ 375.00 | | 56857 | $ 375.00 | | | | | | | | | $ 375.00 | $ - |
| P-MCMCA | 10/6/2009 | INV16207 | $ 578.80 | | | $ - | $ 578.80 | | 58793 | $ 337.49 | 59300 | $ 241.31 | | | | | | | $ 578.80 | $ - |
| P-MCMCA | 10/6/2009 | INV16208 | $ 421.63 | | | $ - | $ 421.63 | | 58051 | $ 310.02 | 59300 | $ 111.61 | | | | | | | $ 421.63 | $ - |
| P-MCMCA | 10/6/2009 | INV16209 | $ 421.35 | | | $ - | $ 421.35 | | 58051 | $ 421.35 | | | | | | | | | $ 421.35 | $ - |
| P-MCMCA | 10/8/2009 | INV16210 | $ 319.43 | | | $ - | $ 319.43 | | 58051 | $ 319.43 | | | | | | | | | $ 319.43 | $ - |
| P-MCMCA | 10/8/2009 | INV16211 | $ 129.20 | | | $ - | $ 129.20 | | 58051 | $ 129.20 | | | | | | | | | $ 129.20 | $ - |
| P-MCMCA | 10/8/2009 | INV16212 | $ 1,165.83 | | | $ - | $ 1,185.83 | | 138 | $ 517.21 | 58051 | $ 668.62 | | | | | | | $ 1,185.83 | $ - |
| P-MCMCA | 10/6/2009 | INV16213 | $ 181.68 | | | $ - | $ 181.68 | | 136 | $ 181.68 | | | | | | | | | $ 181.68 | $ - |
| P-MCMCA | 10/8/2009 | INV16253 | $ 587.32 | | | $ - | $ 587.32 | | 138 | $ 587.32 | | | | | | | | | $ 587.32 | $ - |
| P-MCMCA | 10/8/2009 | INV16318 | $ 660.78 | | | $ - | $ 660.78 | | 138 | $ 660.78 | | | | | | | | | $ 660.78 | $ - |
| P-MCMCA | 10/14/2009 | INV16318 | $ 396.00 | | | $ - | $ 396.00 | | 138 | $ 396.00 | | | | | | | | | $ 396.00 | $ - |
| P-MCMCA | 11/2/2009 | INV16521 | $ 650.00 | | | $ - | $ 650.00 | | 138 | $ 650.00 | | | | | | | | | $ 650.00 | $ - |
| P-MCMCA | 11/2/2009 | INV16524 | $ 650.00 | | | $ - | $ 650.00 | | 138 | $ 650.00 | | | | | | | | | $ 650.00 | $ - |

A0670

tmpaxcel.xls
PARTS

| | Date | Ref | Amount | McMahon's Check # | Date | Amount paid | Amount Open | | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | TOTAL RMI Cks Applied | Internal balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| P-MCMCA | 11/10/2009 | INV16704 | $ 1,136.55 | | | $ - | $ 1,136.55 | | 138 | $ 965.21 | 57376 | $ 171.34 | | | | | $ 1,136.55 | $ - |
| P-MCMCA | 11/11/2009 | INV16726 | $ 195.48 | | | $ - | $ 195.48 | | 137 | $ 136.51 | 57376 | $ 58.97 | | | | | $ 195.48 | $ - |
| P-MCMCA | 11/11/2009 | INV16726 | $ 175.79 | | | $ - | $ 175.79 | | 137 | $ 173.36 | 50054 | $ 2.43 | | | | | $ 175.79 | $ - |
| P-MCMCA | 11/18/2009 | INV16911 | $ 506.00 | | | $ - | $ 506.00 | | 899 | $ 31.32 | 60054 | $ 106.57 | 60055 | $ 368.11 | | | $ 506.00 | $ - |
| P-MCMCA | 11/30/2009 | INV16937 | $ 665.24 | | | $ - | $ 665.24 | | 899 | $ 189.68 | | | | | | | $ 189.68 | $ 475.56 |
| P-MCMCA | 11/30/2009 | INV16938 | $ 639.42 | | | $ - | $ 639.42 | | | | | | | | | | $ - | $ 639.42 |
| P-MCMCA | 12/2/2009 | INV16974 | $ 31.24 | | | $ - | $ 31.24 | | | | | | | | | | $ - | $ 31.24 |
| P-MCMCA | 12/8/2009 | INV17054 | $ 396.50 | | | $ - | $ 396.50 | | | | | | | | | | $ - | $ 396.50 |
| P-MCMCA | 12/16/2009 | INV17149 | $ 2,112.02 | | | $ - | $ 2,112.02 | | | | | | | | | | $ - | $ 2,112.02 |
| P-MCMCA | 12/16/2009 | INV17151 | $ 243.51 | | | $ - | $ 243.51 | | | | | | | | | | $ - | $ 243.51 |
| P-MCVCA | 12/16/2009 | INV17155 | $ 650.00 | | | $ - | $ 650.00 | | 56015 | $ 3.70 | | | | | | | $ 3.70 | $ 646.30 |
| P-MCMCA | 12/18/2009 | INV17195 | $ 650.00 | | | $ - | $ 650.00 | | | | | | | | | | $ - | $ 650.00 |
| P-MCMCA | 1/6/2010 | INV17285 | $ 105.64 | | | $ - | $ 105.64 | | | | | | | | | | $ - | $ 105.64 |
| P-MCMCA | 1/12/2010 | INV17344 | $ 550.00 | | | $ - | $ 550.00 | | | | | | | | | | $ - | $ 550.00 |
| P-MCMCA | 1/19/2010 | INV17409 | $ 1,102.81 | | | $ - | $ 1,102.81 | | | | | | | | | | $ - | $ 1,102.81 |
| P-MCMCA | 1/22/2010 | INV17450 | $ 1,364.99 | | | $ - | $ 1,364.99 | | | | | | | | | | $ - | $ 1,364.99 |
| P-MCMCA | 2/4/2010 | INV17620 | $ 1,335.43 | | | $ - | $ 1,335.43 | | | | | | | | | | $ - | $ 1,335.43 |
| P-MCMCA | 2/22/2010 | INV17813Y | $ 51.07 | | | $ - | $ 51.07 | | | | | | | | | | $ - | $ 51.07 |
| P-MCMCA | 2/25/2010 | INV17868 | $ 35.48 | | | $ - | $ 35.48 | | | | | | | | | | $ - | $ 35.48 |
| P-MCMCA | 2/25/2010 | INV17869 | $ 154.25 | | | $ - | $ 154.25 | | | | | | | | | | $ - | $ 154.25 |
| P-MCMCA | 2/25/2010 | INV17871 | $ 100.00 | | | $ - | $ 100.00 | | | | | | | | | | $ - | $ 100.00 |
| P-MCMCA | 2/25/2010 | INV17873 | $ 149.19 | | | $ - | $ 149.19 | | | | | | | | | | $ - | $ 149.19 |
| P-MCMCA | 3/29/2010 | INV18240 | $ 650.00 | | | $ - | $ 650.00 | | | | | | | | | | $ - | $ 650.00 |
| P-MCMCA | 4/6/2010 | INV18359 | $ 141.50 | | | $ - | $ 141.50 | | | | | | | | | | $ - | $ 141.50 |
| | | | $57,830.36 | | | $ - | $ 57,830.36 | | | | | | | | | | $46,171.64 | $11,658.72 |

RMI 009158

00925

CONFIDENTIAL

A0671

RMI 009159

00926

CONFIDENTIAL

tmpaxcel.xls
SHOWS

| | Date | Ref | Amount | McMahon's Check # | Date | Amount paid | | Amount Open | | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | TOTAL RMI Cks Applied | Internal balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MCMCA | 6/1/2007 | INV34125 | $11,450.69 | | | | $ | 11,450.69 | | 57380 | $11,450.69 | | | | | | | $ 11,450.69 | $ - |
| MCMCA | 10/21/2007 | INV37105 | $12,936.30 | 88436 | 4/22/2009 | $ 271.00 | $ | 12,665.30 | | 56857 | $ 1,134.46 | 57350 | $7,973.31 | 56079 | $1,000.00 | 57388 | $2,500.00 | $ 12,607.77 | $ 57.53 |
| MCMCA | 3/19/2008 | INV39111 | $ 2,444.65 | | | | $ | 2,444.65 | | 56857 | $ 2,444.65 | | | | | | | $ 2,444.65 | $ - |
| MCMCA | 4/21/2009 | INV13972 | $21,721.24 | | | | $ | 21,721.24 | | | | | | | | | | $ - | $ 21,721.24 |
| MCVCA | 6/16/2009 | INV14638 | $ 2,289.50 | | | | $ | 2,289.50 | | | | | | | | | | $ - | $ 2,289.50 |
| MCMCA | 12/1/2009 | INV16971 | $14,543.00 | | | | $ | 14,543.00 | | | | | | | | | | $ - | $ 14,543.00 |
| | | | $65,385.38 | | | $ 271.00 | $ | 65,114.38 | | | | | | | | | | $ 26,503.11 | $ 38,611.27 |

Page 1 of 1

A0672

Impasse/Julie
INTEREST

| Code | Date | Ref | T | Amount | McMahon's Check # | Date | Amount paid | Amount Open | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | RMI Ck# | Amount | TOTAL RMI Cks Applied | Internal balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-MCNICA | 4/7/2008 | INV9874 | | $ 70,000.00 | 16958 | 4/7/2009 | $35,000.00 | $35,000.00 | 95483 | $4,285.75 | 57367 | $2,500.00 | 57251 | $5,000.00 | 57108 | $5,000.00 | $14,285.75 | $20,714.25 |
| I-MCNICA | 1/16/2008 | INV9875 | | $ 34,852.00 | 17263 | 5/1/2008 | $10,084.00 | $24,768.00 | | | | | | | | | $ - | $24,768.00 |
| I-MCNICA | 11/6/2008 | IN9447SA | | $ (435.00) | | | (435.00) | (435.00) | | | | | | | | | $ - | (435.00) |
| I-MCNICA | 11/7/2008 | INV12270 | | $ 13,212.00 | | | | $13,212.00 | | | | | | | | | $ 3,500.00 | $ 9,712.00 |
| I-MCNICA | 11/7/2008 | INV11114 | | $ 12,366.00 | | | | $12,366.00 | | | | | | | | | $ - | $12,366.00 |
| I-MCNICA | 11/7/2008 | INV11115 | | $ 14,322.00 | | | | $14,322.00 | | | | | | | | | $ - | $14,322.00 |
| I-MCNICA | 11/7/2008 | INV11464 | | $ 15,525.00 | | | | $15,525.00 | | | | | | | | | $ - | $15,525.00 |
| I-MCNICA | 11/7/2008 | INV11522 | | $ 13,271.00 | | | | $13,271.00 | | | | | | | | | $ - | $13,271.00 |
| I-MCNICA | 11/7/2008 | INV12290 | | $ 11,903.00 | | | | $11,903.00 | | | | | | | | | $ - | $11,903.00 |
| I-MCNICA | 11/7/2008 | INV12799 | | $ 15,223.00 | | | | $15,223.00 | | | | | | | | | $ - | $15,223.00 |
| I-MCNICA | 11/30/2008 | INV12962 | | $ 11,592.00 | | | | $11,592.00 | | | | | | | | | $ - | $11,592.00 |
| I-MCNICA | 12/30/2008 | INV13004 | | $ 13,959.00 | | | | $13,959.00 | | | | | | | | | $ - | $13,959.00 |
| I-MCNICA | 12/31/2008 | INV13319 | | $ 15,566.00 | | | | $15,566.00 | | | | | | | | | $ - | $15,566.00 |
| I-MCNICA | 2/28/2009 | INV13715 | | $ 13,385.00 | | | | $13,385.00 | | | | | | | | | $ - | $13,385.00 |
| I-MCNICA | 3/31/2009 | INV13766 | | $ 14,348.00 | | | | $14,348.00 | | | | | | | | | $ - | $14,348.00 |
| I-MCNICA | 4/30/2009 | INV14582 | | $ 12,943.00 | | | | $12,943.00 | | | | | | | | | $ - | $12,943.00 |
| I-MCNICA | 5/31/2009 | INV14851 | | $ 15,527.00 | | | | $15,527.00 | | | | | | | | | $ - | $15,527.00 |
| I-MCNICA | 6/30/2009 | INV15256 | | $ 14,087.00 | | | | $14,087.00 | | | | | | | | | $ - | $14,087.00 |
| I-MCNICA | 7/31/2009 | INV15504 | | $ 11,944.00 | | | | $11,944.00 | | | | | | | | | $ - | $11,944.00 |
| I-MCNICA | 8/31/2009 | INV15731 | | $ 11,233.00 | | | | $11,233.00 | | | | | | | | | $ - | $11,233.00 |
| I-MCNICA | 9/30/2009 | INV15632 | | $ 10,698.00 | | | | $10,698.00 | | | | | | | | | $ - | $10,698.00 |
| I-MCNICA | 10/31/2009 | INV15909 | | $ 6,153.00 | | | | $ 6,153.00 | | | | | | | | | $ - | $ 6,153.00 |
| I-MCNICA | 11/30/2009 | INV17174 | | $ 4,272.00 | | | | $ 4,272.00 | | | | | | | | | $ - | $ 4,272.00 |
| I-MCNICA | 1/1/2010 | INV17799 | | $ 1,302.00 | | | | $ 1,302.00 | | | | | | | | | $ - | $ 1,302.00 |
| I-MCNICA | 1/31/2010 | INV17808 | | $ 1,302.00 | | | | $ 1,302.00 | | | | | | | | | $ - | $ 1,302.00 |
| I-MCNICA | 2/29/2010 | INV18151 | | $ 1,176.00 | | | | $ 1,176.00 | | | | | | | | | $ - | $ 1,176.00 |
| I-MCNICA | 3/31/2010 | INV18547 | | $ 1,302.00 | | | | $ 1,302.00 | | | | | | | | | $ - | $ 1,302.00 |
| I-MCNICA | 4/30/2010 | INV18842 | | $ 1,260.00 | | | | $ 1,260.00 | | | | | | | | | $ - | $ 1,260.00 |
| I-MCNICA | 5/31/2010 | INV19401 | | $ 1,302.00 | | | | $ 1,302.00 | | | | | | | | | $ - | $ 1,302.00 |
| I-MCNICA | 6/30/2010 | INV19619 | | $ 1,560.00 | | | | $ 1,560.00 | | | | | | | | | $ - | $ 1,560.00 |
| I-MCNICA | 7/14/2010 | INV19619 | | $ 1,260.00 | | | | $ 1,260.00 | | | | | | | | | $ - | $ 1,260.00 |
| I-MCNICA | 8/20/2010 | INV20475 | | $ 1,054.00 | | | | $ 1,054.00 | | | | | | | | | $ - | $ 1,054.00 |
| | | | | $355,831.00 | | | $45,084.00 | $320,737.00 | | | | | | | | | $17,785.75 | $302,951.25 |

Page 1 of 1

CONFIDENTIAL

RMI 009160

A0673

00927

# PROOF OF SERVICE OF DOCUMENT

In re Mega RV Corp. - 8:14-bk-13770-MW

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **333 S. Grand Avenue, Suite 2100, Los Angeles, CA 90071**

A true and correct copy of the foregoing document entitled (specify):   **ROADTREK'S OBJECTION TO DISCLOSURE STATEMENT**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) **7/13/2015**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Robert P Goe on behalf of Debtor Mega RV Corp., a California Corporation - kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Elizabeth A Lossing, Attorney for Trustee - elizabeth.lossing@usdoj.gov
- James Behrens, Attorney for Creditor Committee - jbehrens@greenbergglusker.com, jreinglass@ggfirm.com; kwoodson@ggfirm.com; sgaeta@ggfirm.com; calendar@ggfirm.com

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (date) **7/13/2015,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) **7/13/2015**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Hon. Mark S. Wallace
U.S. Bankruptcy Court, Central District of California
411 West Fourth Street
Suite 6135 / Courtroom 6C
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 7/13/2015 | Cathy Perez | /s/ Cathy Perez |
|---|---|---|
| Date | Printed Name | Signature |

1

**PROOF OF SERVICE**

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

PAS01\854129.1
ID\GKJ - 110932\0001

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

### MEGA RV CORP., A CALIFORNIA CORPORATION
8:14-bk-13770-MW

### TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):

- Michelle M Bertolino on behalf of Interested Party Portland Local #8 FCU - mbertolino@fwwlaw.com, dgeorge@fwwlaw.com
- Ryan S Carrigan on behalf of Interested Party Courtesy NEF - rscarriganecf@gmail.com, rscarriganlaw@gmail.com
- Louis S Chronowski on behalf of Interested Party Courtesy NEF - lchronowski@dykema.com
- Donald H Cram, III on behalf of Creditor Ally Financial, Inc. - dhc@severson.com, jc@severson.com
- Donald H Cram, III on behalf of Creditor BANK OF AMERICA - dhc@severson.com, jc@severson.com
- Brian L Davidoff on behalf of Creditor Committee Greenberg Glusker Fields Claman & Machtinger LLP - bdavidoff@greenbergglusker.com, kwoodson@greenbergglusker.com; calendar@greenbergglusker.com; jking@greenbergglusker.com
- Vincent W Davis on behalf of Interested Party Courtesy NEF - v.davis@vincentwdavis.com, mary@vincentwdavis.com;e.bershatski@vincentwdavis.com
- Rennee R Dehesa on behalf of Interested Party Elva M. Ayala - rdehesa@rstlegal.com, alopez@rstlegal.com
- Andrew S Elliott on behalf of Interested Party Courtesy NEF - ase@severson.com, pag@severson.com
- Lauren N Gans on behalf of Creditor Winnebago Industries, Inc. - lgans@shensonlawgroup.com
- Duane M Geck on behalf of Interested Party Courtesy NEF - dmg@severson.com, pag@severson.com
- Janel M Glynn on behalf of Creditor Western Alliance Bank - janel.glynn@gknet.com, rachel.milazzo@gknet.com
- Robert P Goe on behalf of Debtor Mega RV Corp., a California Corporation - kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Richard H Golubow on behalf of Creditor Edward Steve Banas and Sandra Weinrub Banas, individually and as Trustee of the Banas Family Trust - rgolubow@winthropcouchot.com, pj@winthropcouchot.com; corbin@winthropcouchot.com
- Richard H Golubow on behalf of Creditor Old Ranch Properties, LLC - rgolubow@winthropcouchot.com, pj@winthropcouchot.com;vcorbin@winthropcouchot.com
- Gregory K Jones on behalf of Creditor Arrowhead Central Credit Union - GJones@dykema.com, CPerez@dykema.com
- Gregory K Jones on behalf of Creditor Roadtrek Motorhomes, Inc. - GJones@dykema.com, CPerez@dykema.com
- John H Kim on behalf of Creditor Santander Consumer USA Inc. - jkim@cookseylaw.com
- John H Kim on behalf of Creditor Santander Consumer USA, Inc., an assignee of GE Capital Consumer Card Co. - jkim@cookseylaw.com
- John H Kim on behalf of Creditor Santander Consumer USA, Inc., an assignee of GEMB Lending Inc. - jkim@cookseylaw.com
- John H Kim on behalf of Creditor Santander Consumer USA, Inc., servicer for E*Trade Consumer Finance Corporation as assignee of Thor Credit Corp - jkim@cookseylaw.com

2
**PROOF OF SERVICE**

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

- Andrew B Levin on behalf of Creditor Edward Steve Banas and Sandra Weinrub Banas, individually and as Trustee of the Banas Family Trust - alevin@winthropcouchot.com, bayrelevin@hotmail.com;pj@winthropcouchot.com;mconour@winthropcouchot.com
- Andrew B Levin on behalf of Creditor Old Ranch Properties, LLC - alevin@winthropcouchot.com, bayrelevin@hotmail.com; pj@winthropcouchot.com; mconour@winthropcouchot.com
- Erica T Loftis on behalf of Interested Party Courtesy NEF - bknotice@rcolegal.com
- Elizabeth A Lossing on behalf of U.S. Trustee United States Trustee (SA) - elizabeth.lossing@usdoj.gov
- Melissa Davis Lowe on behalf of Interested Party Phillip and Gail Cowan - mdavis@shbllp.com, lverstegen@shbllp.com
- Marc S Mazer on behalf of Interested Party Courtesy NEF - mazer@bwmlaw.com, elizabeth@bwmlaw.com
- David W. Meadows on behalf of Interested Party Portland Local #8 FCU - david@davidwmeadowslaw.com
- Joel S. Miliband on behalf of Debtor Mega RV Corp., a California Corporation - jmiliband@brownrudnick.com
- Scott Montgomery on behalf of Interested Party V.S.M., A Minor - smontgomery@abbeylaw.com, ldabbs@abbeylaw.com
- Gerard W O'Brien on behalf of Creditor James McConnell - gerardwobrien@gmail.com, missjanperalta@gmail.com
- Gerard W O'Brien on behalf of Creditor Lorraine McConnell - gerardwobrien@gmail.com, missjanperalta@gmail.com
- Barry L O'Connor on behalf of Creditor STEVE BANAS AND SANDY BANAS EXECUTORS OF THE BANAS FAMILY TRUST - udlawBK@aol.com
- Aram Ordubegian on behalf of Interested Party Courtesy NEF - ordubegian.aram@arentfox.com
- Courtney E Pozmantier on behalf of Creditor Committee Greenberg Glusker Fields Claman & Machtinger LLP - cpozmantier@greenbergglusker.com, kwoodson@greenbergglusker.com; jking@greenbergglusker.com; calendar@greenbergglusker.com
- Yuval M Rogson on behalf of Creditor U.S. Bank National Association - yuval@rogsonlaw.com, yrogson@hotmail.com
- Gregory M Salvato on behalf of Interested Party Courtesy NEF - gsalvato@salvatolawoffices.com, calendar@salvatolawoffices.com; jboufadel@salvatolawoffices.com
- Allan D Sarver on behalf of Creditor Gary Collins - ADSarver@aol.com
- Kenneth Schnur on behalf of Interested Party Courtesy NEF - schnur@bwmlaw.com, elizabeth@bwmlaw.com
- Summer Shaw on behalf of Creditor Lewis & Patricia E Minard - hanlaw@aol.com
- Jonathan Shenson on behalf of Interested Party Jonathan Seligmann Shenson - jshenson@shensonlawgroup.com
- Arash Shirdel on behalf of Creditor Traveland International, LLC - ashirdel@pacificpremierlaw.com, ECF@pacificpremierlaw.com
- Ramesh Singh on behalf of Interested Party Recovery Management Systems Corporation - claims@recoverycorp.com

3

**PROOF OF SERVICE**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

- Wayne R Terry on behalf of Creditor GE Commercial Distribution Finance Corporation - wterry@hemar-rousso.com
- United States Trustee (SA) - ustpregion16.sa.ecf@usdoj.gov
- Danielle K Wakefield on behalf of Interested Party Courtesy NEF - dwakefield@bplawgroup.com, danielle@wakefieldlawfirm.com
- Sam S Yebri on behalf of Interested Party ARBOGAST BUICK, PONTIAC, GMC INC. - syebri@mylawllp.com
- Mark Andrews on behalf of Wells Fargo Bank – Sandra.g.memasters@wellsfargo.com
- Adam N. Barasch on behalf of Bank of America – anb@severson.com, dgl@severson.com
- James C. Bastian on behalf Interested Party – jbastian@shbllp.com
- Alex L. Benedict on behalf of Traveland International – bkinfo.ablaw@gmail.com, alexbenedict2000@yahoo.com
- Mark S. Blackman on behalf of Creditor Bank of the West – Mblackman@AlpertBarr.com
- J. Scott Bovitz on behalf of U.S. TelePacific Corp. – bovitz@bovitz-Spitzer.com
- Keith Butler on behalf of Universal Underwriters Ins. Co. – kbutler@fgppr.com
- Frank Cadigan on behalf of U.S. Trustee – frank.cadigan@usdoj.gov
- M. Douglas Flahaut on behalf of Altman Colton Properties – flahaut.douglas@arentfox.com
- Matthew A. Gold on behalf of Argo Partners – courts@argopartners.net
- Andy Kong on behalf of Altman Colton Properties – Kong.Andy@Arentfox.com
- Nancy Lee on behalf of Interested Party – bknotice@rcolegal.com, nlee@rcolegal.com, RCO@ecf.inforuptcy.com
- Craig Millet on behalf of Creditor Forest River – cmillet@gibsondunn.com, pcrawford@gibsondunn.com, cmillett@gibsondunn.com
- Christopher Minier on behalf of Four Winds – becky@ringstadlaw.com
- Nicholas E. Mitchell on behalf of Logix Federal Credit Union – nmitchell@lfcu.com
- R.G. Pagter on behalf of Dale Carson – Gibson@ppilawyers.com, ecf@ppilawyers.com
- Holly Roark on behalf of Anthony J. LaPonza & Patricia LaPonza – holly@roarklawoffices.com, G2978@notify.cincompass.com
- Gregory E. Robinson – ger@rrlawyers.com
- Jonathan Shenson on behalf of Jonathan Seligmann Shenson – jshenson@shensonlawgroup.com
- Arjun Sivakumar on behalf of Mega RV Corp – asivakumar@brownrudnick.com
- Sam X J Wu on behalf of Hong Jun Alice Fu – wuefile@yahoo.com

4

**PROOF OF SERVICE**